# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 3:19-cr-083-M-1 |
| | ) Judge Barbara M. Lynn |
| RUEL M. HAMILTON | ) |

**DECLARATION OF REGINA FRANK TURNER**

Pursuant to 28 U.S.C. § 1746, I make the following declaration:

1. I am a lifelong resident of Dallas, Texas. I was formerly the volunteer assistant to Dr. Jerry Chambers, who passed away in April 2015. Dr. Chambers was a long-time Dallas educator, who worked as a teacher for the Dallas Independent School District for forty years. Dr. Chambers was deeply involved in his community and had a life-long dream of organizing educational tours for DISD high school students to learn about the history of the American civil rights movement.

2. The first tour was scheduled for November of 2013. This trip was a re-creation of the 1963 "Freedom Rides." The trip was centered around the historic 1963 events, including the bombing of the 16th Street Baptist Church in Birmingham, Alabama. DISD high school seniors were invited to submit an essay relating to the civil rights movement, and Dr. Chambers and I reviewed the essays, and selected approximately 30 students for the trip. As the date for the trip approached, we still had not been able to raise sufficient funds to pay for the trip, and it looked like it might not be able to happen. Ruel Hamilton generously stepped up to the fund the trip through a donation to the Martin Luther King Center, which handled the funds for this initial trip. Dr. Chambers was so thrilled and grateful that he invited Mr. Hamilton to come to the send-off and speak to the students on the bus, so the students could meet the person who made the trip possible. Mr. Hamilton gave an inspiring speech to the students, and I was moved by his generosity and his genuine interest in the value of this educational opportunity.

3. I do not personally know Mr. Hamilton well, but am aware of his good reputation in the community as a generous supporter of educational and civil rights causes.

4. Three more trips occurred prior to Dr. Chambers's death. In September 2014, we took a trip to Washington, DC to visit the White House, marking the 50th anniversary of President Lyndon B. Johnson signing the Civil Rights Act. We also took the students to meet with the Congressional Black Caucus. Mr. Hamilton made critical donations to support this trip.

5. In November 2014, we took students on a third trip, a three-state tour to study the legacy of Dr. Martin Luther King, Jr. Mr. Hamilton made critical donations to support this trip.

1

6. In March 2015, we took students on the fourth and final educational tour, to re-create the "Bloody Sunday" trip across the Edmund Pettis Bridge along with President Obama, Congressman John Lewis, and many other prominent Civil Rights Leaders. There were over 60 students plus chaperones. Mr. Hamilton made critical donations to support this trip as well.

7. I personally attended each of these trips, along with two of my daughters, and I have personal knowledge that Ruel Hamilton's donations went to fund each of these trips.

8. After the first trip, Councilwoman Carolyn Davis connected Dr. Chambers to a non-profit organization called Hip Hop Government, which was run by a man named Jeremy Scroggins, for the purpose of helping with fundraising for future trips. I did not know Jeremy Scroggins, but I had heard of Hip Hop Government relating to their work in southern Dallas over the years. I have known Carolyn Davis for many years from her tenure on the Dallas City Council, and before from her long history of advocacy in her community.

9. We were told that Hip Hop Government would be able to more effectively help raise funds for these trips, because of its notoriety and stature (it had previously been on the Oprah Winfrey show and received other positive publicity) and because Hip Hop Government had some sort of formal relationship with the City of Dallas as a representative for a southern Dallas Public Improvement District (PID). We were also told that Hip Hop Government could potentially get funds from the Dallas City Council to help pay for these trips, which it in fact later did.

10. When it came time for the second trip, which occurred in September 2014, Mr. Hamilton was again contacted to help sponsor the trip, and he generously agreed to do so. Mr. Hamilton initially made checks out to the Martin Luther King center, as he had for the first trip. However, we contacted Mr. Hamilton and asked him to replace the checks to the Martin Luther King Center with checks to Hip Hop Government, since that was now the entity that would be handling the funds for the trip.

11. I recall that on multiple occasions that Mr. Hamilton had given us checks made out to the Martin Luther King Center that we had to return, requesting that they be replaced by checks to Hip Hop Government. I remember this for several reasons. One, I was the person who was personally responsible on behalf of Dr. Chambers for helping to keep track of the finances relating to the trips. I also remember this because Mr. Hamilton was the largest individual sponsor of the trips, and repeatedly provided funding without which the trips would not have occurred.

12. This fact stands out in my mind, because when I read in the newspaper that Mr. Hamilton was being accused of paying bribes to Carolyn Davis through what were being called sham donations to Hip Hop Government, the public allegations against Mr. Hamilton did not make any sense, and the allegations did not match the facts I had personal knowledge of. It doesn't make sense that Mr. Hamilton would be writing checks to the Martin Luther King center, which we sent back and requested the checks be made out to Hip Hop

2

12. (cont.) Government, if he believed the funds were going to something other than the educational tours. I have personal knowledge that the funds from Mr. Hamilton did in fact go to pay for the civil rights tours. I know this because Hip Hop Government had provided us with documentation showing the sources of the donations, and I was responsible for maintaining those records on behalf of Dr. Chambers.

