IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:19-cr-083-M |
| | ) | Chief Judge Barbara M.G. Lynn |
| RUEL M. HAMILTON | ) | |

# MR. HAMILTON'S MOTION TO DISMISS
# DUE TO PRE-INDICTMENT DELAY

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 24114011TX
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

## TABLE OF CONTENTS

                                  **Page**

INTRODUCTION ............................................................................................................................. 1

ARGUMENT .................................................................................................................................... 3

I.      THE INDICTMENT SHOULD BE DISMISSED BECAUSE PRE-INDICTMENT
        DELAY HAS CAUSED ACTUAL AND SUBSTANTIAL PREJUDICE ........................ 3

        A.      The Government Engaged In Significant Pre-Indictment Delay…………………..6

        B.      Mr. Hamilton Is Substantially Prejudiced By the Pre-Indictment Delay………….7

        C.      The Government's Delay Was For An Impermissible Purpose……………...….8

CONCLUSION ............................................................................................................................... 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Howell v. Barker*, 904 F.2d 889 (4th Cir. 1990) ................................................................5

*Sherman v. United States*, 356 U.S. 369 (1958) ................................................................8

*Sorrells v. United States*, 287 U.S. 435 (1932) .................................................................8

*State ex Rel. Knotts v. Facemire*, 223 W. Va. 594 (W. Va. 2009) ....................................5

*United States v. Crouch*, 84 F.3d 1497 (5th Cir. 1996) ................................................ 4- 6

*United States v. Gulley*, 526 F.3d 809 (5th Cir. 2008) ......................................................5

*United States v. Lovasco*, 431 U.S. 783 (1977) ........................................................ 3- 5, 9

*United States v. Marion*, 404 U.S. 307 (1971) ............................................................. 3- 4

*United States v. Theagene*, 565 F.3d 911 (5th Cir. 2009) .................................................9

**Other Sources**

Fed. R. Cr. P. 12(b)(3)(A)(ii) ..............................................................................................3

U.S. Const., art. II, §3 (1789) ............................................................................................10

**INTRODUCTION**

The government brings this case in the name of prosecuting government corruption, but the crimes alleged occurred only because of the government's toleration of public corruption and conscious decision to allow this conduct to occur. The government decided that Dallas City Councilmembers Carolyn Davis and Dwaine Caraway were corrupt, but the government actively encouraged them to continue to abuse their positions (in some cases for years) hoping to see if they could ensnare others. With respect to Mr. Hamilton, Davis solicited charitable donations to fund the Freedom Rides and Caraway solicited charitable assistance for medical expenses for his elderly mother and his own bout with cancer, yet the government treats those charitable solicitations as solicitations by Davis and Caraway to commit new crimes, made possible only because the government did not prosecute Davis and Caraway sooner, once the government determined they were corrupt government officials.

As early as November 2014, the government determined that Councilmember Davis was corrupt, but the government allowed her to finish out her term in June 2015. The charge in the Indictment concerning Davis involves activities from early 2015, which were not indicted until February 2019 (nearly four years after Davis left office). In the intervening period, the government also decided that Councilmember Caraway was corrupt, but they did not arrest him right away either. Instead, they wired him up in an effort to have him – a corrupt public official – initiate some sort of new crime through the shakedown of a Dallas citizen, so that it could charge the citizen with bribery if he agreed to the public official's plea for someone he knew well to help his sick mother and his own fight with cancer.

