IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:19-cr-083-S |
| | ) | Chief Judge Barbara M. G. Lynn |
| RUEL M. HAMILTON | ) | |

# MR. HAMILTON'S MOTION TO DISMISS THE INDICTMENT
# FOR DUE PROCESS VIOLATIONS IN THE GOVERNMENT'S
# MANUFACTURING OF A CRIME

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

**INTRODUCTION**

The government's Indictment of Mr. Hamilton on two counts of bribery rests upon the Government's over-involvement in conduct that manufactured the supposed crimes now before the Court, in violation of Mr. Hamilton's rights under the Due Process Clause of the Fifth Amendment. The Indictment must be dismissed.

**BACKGROUND**

As Mr. Hamilton has explained elsewhere (*see* Mot. To Dismiss for Pre-Indictment Delay), this case was manufactured by the government leaving in place, and in one instance scripting, elected members of the Dallas City Council who it concluded were corrupt, with the hope that they would extort money from citizens seeking the lawful assistance of their public officials. The government then charged Mr. Hamilton with bribery when he wrote the charitable checks that these public officials asked of him. Despite these efforts, no bribery occurred, but the theory of liability advanced in the Indictment, if true, would constitute conduct that courts have ruled violates the Due Process Clause.

As early as November 2014, the government determined that Councilmember Davis was corrupt, but the government allowed her to finish out her term in June 2015, creating additional opportunities for her to interact with others who had interests before the City Council. Davis told the government that Dr. Jerry Chambers had enlisted her help in raising funds for a Freedom Ride tour, in which Dallas school children would retrace the steps of the Freedom Riders of the 1960s and learn about the civil rights movement. Davis explained that she solicited this money from Mr. Hamilton, and that he generously contributed to this charitable cause. (Davis 12/31/18 FBI 302 at 1-2.) In none of the FBI 302s that the government has turned over, does Davis ever suggest to Mr. Hamilton that these charitable donations – which she solicited from him – would be used for

1

anything other than charitable purposes or that these charitable donations were *quid pro quos* in exchange for any of her official acts.

Nevertheless, as witnesses have now recounted, Davis stated that the government intimidated her into pleading guilty and characterizing these charitable payments as bribes. Before her death, Davis told at least *four people* that she had only pled guilty because the government threatened her with a lengthy jail term in which nobody would be around to care for her handicapped daughter, that she was preparing to change her plea to not guilty, and that if called to testify she would admit that Mr. Hamilton had not bribed her or done anything wrong, he was simply being kind and charitable. (*See* STA Mot. To Dismiss Exs. A-C.).)

Manufacturing a criminal case in that manner offends any sense of justice, but even the government's version of these events is no better. The prosecutors want the Court to believe that they left a corrupt public official in place, simply to solicit new crimes by demanding bribes of citizens and ensnaring them with bribery charges when they agreed. However, the discovery reveals that is not what happened. Nobody claims there was anything inherently wrong in asking Davis or any Member of the City Council for assistance in matters before the City Council, especially those that would improve the lives of people in Dallas. But, in the prosecutors' telling, they had Davis refuse to provide a citizen like Mr. Hamilton with her honest services unless he succumbed to her extortionate demands for money – the claim made in her apparently coerced and false guilty plea. Manufacturing bribery cases through such government-sponsored shake-downs by corrupt public officials is no better than coercing witnesses to giving false testimony. Both equally involve government over-involvement that violates the Constitution.

The charges concerning Councilmember Dwayne Caraway are just as flawed. It is common knowledge (and surely Caraway knew) that Mr. Hamilton remains debilitated and nearly

died from cancer, and that it has left him sensitive about helping others struggling with cancer and other serious illnesses. Indeed, that is why Mr. Hamilton was reaching out to Caraway in the first place – to help get a referendum in favor of paid medical leave on the ballot.