13. Prior to the final educational trip in March 2015, Dr. Chambers had been diagnosed with pancreatic cancer. On the last trip, Dr. Chambers contracted pneumonia, and he knew that he did not have long to live. Dr. Chambers and I had a meeting with Jeremy Scroggins and Carolyn Davis to discuss how Dr. Chambers wanted the trips to continue after his passing. Dr. Chambers said that he knew there were funds remaining that could pay for at least one more educational tour. Jeremy Scroggins said there was no money, but this did not add up with our own records. Carolyn Davis appeared surprised that there was no money left.

14. Dr. Chambers and I were furious. After discussing this at length with Dr. Chambers, and learning more information about Jeremy Scroggins's criminal history and reputation for defrauding people, Dr. Chambers agreed that I could take the story to the news media. We were both very upset that someone would steal money that was donated to educate children. The funds stolen included funds provided by the City of Dallas. I provided documentation regarding the theft of charitable funds to a local investigative reporter, who agreed to cover the story and scheduled on interview. On the morning of the scheduled interview, Dr. Chambers passed away. I canceled the interview and then unfortunately never followed up.

15. When I saw the news reports about Mr. Hamilton being accused of a crime for his generosity, I knew the accusations were not true. I went and looked for the documentation I had previously compiled, but I could not find it, since many years had now passed.

16. I spoke to Carolyn Davis on numerous occasions after her plea. Carolyn repeatedly told me she was feeling very bad because Ruel Hamilton was a good guy and didn't do anything wrong, and that she felt she needed to figure out how to reverse her plea to set the record straight. Carolyn further told me that if called to testify, she would say that Mr. Hamilton did not do anything wrong and never intended to pay her any bribes.

17. While I did not want to get involved in a high-profile criminal case, it was eating me up knowing that Mr. Hamilton had been falsely accused. My husband was scheduled for a surgery in California, and I decided that prior to surgery I had to get this off my conscience. In June 2019, I contacted Ruel Hamilton directly and requested a meeting to explain what I knew. Mr. Hamilton put me in contact with his lawyers.

18. While I was in California, in early July 2019, a few days before her untimely death, I spoke with Carolyn Davis by telephone. Carolyn Davis again told me that she knew that Mr. Hamilton had not done anything wrong, and that she felt terrible that her plea was being used to smear his name. Carolyn Davis told me that she had told the FBI investigators that Ruel Hamilton had no idea that funds were being diverted, and that he believed he was supporting a good cause. Carolyn Davis told me that she was going to reverse her plea. Carolyn Davis told me that she felt terrible for Mr. Hamilton, and that he was a good man

who had generously supported many different charitable causes over the years, which he continued to do long after Carolyn left the Dallas City Council. Carolyn Davis told me that Ruel Hamilton had not bribed her to do anything, and had not done anything wrong, that he believed he was supporting charitable causes, and that was what she would testify to at trial. Carolyn Davis told me she could not get on the stand and lie and say that Mr. Hamilton had bribed her, and was not going to do so.

19. Carolyn Davis told me that she had pled guilty because she had been intimidated by the prosecutors' threats of a long prison sentence, and that she didn't know who would take care of her daughter, who suffered from mental illness, if she had to go to prison, and that when the prosecutors had offered the possibility of a short sentence or even probation, she felt she had no choice to accept. Carolyn Davis made clear to me that she never told the FBI or prosecutors that Ruel Hamilton had done anything wrong, and she was upset that prosecutors were using her plea to suggest that Mr. Hamilton had done anything wrong.

20. I am making this declaration of my own free will because I know that Carolyn had wanted to set the record straight, and I want her to rest in peace.

21. If these issues had been raised back near the time, I could have provided additional documentation regarding Ruel Hamilton's innocence. However, many years have passed, and I am no longer able to locate any documents despite my best efforts.

22. Of course, I wish this had all been brought up while Dr. Chambers was still alive, God rest his soul, as he also could have provided testimony and documents as well to prove Mr. Hamilton's innocence and to set the record straight. Dr. Chambers would certainly be very upset to know that Mr. Hamilton so many years later was being accused of wrongdoing over his generous charitable donations that directly supported life-changing educational events for so many students who would not have otherwise had such an opportunity.

23. <u>I declare under penalty of perjury that the foregoing is true and correct.</u>

Executed on this 7 day of August 2019.

Regina F. Turner
[signature]

[print full name]

4