Caraway's supposedly corrupt meeting with Mr. Hamilton is recorded, and it apparently did not go as the government expected. First, Mr. Hamilton asked for the meeting to seek Caraway's support for a ballot initiative that would expand paid-medical leave in Dallas – an issue

close to Mr. Hamilton's heart as a cancer survivor, but not an issue that would benefit him financially (as an employer it would impose new legal requirements upon him). As Mr. Hamilton already knew, Caraway would support the measure because it would be good for his constituents and Caraway's re-election campaign. There was no discussion of a *quid pro quo*. Second, it was Caraway (obviously playing out a script), not Mr. Hamilton who raised the prospect of some sort of "quo" with respect to their shared desire to rehabilitate a blighted area on 11th Street, but no concrete development proposal is ever suggested or made by either of them, and the meeting ended without a specific "quo" for Caraway to support. And third, even when Caraway does initiate requests for money from Mr. Hamilton – he actually begs for charity after pleading about needing to pay medical bills for his mother and his own graphically-described fight with cancer – he never conditions taking any official act on Mr. Hamilton's behalf upon receipt of this money. There was no request for a *quid pro quo*, merely a request for charity, which Mr. Hamilton provided. Regardless of the government's efforts to manufacture a crime here, it has failed to create anything more than a sympathetic response to a plea for medical help from someone coached to follow a government-created script.

The government's pre-indictment delay was not only for this improper purpose of allowing corrupt public officials to continue to commit crimes, it also severely prejudiced Mr. Hamilton's defense in violation of the Fifth Amendment. The allegations involving Davis do not concern an actual crime either, but the government's pre-indictment delay has made that more difficult to prove. Councilmember Davis had solicited Mr. Hamilton's financial support for Dallas school children to attend the Freedom Rides, retracing the steps of the civil rights movement's freedom rides of the 1960s, which would be funded through donations made to a 501(c)(3) charity, Hip Hop Government. While the Freedom Rides did occur, the government claims that Davis and Hip

Hop Government's founder, Jeremy Scroggins, looted the charity of the remaining funds. The government even claims that some part of Mr. Hamilton's payments to Hip Hop Government were intended as bribes to Davis, and that is the basis for Count 1 of the Indictment. This charge is groundless, but the government's excessive four-year pre-trial delay has denied Mr. Hamilton the ability to call the most important witness to his defense – Davis herself, who died on July 16, 2019 – and other exculpatory evidence has been lost.

Although Davis had pled guilty to soliciting bribes from Mr. Hamilton, before her death Davis emphatically told at least four people that she would testify that Mr. Hamilton had not bribed her or done anything wrong, and that he was a good man who believed all of his donations were going to charity. Davis explained that the government had threatened her with a long jail sentence that would have prevented her from caring for her disabled daughter, which is why she had pled guilty, but that she regretted that decision and would seek to change her plea to not guilty. (*See* STA Mot. To Dismiss Exs. A-C.) Putting aside how the government plans to make a case without Davis to testify to their theory of a corrupt agreement or a *quid pro quo*, Mr. Hamilton has every reason to believe that her testimony would actually prove him innocent. There is no recording where the required corrupt agreement is discussed or made, and the loss of this critical witness to the defense, as a result of the government's improper pre-trial delay, necessitates the dismissal of the Indictment in accordance with the Fifth Amendment.

**ARGUMENT**

I. **THE INDICTMENT SHOULD BE DISMISSED BECAUSE PRE-INDICTMENT DELAY HAS CAUSED ACTUAL AND SUBSTANTIAL PREJUDICE**

The Supreme Court has made clear that "the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial." *United States v. Marion*,

3

404 U.S. 307, 324 (1971); *see* Fed. R. Cr. P. 12(b)(3)(A)(ii) (addressing motions to dismiss for "preindictment delay"). In particular, the Due Process Clause of the Fifth Amendment safeguards against excessive and unnecessary pre-indictment delay so "that the parties shall not suffer by loss of evidence from death or disappearance of witnesses, destruction of documents, or failure of memory." *Id.* at 322 n.14 (citation omitted). "[P]roof of actual prejudice makes a due process claim concrete and ripe for adjudication," *United States v. Lovasco*, 431 U.S. 783, 789 (1977), which is the case here given the death of Davis and the substantial prejudice from the loss of her valuable testimony.