Caraway postponed that meeting with Mr. Hamilton until the government, who had already caught Caraway in serious illegal conduct having nothing to do with Mr. Hamilton, could have the meeting wired up to be videotaped and audio recorded, and give him a script to use. The meeting began with Caraway in Mr. Hamilton's earshot on the phone with his elderly mother discussing her health and the need to pay her medical bills. Caraway and Mr. Hamilton then discussed the reason Mr. Hamilton had asked for the meeting – Mr. Hamilton's request for Caraway's assistance in getting the City Council to place paid medical leave on the ballot. Mr. Hamilton knew Caraway supported paid medical leave, that it would be good for his constituents, and that his support would be good for his re-election campaign. Paid medical leave supporters thought they had nearly double the signatures they needed to get the initiative on the ballot by petition, but when the petition was unexpectedly found invalid, the remaining recourse was a vote of the City Council to place the initiative on the ballot.[1] Mr. Hamilton did not offer a bribe and Caraway did not suggest that one was necessary to obtain his help just to let the public vote on such a noteworthy initiative.

Mr. Hamilton encouraged Caraway to run for another term in office, and Caraway then began discussing his own poor health. Discussing his fight with cancer and the related medical bills, Caraway only then told Mr. Hamilton that he needed to find $6,200. Exasperated, Caraway tells Mr. Hamilton, that he is "[t]rying to survive," and "it's difficult," even without the campaign.

---

[1] Tristan Hallman, *Activists say they have enough signatures to put paid sick time for Dallas workers on November ballot*, Dallas Morning News (June 11, 2018), https://www.dallasnews.com/news/2018/06/11/activists-say-they-have-enough-signatures-to-put-paid-sick-time-for-dallas-workers-on-november-ballot/

3

Caraway tells Mr. Hamilton: "I'm dealing with so much shit. . . . I'm tired. I'm bleeding out my ass. . . ." Mr. Hamilton tried to reassure Caraway, telling him that he will get through this and he has people who support him.

Then, per the plan manufactured by the government, Caraway changed the subject to something he – not Mr. Hamilton – raised. Mr. Hamilton seeking Caraway's support for a paid medical leave initiative could not credibly serve as the *quo* in any bribery scheme, as nobody would have needed to bribe Caraway to help on such a popular initiative in his district, and nobody would believe that Mr. Hamilton would bribe someone to support an initiative that would not even put a penny in his pocket (as an employer, it would impose a legal obligation on him to pay for medical leave). So, the government had Caraway come up with something else.

Out of the blue, Caraway shifts the conversation to talk about a blighted area on 11th Street that he would like to see torn down and re-developed because he sees it as an "opportunity" and Caraway says the redevelopment is "important" to him. Mr. Hamilton agreed the area is blighted and said that he was interested in investing in something there because he believed it was a good opportunity, "whether I buy or whoever buys it." They then discussed the available properties and a desire for redevelopment generally, rather than any specific proposal for redevelopment, and Caraway said that he would like to help Mr. Hamilton redevelop that part of Caraway's blighted district. Again, this is Caraway's suggestion. Neither Mr. Hamilton nor Caraway proposed any specific course of action for either to take, and certainly there was no discussion of anything illegal. It was simply an unremarkable conversation in which a public official encouraged a local developer to consider some kind of unspecified redevelopment project in a blighted part of the official's district – the very sort of thing public officials should promote in the districts they serve.

4

Caraway, working to do as the government wanted, then asked again for help with medical expenses, and explained the money is "going to go pay for my mama." Recognizing that Caraway was not just discussing his medical troubles, but was hitting him up to pay for them, Mr. Hamilton tried to signal his discomfort with how this could be misinterpreted. Mr. Hamilton asked whether to make the check out to Caraway personally and how the reference on the check should be framed, "just for posterity's sake" in case "somebody's every going to ask," so that Caraway would think twice about appearances before hitting him up again. But the government manufactured this situation because of its appearances, knowing that people will always question motives when a public official receives a personal check with nothing in return, and Caraway pressed him again.