The next step in the legal analysis, however, is less clear and has divided the lower courts because, since *Marion*, the Supreme Court has explained, "so few defendants have established that they were prejudiced by delay that neither this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay." *Id.* at 796-97. Thus, the Supreme Court has not "determine[d] when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution." *Marion*, 404 U.S. at 324. The Supreme Court's guidance has been fairly limited since *Marion*'s observation: "To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case." *Id.* at 325. The Court's subsequent decision in *Lovasco* merely clarified that delay due to legitimate investigatory activities would not be grounds for dismissal. *Lovasco*, 431 U.S. at 795-96.

The line at which pre-indictment delay has gone so far as to necessitate the dismissal of an indictment is less clear. Even "the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that

4

the delay was an intentional device to gain tactical advantage over the accused." *Marion*, 404 U.S. at 324. The government has further conceded that pre-indictment delay made with "reckless disregard" to the risk that delay could impair the defense may constitute a due process violation. *Lovasco*, 431 U.S. at 795 n.17. While the government concession, which the Supreme Court has "noted with approval," *id.*, helps identify circumstances that are beyond the constitutional line, where that line itself must be drawn is less clear.

The Fifth Circuit has noted that the Supreme Court precedent is not "crystal clear" as to whether the due process test merely requires a balancing of the prejudice from the delay against the government's reasons for the delay, or whether some sort of bad faith on the part of the government is required. *United States v. Crouch*, 84 F.3d 1497, 1510 (5th Cir. 1996) (en banc). Nevertheless, the Fifth Circuit has determined that "dismissal for pre-indictment delay requires an appropriate showing not only of prejudice but also that the prosecution purposely delayed the indictment to gain tactical advantage or for other bad faith purpose." *Id.* at 1500; *see id.* at 1512 (requiring a showing that delay was "intentionally caused by the prosecution to gain a tactical advantage over the defendant or for some other bad purpose"). Thus, the law of the circuit is now clear that "for pre indictment delay to violate the due process clause it must not only cause the accused substantial, actual prejudice, but the delay must also have been intentionally undertaken by the government for the purpose of gaining some tactical advantage over the accused in the contemplated prosecution or for some other impermissible, bad faith purpose." *United States v. Gulley*, 526 F.3d 809, 820 (5th Cir. 2008) (internal quotations and citations omitted).

Mr. Hamilton believes the better view is reflected by "the Fourth and Ninth Circuits [which] rely instead on a balancing test approach that weighs the actual prejudice demonstrated by a defendant against the government's reasons for delay." *State ex rel. Knotts v. Facemire*, 223 W.

5

Va. 594, 601 (W. Va. 2009) (adopting this position); *see Howell v. Barker*, 904 F.2d 889, 891, 895 (4th Cir. 1990) (affirming dismissal following 2 years and 4 months of pre-indictment delay where government's excuse for delay was "mere convenience"). Nevertheless, regardless of which test is applied, the result here would be the same. The government's pre-indictment delay violated the Due Process Clause, which necessitates the dismissal of the Indictment.

### A. The Government Engaged In Significant Pre-Indictment Delay

After clearly determining that it had a case against Davis and others (including Mr. Hamilton), the government delayed indicting Mr. Hamilton for nearly four years. The government's investigation into Davis began as early as November 2014. Throughout the course of the investigation, the government collected countless hours of telephone-wiretap recordings and in-person wire recordings. These recorded conversations between Davis, confidential informants, and undercover agents led the government to conclude that Davis was a corrupt public official, nevertheless the government did not expose her corruption and allowed her to complete her term in office in June 2015. Indeed, the government would not indict her until nearly four years *after* she had left office, on February 27, 2019. This delay is unfathomable.