Caraway may have tried to do what the government wanted, but either the government left the *quid pro quo* out of the script of Caraway forgot to convey that message, so Caraway's request for charity is just that – it never became a request for a bribe. In other words, all this conversation reflects is that Caraway was effective in playing to Mr. Hamilton's sympathies (someone he knew well) to receive charitable assistance for his family's medical bills. There is no indication of bribery. Caraway never tells Mr. Hamilton the reason to write the check is so that Caraway will perform official acts, rather his pitch for the money was to help with medical bills for his elderly mother (conveniently on the phone when Mr. Hamilton arrived) and his own graphically-described fight with cancer. The government may believe that no good deed should go unpunished, but it is no crime to succumb to this type of plea and provide assistance to someone you have known well for a long time when they stumble on hard times and ask for medical assistance.

Again, there was no *quid pro quo* ever offered or made, and Mr. Hamilton was not even seeking anything that would benefit him personally. He was seeking help in getting an initiative voted on by the public that would require employers, like him, to provide paid medical leave.

Caraway was the one who raised the issue of needing help with medical bills, thrust money into the meeting, and characterized it as necessary for his and his mother's health. Caraway did not say that he needed this money as a bribe to support the paid medical leave ballot initiative, he said he needed it to cover medical bills and for his mother. And it was Caraway who brought up his shared desire with Mr. Hamilton to develop the blighted 11th Street area. Even then, there was no proposal to do anything in particular with 11th Street at all, much less to do something conditioned upon a bribe, and the meeting concluded without any commitment by either man to do anything with 11th Street either then or in the future.

This is not bribery, but if it were, it would be the same sort of government-manufactured shake-down it engineered with Davis. There is nothing wrong with a citizen asking a Councilmember with help in getting a ballot measure voted upon by the Council, but there is something wrong with having a corrupt public official deny that citizen his honest services unless some extortionate demand from the public official is met. The government's elaborate set-up – keeping Davis and Caraway in office after it determined they were corrupt so that they could shake-down citizens – is the type of misconduct that crosses the line and manufactures rather than investigates criminal offenses.

**ARGUMENT**

**THE GOVERNMENT'S CONDUCT VIOLATES FUNDAMENAL FAIRNESS AND THIS PROSECUTION SHOULD BE BARRED**

The Due Process Clause bars the prosecution of a defendant where the prosecution arises from fundamentally unfair government conduct. *United States. v. Graves*, 556 F.2d 1319, 1322 (5th Cir. 1977). This bar to prosecution, the outrageous government conduct defense, was first introduced by the Supreme Court in *United States v. Russell*. 411 U.S. 423, 431–32 (1973). In *Russell*, the Court revisited whether entrapment is a subjective standard—examining the

6

"predisposition" of the defendant to commit the crime—or an objective standard—examining only whether the government "instigated the crime." *Id.* at 429. In affirming the Court's previous ruling that the entrapment standard is subjective and turns on the predisposition of the defendant to commit the crime, *Sorrells v. United States*, 287 U.S. 435 (1932), the Court noted that it could "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32.

The Supreme Court thus opened the door to a bar to prosecution that is "distinct from the defense of entrapment." *United States v. Flowers*, 712 F. App'x 492, 497 (6th Cir. 2017). While entrapment focuses on the defendant by drawing "a line . . . between the trap for the unwary innocent"—who will be protected under the defense—"and the trap for the unwary criminal"—who will not be protected, *Sherman v. United States*, 356 U.S. 369, 372 (1958), "the defense of outrageous government conduct focuses on the *government's* actions," not the defendant. *United States v. Williams*, 720 F.3d 674, 687–86 (8th Cir. 2013) (emphasis in original); *see also Graves*, 556 F.2d at 1322 (emphasis added) (recognizing that "*apart* from any question of predisposition of a defendant to commit the offense in question, governmental participation may be so outrageous or fundamentally unfair as to deprive the defendant of due process of law"). This defense is rooted in the Due Process Clause, which "forbids the government to act improperly *even against culpable persons*." *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986) (emphasis added). "[T]he government's conduct *alone* [can therefore] bar prosecution," regardless of the defendant's predisposition or behavior. *Flowers*, 712 Fed. App'x at 497 (emphasis added). *See also United States v. Costales*, 5 F.3f 480, 487 (11th Cir. 1993) ("The law mitigates conduct of a defendant where the government engages in overreaching or outrageous misconduct that violates