The alleged activity that forms the basis of Mr. Hamilton's Indictment occurred in February 2015, and the government's investigation as it relates to Davis and Mr. Hamilton was largely complete by April 2015. The government alleges that Mr. Hamilton paid Ms. Davis "to lobby for and vote in favor of one of Hamilton's housing projects" in early 2015. (Indict. ¶¶6-10.) The government further alleges that Mr. Hamilton provided a cash payment to Ms. Davis in April 2015 in furtherance of the alleged scheme. (*Id.* ¶9.) The government relies on recorded conversations between Davis and Mr. Hamilton during this time period to support its allegations. However, the

6

government did not indict Mr. Hamilton at this time and instead intentionally delayed seeking an indictment until February 2019 (unsealed in March 2019) – nearly four years later.

### B. Mr. Hamilton Is Substantially Prejudiced By the Pre-Indictment Delay

In *Crouch*, the Fifth Circuit acknowledged that the death of witnesses may cause the sort of substantial prejudice that may warrant dismissal of an indictment for pre-indictment delay, but it engaged in careful analysis of what each deceased witness knew and could have testified about in order to determine whether their loss was substantially prejudicial. 84 F.3d at 1520 (explaining the lack of proof that any of the deceased witnesses had anything favorable to testify about). Here, that evidence is overwhelming.

As noted in Mr. Hamilton's Speedy Trial Act motion, Davis told at least four witnesses before her death that she regretted allowing the government to intimidate her into pleading guilty, that she intended to change her plea, and – most importantly – that she would testify that Mr. Hamilton was innocent. She would testify that Mr. Hamilton had not bribed her and that he is a good man, who wrote checks to Hip Hop Government to support the charitable freedom Ride tours for Dallas school children. (STA MTD at 20-21.) The loss of this testimony constitutes substantial prejudice, which cannot be replicated, and it is equally subject to consideration in the pre-indictment delay context.

Additionally, Regina Turner explains that she had been the assistant to Dr. Chambers, who organized the participation of the Dallas school children in the Freedom Rides, and that she helped keep track of the finances for the trips. (Ex. B. ¶11.) She recalled that Mr. Hamilton was the largest individual sponsor of the trips, and that she had personal knowledge from the documentation that Mr. Hamilton's money was in fact used to fund the trips. (*Id.* ¶¶11-12.) Turner explained that prior to the final Freedom Ride in March 2015, she and Dr. Chambers confronted

Jeremy Scroggins, the founder of Hip Hop Government, and learned that he had stolen enough money to fund another trip. (*Id.* ¶¶13-14.) Turner had compiled the documentation to prove the fraud and was prepared to go to the media, when Dr. Chambers died in April 2015. (*Id.* ¶14.) Her desire to have a corroborating witness was impossible. When she saw the news of Mr. Hamilton's Indictment, Turner explained that she looked for this exculpatory evidence and could not find it, and she explains that she would have had the documentation if the government had prosecuted the case sooner. (*Id.* ¶15, 21.) Given that the government had determined that Davis was corrupt in late 2014, and Turner had the exculpatory evidence at least as late as April 2015, this exculpatory evidence would have been available had Mr. Hamilton been diligently prosecuted.

To be sure, Turner is available to testify as to her memory of those events four years ago, but a jury would find her testimony more credible if it is independently corroborated by the documentary evidence. The loss of that documentary evidence substantially prejudices Mr. Hamilton's ability to prove that his payments were legitimate charitable contributions, and not bribes.

   **C. The Government's Delay Was For An Impermissible Purpose**

"The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States*, 356 U.S. 369, 372 (1958). "The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it." *Sorrells v. United States*, 287 U.S. 444 (1932) (internal quotation omitted). Nevertheless, the government intentionally chose not to prevent crime. The government believed that Davis was a corrupt public official, but it allowed her to complete her term and, even then, delayed another four years before prosecuting her. Likewise, the government believed Caraway was a corrupt public official, but it did not arrest him right away either. Instead, the

8

government sought to have both Davis and Caraway stay on as public officials and actively solicit conduct that the government now characterizes as crimes.