7

fundamental fairness and shocks the universal cause of justice."). The principle underlying this doctrine is that the government's duty "in a criminal case[] is not that it shall win [the] case but that justice shall be done." *United States v. Mauskar*, 2011 WL 4790785 at *11 (S.D. Tex. May 6, 2011) (quoting *Dickson v. Quarterman*, 462 F.3d 470, 479 (5th Cir. 2006)). Where the government acts in a manner that is fundamentally unfair, justice is not done.

Whether the government's conduct was unconstitutional "is a matter of law to be decided by the trial court." *United States v. Miller*, 799 F.2d 985, 988 (5th Cir. 1986). "The standard to be applied is whether the government's conduct violates 'fundamental fairness' and is 'shocking to the universal sense of justice.'" *Id.* (quoting *United States v. Tobias*, 662 F.2d 381, 386 (5th Cir. 1981)). In other words, an indictment may be dismissed where "the government's prosecution of the crime would abridge fundamental protections against unfair treatment." *United States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997) (quoting *United States v. Smith*, 7 F.3d 1164, 1168 (5th Cir. 1993)). "There is no bright line dictating when law enforcement conduct crosses the line between acceptable and outrageous, so every case must be resolved on its own particular facts." *United States v. Black*, 733 F.3d 294, 302 (9th Cir. 2013).

The facts here show that the government acted in a manner that abridged Mr. Hamilton's right to be protected against fundamentally unfair treatment. *See, e.g.*, *United States v. Twigg*, 598 F.2d 373 (3d Cir. 1978) (dismissing indictment for government involvement in manufacturing the crime); *Green v. United States*, 454 F.2d 783 (9th Cir. 1971) (same). The government should not be permitted to perpetuate government corruption by leaving corrupt public officials in office so that they can make extortionate demands on its citizens; it should not lay in wait to now charge in 2019 what it says happened in 2015; it should not script a person to pray on the sympathy of a friend to provide support for critical medical needs; it should not turn a meeting on a public benefit

referendum into a script to set a trap only it sought to occur; it should not dangle turning a friendship into a criminal scheme by encouraging someone caught stealing to falsely accuse others of crimes for their own lesser sentence; and it should not have its agent be the one to try to link his request for medical need with some vague support for a real estate project.

All this conduct crossed the line in precisely the ways courts have ruled violate the Due Process Clause. Reviewed carefully, Mr. Hamilton offered nothing improper to Davis or Caraway. In both instances, they asked him for charity and he agreed. Because it wants convictions to justify leaving Davis and Caraway in government after it determined they were corrupt, the government seeks to make charitable requests look like requests for bribes. Instead, the traps look more like extortion, with the government manufacturing the crimes it has charged.

This sort of effort to manufacture new crimes, particularly by twisting lawful activity to appear criminal, turns the function of law enforcement in its head. "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States*, 356 U.S. 369, 372 (1958). "The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it." *Sorrells*, 287 U.S. at 444 (internal quotation omitted). That duty was unambiguously violated here and, consistent with the case law, this Court should dismiss the Indictment so that government understands that such conduct will not be rewarded.

## CONCLUSION

As a result of the government's conduct, Mr. Hamilton was deprived of his right to due process under the Due Process Clause of the Fifth Amendment. Accordingly, this Court should dismiss the Indictment.

Dated: September 26, 2019

                                        Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC 20006
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

**CERTIFICATE OF SERVICE**

I certify that on September 26, 2019, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

                                        /S/Abbe David Lowell
                                        Abbe David Lowell