With respect to Davis, the government had completed a sting operation that had snagged her before she ever solicited any money from Mr. Hamilton for charity. But the government let her stay on the Dallas City Council, where people with city-related business, including Mr. Hamilton, would have to deal with her. Although the government characterizes what happened here as Davis shaking Mr. Hamilton down for money, rather than soliciting charity, the government's behavior is improper. The public corruption laws exist to rid governments of corrupt officials, and the government believed Davis was corrupt but allowed her to complete her term so that they could watch her instigate more crimes and see if others would join her.

The situation with Caraway is even worse. After it had the evidence to convict him, rather than promptly arrest him, the government wired Caraway up to solicit money from Mr. Hamilton. It is well known that Mr. Hamilton nearly died and is still debilitated from a long ordeal with cancer, and that he is a soft-touch for anyone seeking charity to deal with an illness. Indeed, it was that desire to help sick people and their families that led Mr. Hamilton to approach Caraway about getting a paid medical leave initiative on the ballot – the very issue for which Mr. Hamilton called and sought to meet with Caraway.

Mr. Caraway was on the phone with his ailing mother discussing her health care bills when he met Mr. Hamilton, Caraway then graphically explained his own battle with cancer (bleeding from his rectum), and complained that he cannot cover his or his mother's mounting medical costs. Only after Caraway repeatedly asks for charity does Mr. Hamilton give in and write the check – without anything offered in return – and the government wants to recharacterize that as a bribe. Moreover, it is clear from the recordings that Mr. Hamilton was concerned only with his desire to

have a paid sick leave initiative voted upon. It was Caraway (obviously being prompted by the government) to raise the idea of some sort of private project to rehabilitate a blighted part of 11th Street, which Caraway knew he and Mr. Hamilton both wanted to see developed in some way. Even then no concrete proposal or any sort of official act by Caraway is discussed.

Not only is this yet another example of the government not stopping public corruption, and leaving a corrupt public official in place so that he can instigate more of what the government calls crimes, the conduct here is particularly inappropriate. Even in sting operations, the government cannot make "pleas based on need, sympathy, or friendship," or to take "actions designed specifically to take advantage of the defendant's weaknesses." *United States v. Theagene*, 565 F.3d 911, 922 (5th Cir. 2009) (internal quotations omitted). That is precisely what the government did here.

The government delayed its prosecution in this case so that it could leave corrupt public officials in power, depriving the people of Dallas of honest elected officials, so that it could incite those corrupt officials to go on some kind of crime spree and see who would succumb to their requests for money, often solicited on the basis of extreme medical need. That is certainly not an appropriate law enforcement function. It is a fundamental betrayal of the Executive Branch's primary obligation to "take care that the laws be faithfully executed." U.S. Const., art. II, §3 (1789)

## CONCLUSION

This Court should dismiss the Indictment against Mr. Hamilton because the government's pre-indictment delay caused him substantial prejudice and was done for improper reasons. If necessary, the Court should conduct an evidentiary hearing to substantiate the delay, the insufficient reasons for it, and the impact of the loss of evidence to Mr. Hamilton.[1]

---

[1] Hearings have often been found necessary to evaluate the government's justification for delay and the resulting prejudice. *See, e.g.*, *Crouch*, 84 F.3d at 1499; *United States v. Jordan*, 1995 WL

Dated: September 26, 2019

                            Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

---

337931, at *1 (5th Cir. May 25, 1995); *United States v. Comeaux*, 954 U.S. 255, 258 (5th Cir. 1992); *United States v. Campbell*, 1996 WL 459746, at *2 (5th Cir. July 22, 1996); *United States v. Jordan*, 1995 WL 337931, at *1 (5th Cir. May 25, 1995).

11

## CERTIFICATE OF SERVICE

I certify that on September 26, 2019, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

/S/Abbe David Lowell<br>
Abbe David Lowell