IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | |
| | | |
| v. | | No.  3:19-CR-083-M |
| | | |
| RUEL M. HAMILTON | | |

### GOVERNMENT'S RESPONSE TO MOTION TO DISMISS THE INDICTMENT FOR OUTRAGEOUS GOVERNMENT CONDUCT

Respectfully submitted,

ERIN NEALY COX
UNITED STATES ATTORNEY

*/s/ Joseph A. Magliolo*
MARCUS BUSCH
Assistant United States Attorney
Texas Bar No. 03493300
JOSEPH A. MAGLIOLO
Assistant United States Attorney
Texas Bar No. 24074634
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
E-mail: joseph.magliolo@usdoj.gov

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES...........................................................................................iii

INTRODUCTION ........................................................................................................ 1

FACTUAL BACKGROUND ........................................................................................ 2

    1.    Hamilton pays bribes to and later employs Dallas City Council Member
Carolyn Davis in 2015 in return for Davis abusing her position and taking
official actions benefitting Hamilton on a number of lucrative real estate
projects .......................................................................................................... 2

    2.    Hamilton then bribes City Council Member Dwaine Caraway to support
projects that will benefit Hamilton's political preferences and him
personally ...................................................................................................... 6

ARGUMENT AND AUTHORITIES ......................................................................... 11

    1.    Defendants may not successfully assert the outrageous government conduct
defense when they are active, willing participants in the crime for which
they are charged............................................................................................ 12

    2.    Under clear Fifth Circuit precedent, because Hamilton has not even
argued, let alone established, that he was merely a passive participant in
his charged criminal conduct, the outrageous government conduct
defense is categorically foreclosed to him .................................................. 13

    3.    Even if Hamilton *could* assert this defense, it does not apply here because
the putative outrageous conduct was "leaving" an elected officeholder in
place and recording his discussions about bribe payments, which do not
nearly meet the Fifth Circuit's standard for this defense ........................... 16

CONCLUSION ........................................................................................................... 23

CERTIFICATE OF SERVICE.................................................................................... 24

# TABLE OF AUTHORITIES

**Federal Cases**                                                                   **Page(s)**

*United States v. Arteaga*, 807 F.2d 424 (5th Cir. 1986)............................................... 12, 13

*United States v. Asibor*, 109 F.3d 1023 (5th Cir. 1997)............................................... 12, 19

*United States v. Evans*, 941 F.2d 267 (5th Cir. 1991).................................................. 13, 14

*United States v. Flowers*, 712 F. App'x 492 (6th Cir. 2017) ........................................... 13

*United States v. Garrett*, 716 F.2d 257 (5th Cir. 1983)......................................... 18, 19, 21

*United States v. Graves*, 556 F.2d 1319 (5th Cir. 1977) ............................................. 15, 16

*United States v. Gutierrez*, 343 F.3d 415 (5th Cir. 2003) ................................................ 13

*United States v. Ivey*, 949 F.2d 759 (5th Cir. 1991) .......................................................... 14

*United States v. Pawlak*, 935 F.3d 337 (5th Cir. 2019)............................................... 17, 19

*United States v. Posada Carriles*, 541 F.3d 344 (5th Cir. 2008) ..................................... 14

*United States v. Quinn*, 543 F.2d 640 (8th Cir. 1976)....................................................... 16

*United States v. Rodriguez*, 603 F. App'x 306 (5th Cir. 2015) ........................................ 12

*United States v. Sandlin*, 589 F.3d 749 (5th Cir. 2009) .................................................... 12

*United States v. Smith*, 7 F.3d 1164 (5th Cir. 1993)......................................................... 17

*United States v. Tobias*, 662 F.2d 381 (5th Cir. Unit B 1981) ....................... 12, 17, 18, 21

*United States v. Yater*, 756 F.2d 1058 (5th Cir. 1985)......................................... 12, 14, 15

## **INTRODUCTION**

The Fifth Circuit has made plain that a defendant cannot avail himself of the outrageous government conduct defense where he is an active participant in the criminal conduct for which he is charged.  Not only was Ruel Hamilton an active participant in the charged criminal conduct, he does not even contest that fact in his motion to dismiss. Because Hamilton bears the burden of establishing his entitlement to the outrageous government conduct defense, and he fails to even attempt to do so on its first element, the Court should deny his baseless motion on that basis alone.  Even had Hamilton attempted to make such an argument, it would have failed because the evidence shows Hamilton actively pushing Dallas City Council Members to take official actions to benefit him financially and politically and eagerly paying them for doing so.

Moreover, Hamilton cannot meet the "extremely demanding" standard to show the government engaged in outrageous conduct.  The government merely recorded Hamilton discussing official actions he wanted from elected officials whom he repeatedly bribed. The Fifth Circuit has consistently found that government sting operations involving far more government involvement in the criminal activities than is present here did not rise to the level of outrageous conduct.  Therefore, under longstanding Fifth Circuit precedent and based on Hamilton's inadequate briefing, the Court can easily deny Hamilton's motion to dismiss without a hearing.

## FACTUAL BACKGROUND

1.    **Hamilton pays bribes to and later employs Dallas City Council Member Carolyn Davis in 2015 in return for Davis abusing her position and taking official actions benefitting Hamilton on a number of lucrative real estate projects.**

Defendant Ruel Hamilton, a real estate developer, repeatedly bribed Dallas City Council Member Carolyn Davis in return for Davis taking or promising to take favorable official actions for Hamilton's real estate projects. Hamilton paid Davis these bribes from approximately November 2013 to June 2015, either directly to Davis or through co-conspirator Jeremy Scroggins. For example, on April 13, 2015, Davis and Hamilton had the following discussion:

**Hamilton**: Hey, Carolyn.

**Davis**: Hey, hon, how you doing?

**Hamilton**: Doing all right. How are you?

**Davis**: Oh, I'm doing okay. I'm doing okay. You still want to try to get together today?

**Hamilton**: Yeah, I haven't had – I can. I haven't had a chance to go to the bank.

**Davis**: Okay.

**Hamilton**: So I know you wanted the rest of the cash. I have a – probably half of it. I know I have over another thousand bucks or we could do it tomorrow, so –

**Davis**: Well, it's up to you. It's up to whatever you want to do. We can wait till tomorrow if you want to.

**Hamilton**: Let's – let's do it tomorrow.

**Davis**: Okay.

**Hamilton**: Make it easier.

**Davis**: Okay.

**Hamilton**: And the check – and the check that I had given you was – was it 500?

**Davis**: Uh-huh. Uh-huh.

**Hamilton**: Okay.  It was –

**Davis**: And I had – and I have it in my – in my – in my billfold.

**Hamilton**: Okay.  I was just trying to remember the amount because I'm going to have to go to the bank and get cash.

**Davis**: Okay, then.

**Hamilton**: Okay?

**Davis**: Okay.

(*See* **Exhibit A** (April 13, 2015 Tr.) at 2-3.)[1]

In June 2015, Davis and Hamilton had a similar conversation about payments

Hamilton planned to make to Davis:

**Hamilton**: Hey, Carolyn.

**Davis**: Hey, I'm on my way.  Just finished moving.

**Hamilton**: Hey, could we do it in the morning?

**Davis**: Yeah, we can.

**Hamilton**: Let's do it in the morning because I've been out in the sun for a couple hours.  I'm wiped out.

---

[1] Because of the nature of the supporting evidence, the government will file a motion to file the exhibits referenced in this motion under seal.

**Davis**: You're wiped out, okay.  Okay.

**Hamilton**: Yeah, plus if we're going to get to the bank.  Tomorrow is a better day to mess around –

**Davis**: Okay.

**Hamilton**: – with it anyway.

**Davis**: Okay.  Then what I'll do – give me a time.

**Hamilton**: 10:00.

**Davis**: Okay.  Ten o'clock then.

(*See* **Exhibit B** (June 4, 2015 Tr.) at 2.)

Davis admitted that the Hamilton payments referenced in the discussions listed above were made in return for official actions she took on Hamilton's behalf.  *See* Davis Factual Resume (Dkt. 10 at 3.)  She also admitted to taking payments from Hamilton through Jeremy Scroggins' non-profit company, Hip Hop Government.[2]  *See* Davis Factual Resume (Dkt. 10 at 3.)  Scroggins admitted that Hamilton would write checks to him personally or to Hip Hop Government, and he would deposit or cash Hamilton's checks and transfer the payments to Davis in cash.  *See* Scroggins Factual Resume (Dkt. 58 at 3.)  For example, on January 8, 2015, "Hamilton wrote a check payable to Hip Hop Government for $3,500.00 which he gave to Davis.  On January 9, 2015, Davis directed Scroggins to go to a local check cashing business and cash the check which he did, and

---

[2] In Davis's factual resume, Ruel Hamilton is "Person A" and Scroggins is termed "Person B," while Hip Hop Government is "Person B's not-for-profit company[.]"  *See* Davis Factual Resume (Dkt. 10 at 3.)

then at Davis' direction, gave all the currency to Davis." Scroggins Factual Resume (Dkt. 58 at 4.)

Davis later indicated that all the checks Hamilton wrote to Hip Hop Government were done at her request. (*See* **Exhibit C** (Davis 12/20/2018 FBI 302) at 5.) Davis wanted these checks written to Hip Hop Government, rather than to her directly, because she did not want to report them on her financial statements, and Hamilton never questioned why she wanted the checks written in this manner. (*See* **Exhibit C** at 5.) Hamilton also paid Davis directly in cash. (*See* **Exhibit C** at 6.) Davis then supported Hamilton's projects based on money he paid to her. (*See* **Exhibit C** at 5-7.)

In total, Davis received benefits of approximately $40,000 from Hamilton and the promise of future employment in return for taking official actions on his behalf. Davis Factual Resume (Dkt. 10 at 4.) In return for these illegal benefits, Davis performed the following official actions on Hamilton's behalf:

- On February 2, 2015, during a meeting of the Housing Committee, Davis, as the Chair of a Housing Committee meeting, voted to support moving Hamilton's project forward to the City Council, including recommending support for City of Dallas funding of $168,000 and a Dallas Housing Finance Corporation (DHFC) development loan of $2,520,000 for Hamilton's project.

- On February 25, 2015, Davis moved the City Council to authorize the DHFC to make a development loan to Hamilton's company in an amount not to exceed $2,520,000 for Hamilton's project as an integral part of Hamilton's Texas Department of Housing and Community Affairs (TDHCA) 9% tax credit application.

- After voting for Hamilton's project, Davis discussed her continued support of the project with Hamilton. Specifically, on April 23, 2015, Davis told Hamilton that she questioned a City of Dallas housing official about the status of Hamilton's project for 9%

TDHCA funds, which was tied in points with another, unrelated project. Davis told Hamilton that she told this official to connect Hamilton with a nonprofit so that his project would get another point in the scoring system, thereby surpassing the score of the other competing project. Hamilton told Davis that he would be "disappointed" if his project did not get on TDHCA's list of projects "they are seriously considering." Hamilton told Davis he wanted her, and possibly another City Council Member, to lobby for his project before the TDHCA. Davis agreed to lobby the project, in her official capacity, before the TDHCA in Austin, Texas.

*See* Davis Factual Resume (Dkt. 10 at 4-5.)[3] Davis left the Dallas City Council in 2015 and began working for Hamilton in a job she continued until November 2018. (*See* **Exhibit C** at 7.)

## 2.    Hamilton then bribes City Council Member Dwaine Caraway to support projects that will benefit Hamilton's political preferences and him personally.

Continuing his scheme to corruptly influence public officials towards his personal ends, Hamilton bribed Dallas City Councilman Dwaine Caraway in 2018 for Caraway's help on two matters. The first was securing the late addition of a paid sick-leave initiative on the Dallas City Council's agenda, which required the mayor's assistance. The second concerned Hamilton's desire that Caraway help him with a real estate project Hamilton wanted to develop in Dallas. Hamilton and Caraway discussed these issues on August 2 and 3, 2018.[4]

As Hamilton concedes in his motion to dismiss, Hamilton contacted Caraway and they spoke on August 2, 2018. *See* Motion to Dismiss (Dkt. 79 at 3 (attempting to

---

[3] Ms. Davis passed away on July 15, 2019. *See* Motion to Dismiss (Dkt. 71 at 1.)

[4] Caraway recorded these conversations with assistance from law-enforcement officials.

explain the purported motivation for Hamilton "reaching out" to Caraway)) ("Motion");

(**Exhibit D** (Aug. 2, 2018 Tr.) at 1-2). During their initial telephone call on August 2,

2018, Hamilton informed Caraway that he was involved with an effort to gather

signatures to put a paid sick-leave referendum to a vote in Dallas in November 2018.

(*See* **Exhibit D** at 1-2.) But, because the signature effort failed, Hamilton told Caraway

that "the only option" left was to get the Dallas City Council to approve putting the sick-

leave issue on the ballot as an ordinance. (*See* **Exhibit D** at 3.) Hamilton pitched the

idea to Caraway with a primary focus on the political advantages Hamilton thought

would result if the sick-leave issue were on the November ballot:

> [I]f it can go on the ballot in November as a referendum . . . we could
> probably increase turnout by maybe 15 to 20,000 votes. Well, so to me
> then it's not just about – you know, **it's not just about paid sick leave for**
> **employees**, which I think everybody should have, **it's also about carrying**
> **some of these other races, you know, all across the county just because**
> **we can get, you know, people out for it. It will get people out**. It's a hot
> button for working people.

(*See* **Exhibit D** at 3-4 (emphasis added).)

Hamilton then explained that the Dallas Mayor would have to place that issue on

the City Council agenda for August 8, 2018 in order for the measure to be on the ballot,

and the placement would have to be done by August 3, 2018. (*See* **Exhibit D** at 4.)

Hamilton returned to the political advantages of having this measure on the ballot: "**So**

**this issue runs a lot deeper than just paid sick leave**. It's about other races. It can help

Colin Allred, for example, is just one of them [sic]." (**Exhibit D** at 4 (emphasis added).)

After explaining the political benefits of his idea, Hamilton told Caraway that he

understood Caraway to be able to influence the Mayor for the matter to be placed on the

ballot.  (**Exhibit D** at 4-5.)  Hamilton and Caraway set a meeting for the next day to continue their discussions.  (**Exhibit D** at 5-6.)  They then briefly discussed Hamilton's interest in a real estate development project on Eleventh Street in Dallas and agreed to discuss it further the next day.  (**Exhibit D** at 6-9.)

When Hamilton and Caraway met the next day, in person, Caraway conducted a telephone call with his mother in Hamilton's presence.  (*See* **Exhibit E** (Aug. 3, 2018 Tr.) at 2-4.)  During this conversation, Caraway told his mother that he was going to make a payment related to her healthcare.  (**Exhibit E** at 3.)  After the call concluded, Hamilton reiterated to Caraway that his sick-leave ballot proposal would bring political benefits: "this thing can boost us in our races in November because it will increase the turn out.  You get – any time you put something like this on the ballot, it'll get people out."  (**Exhibit E** at 6.)  Hamilton told Caraway again that, procedurally, the Mayor was the only person who could place the measure on the agenda, and "what I've been told, there's only one person that might get the Mayor to do that and that's Councilmember Dwaine Caraway."  (**Exhibit E** at 7-8.)

Hamilton returned in the conversation to the time-sensitive nature of his proposal, after noting that if the measure was not on the City Council agenda on August 8, 2018, it would be "done for this time around."  (**Exhibit E** at 8.)  He explained again to Caraway that not having the measure on the council agenda would negatively affect his political preferences: "what we lose is the chance of getting an extra 20, 15, 20,000 people out to vote . . . .  In the democratic primary, you know, we had the turnout up, there's a bunch of these races.  I think we can win."  (**Exhibit E** at 9.)

Hamilton then turned the conversation to the subject of his hoped-for development project on Eleventh Street.  (*See* **Exhibit E** at 11.)  Hamilton told Caraway:

> I personally, from talking to other people what I see you do [sic], I think you've been doing an extraordinary job in your district.  I want you here and I think that you and I can get a lot of stuff done.  I really do.  We're starting, it takes a little while to get it going.  Before you leave office or whenever your last term is, we're going to have stuff built down there on Eleventh Street.  You just watch.  **I need you for that.  What I'm saying is, I'm there, you know, and so if there is anything I can help you with, I mean, I hope you feel like you can reach out**.

(**Exhibit E** at 11 (emphasis added).)  Immediately after Hamilton offered his "help" to Caraway, Caraway told Hamilton that he needed to find "$6200 today" and detailed health problems he had.  (**Exhibit E** at 11-12.)

The conversation turned to Hamilton discussing Dallas properties in which he had an interest.  (**Exhibit E** at 13-20.)  Caraway and Hamilton then had the following discussion about Hamilton's payment to Caraway:

**Caraway**: I want to help.

**Hamilton**: Yeah, it's okay.  And I want to help you.

**Caraway**: All right.  Well, I – man, I –

**Hamilton:** So what can I do for you right now today?

**Caraway**: You can answer that bill that I just threw out there –

**Hamilton**: Okay.

**Caraway**: – for about 62 today and that will help me –

**Hamilton:** Okay.

**Caraway**: – do what I need to do.

**Hamilton**: Okay.

**Caraway**: I will then move from there to try to take a look at what else need[s] to happen.

**Hamilton**: Okay.  Can you follow through with the Mayor –

**Caraway**: Okay.

**Hamilton**: – see if we can do this?

**Caraway**: Yeah, I'm – I'll – I'll – I'll talk to him –

**Hamilton**: Okay.

(**Exhibit E** at 20-21.)  Immediately after this interchange, Hamilton asked Caraway: "So you might want to keep everything completely straight.  Can I just write a check to Dwaine Caraway?"  (**Exhibit E** at 22.)  Caraway responded "[h]owever you want to do that" and Hamilton asked "That's okay? I mean, does it need to go to campaign, if somebody . . . ."  (**Exhibit E** at 22.)  Caraway told Hamilton that it should not have anything to do with the campaign, so Hamilton inquired "if somebody looks at this and asks?  What are they going to say, I loaned you money or I said, here?"  (**Exhibit E** at 22.)  Caraway repeated that it did not have to do with his campaign and that he needed the money to pay for his mother's bill.  (*See* **Exhibit E** at 22.)  Hamilton then told Caraway, "there's only one thing we need, Dwaine . . . . A pen."  (**Exhibit E** at 22.)

Hamilton asked Caraway how much he wanted the check for: "So $6200? $6500?" (**Exhibit E** at 23.)  Hamilton then asked Caraway what the memo line should say: "What should I put down just for posterity sake [sic], down in here for, what should I say?  All right.  I just wrote something down there just so . . . somebody ever asks, I can come up

with some kind of reference." (**Exhibit E** at 23.) Hamilton wrote what appears to be "#

1229" on the memorandum line, and the check he wrote to Caraway was for $7,000. (*See*

**Exhibit F** (Aug. 3, 2018 Check from Hamilton to Caraway).)

Based on his scheme to illegally influence public officials, as evidenced by,

among other things, his illegal bribe payments to Caraway and Davis, a grand jury

indicted Hamilton on two bribery charges. *See* Indictment (Dkt. 1).

## ARGUMENT AND AUTHORITIES

Hamilton argues that the Court should dismiss the indictment based on the

government purportedly engaging in outrageous conduct. Beyond his dubious and self-

serving recounting of the facts that led to his indictment, Hamilton's claim boils down to

two "actions" he contends the government took: (1) leaving Council Member Davis in

office, without explaining how exactly the federal government could remove her from

that position, and (2) recording conversations he had with Council Member Dwaine

Caraway where Hamilton paid Caraway a bribe in return for Caraway's future help by

taking official actions on two matters Hamilton wanted.

These claims fail initially because Hamilton has not even stated the applicable

standard or set forth a version of events that could meet it. Specifically, in the Fifth

Circuit, to show the Court should dismiss the indictment for outrageous government

conduct, Hamilton must show he was only a passive participant in the criminal activity.

Instead of attempting to demonstrate his passivity, Hamilton ignores the standard and

focuses entirely on the government's actions. This is patently insufficient under

longstanding Fifth Circuit precedent, and the Court should dismiss his frivolous motion

on this basis alone.  Further, the conduct he terms "outrageous" does not even approach

the level of other investigative techniques the Fifth Circuit has found acceptable in the

past.  Accordingly, the Court should deny Hamilton's baseless motion.

1.    **Defendants may not successfully assert the outrageous government conduct defense when they are active, willing participants in the crime for which they are charged.**

The Due Process Clause protects defendants from law-enforcement agents

engaging in "outrageous conduct," forbidding the government from acting improperly

against even culpable individuals.  *See United States v. Arteaga*, 807 F.2d 424, 426 (5th

Cir. 1986).  But "[g]overnment misconduct does not mandate dismissal of an indictment

unless it is so outrageous that it violates the principle of fundamental fairness[.]"  *United

States v. Sandlin*, 589 F.3d 749, 758-59 (5th Cir. 2009) (citation and quotation marks

omitted).  It is "well-established" that the Court will find this sort of violation only "in

the rarest and most outrageous circumstances."  *Arteaga*, 807 F.2d at 426 (citing *United

States v. Tobias*, 662 F.2d 381, 387 (5th Cir. Unit B 1981)).  This standard is "extremely

demanding."  *Sandlin*, 589 F.3d at 758.  Conduct sufficient to reach this standard must be

both "shocking to the universal sense of justice," *United States v. Yater*, 756 F.2d 1058,

1065 (5th Cir. 1985) (quotation marks omitted), and "shock the most cynical among us."

*United States v. Rodriguez*, 603 F. App'x 306, 312 (5th Cir. 2015).

Defendants who assert the defense of outrageous government conduct bear the

burden of proof, which the Fifth Circuit has found to be "extremely high[.]"  *United

States v. Asibor*, 109 F.3d 1023, 1039 (5th Cir. 1997).  To prove this defense applies, the

defendant must demonstrate, "in light of the totality of the circumstances[,]" two

elements: "[1] both substantial government involvement in the offense and [2] a passive

role by the defendant."  *United States v. Gutierrez*, 343 F.3d 415, 421 (5th Cir. 2003); *see

also Arteaga*, 807 F.2d at 427 (calling this second element government "overinvolvement

in the charged crime").  As to the second element—that the defendant be only a passive

player in the criminal activity—the Fifth Circuit has made plain: if a defendant "actively

participates in the crime," he may not avail himself of the outrageous government

conduct defense.  *United States v. Evans*, 941 F.2d 267, 271 (5th Cir. 1991) (quotation

marks and citation omitted).

2.     **Under clear Fifth Circuit precedent, because Hamilton has not even argued,
       let alone established, that he was merely a passive participant in his charged
       criminal conduct, the outrageous government conduct defense is categorically
       foreclosed to him.**

     In his motion to dismiss, Hamilton does not even argue he played a passive role in

the criminal activity for which he was charged, though a defendant must establish that

element in order for the Court to even consider the outrageous government conduct

defense.  Instead, ignoring unfavorable Fifth Circuit precedent and, based on an

unpublished, out-of-circuit case, Hamilton claims "'the government's conduct *alone* [can

therefore] bar prosecution,' regardless of the defendant's predisposition or behavior."

(Motion at 7 (quoting *United States v. Flowers*, 712 F. App'x 492, 497 (6th Cir. 2017)

(internal marks omitted)).)  This is simply not the controlling standard in the Fifth

Circuit.

     In numerous published decisions issued over the course of more than three

decades, the Fifth Circuit has not equivocated on this subject: "[o]utrageous conduct will

not be found when the defendant is an active, willing participant in the criminal conduct that leads to his arrest." *See United States v. Posada Carriles*, 541 F.3d 344, 361 (5th Cir. 2008) (internal quotation marks omitted); *Yater*, 756 F.2d at 1066 (noting that the "common thread in our decisions [is] that a defendant cannot avail himself of the [outrageous government conduct] defense where he has been an *active participant* in the criminal activity which gave rise to his arrest."). Thus, Hamilton's attempt to distract the Court from his active participation in the criminal conduct flouts well-settled Fifth Circuit law.

Following this principle, the Court has found the outrageous government conduct defense unavailable to a defendant in a drug case even though the government agents approached him and "offered to help him manufacture drugs, phoned him to pursue the arrangement, supplied the expertise, sold [the defendant] the equipment, and supplied the laboratory site." *Evans*, 941 F.2d at 270. The Court reasoned that, notwithstanding those facts, there was enough evidence demonstrating the defendant was a "predisposed active participant," including his "past drug activities," and his active participation in the present scheme, demonstrated by his purchase of materials required to make drugs. *Id.* at 271. Thus, he did not play a "passive role" necessary for the outrageous government conduct defense. *See id.*

Similarly, the Court has found active participation in criminal activities where the government initially contacted defendants to sell them illegal animal hides, but the defendants continued returning to purchase them and thus demonstrated that they were active participants in the criminal activity. *See United States v. Ivey*, 949 F.2d 759, 769

(5th Cir. 1991); *see also Yater*, 756 F.2d at 1066 (finding defense did not apply where defendant, despite arguing drug deal was orchestrated by government informants, obtained subject cocaine "through his own contacts without assistance from the government and transported it himself to the site of the drug sale").

Under this precedent, the outrageous government conduct defense is unquestionably foreclosed to Hamilton, who does not even attempt to demonstrate he was a passive participant in the charged criminal activities.  And even if he had asserted passive participation, a mountain of evidence would rebut it.  As set forth at length above, Hamilton eagerly discussed bribes he was paying to both Hamilton and Caraway.  He initiated the meetings with Caraway which concluded with a $7,000 bribe payment— hundreds of dollars above the amount Caraway requested.  (*See* **Exhibit E** at 20-21; **Exhibit F**); *see also* Motion at 3 (conceding that Hamilton initiated the meetings with Caraway).   He also paid Davis thousands of dollars in return for official actions and followed through on his promise to provide her post-Council-Membership employment. In other words, Hamilton was a more-eager criminal than the defendants in either *Ivey* or *Evans*, whom the government agents approached and engaged in criminal activities—and even in those cases, the Fifth Circuit found the outrageous government conduct defense inapplicable.

Hamilton never attempts to address the Fifth Circuit's standard for outrageous government conduct.[5]  He instead insists that the standard depends *solely* on the

---

[5] The closest Hamilton comes to doing so is citing *United States v. Graves*, 556 F.2d 1319 (5th Cir. 1977), where the Fifth Circuit reviewed the propriety of the district court's decision not to submit an outrageous

government's conduct.  (*See* Motion at 7-8 (citations omitted).)  In support of this false

claim, Hamilton cites no Fifth Circuit cases.  He turns to the Sixth and Eighth Circuits for

the standard upon which he depends for the remainder of his motion—that this defense

"focuses on the *government's* actions, not the defendant's." (*See* Motion at 7 (citation

and quotation marks omitted).)  While this is perhaps sufficient to preserve the argument

for future appellate review—which would require intervention from either the United

States Supreme Court or the en banc Fifth Circuit—it does not state or address the

standard that actually applies to his case.  As set forth above, as an active participant in

the criminal activity, Hamilton is not entitled to the outrageous government conduct

defense.  Because Hamilton does not even attempt to challenge this fact, this Court can

easily conclude that decades of precedent foreclose his outrageous government conduct-

based argument.

**3.      Even if Hamilton *could* assert this defense, it does not apply here because the putative outrageous conduct was "leaving" an elected officeholder in place and recording his discussions about bribe payments, which do not nearly meet the Fifth Circuit's standard for this defense.**

The government has not found any case where the Fifth Circuit has held an

outrageous government conduct defense should have led to the dismissal of an

---

government conduct defense instruction to the jury.  (*See* Motion at 7 (citing *Graves*, 556 F.2d at 1322-23).)  The aspect of that case to which Hamilton cites, however, comes from an *Eighth Circuit* case, which he does not acknowledge.  (*See* Motion at 7 (citing *Graves* without revealing that his quoted language actually came from *United States v. Quinn*, 543 F.2d 640, 647-48 (8th Cir. 1976).).  In *Graves*, the Court was focused entirely on the matter of whether the outrageous government conduct defense should have gone to the jury or if it was a question of law for the district court.  *See* 556 F.2d at 1321.  It did not pronounce the language Hamilton quoted as its standard.  *See generally id.*  As the Fifth Circuit has made clear in cases cited throughout this response, a defendant may not avail himself of the outrageous government conduct defense when he is an active participant in those activities.

**Government's Response to Motion to Dismiss for Outrageous Government Conduct – Page 16**

indictment, in any circumstance, nor has Hamilton pointed to one. *See United States v. Smith*, 7 F.3d 1164, 1168 (5th Cir. 1993) ("This Court has never invalidated a conviction" based on an outrageous government conduct defense). The Fifth Circuit has held that the government's purportedly outrageous conduct must be evaluated "in light of the undercover activity necessary to the enforcement of the criminal laws." *United States v. Pawlak*, 935 F.3d 337, 344 (5th Cir. 2019) (internal quotation marks and citation omitted). The Court set forth the "outer limits" of acceptable government conduct in this context in *United States v. Tobias*, where it affirmed the conviction of a defendant to whom government agents: suggested that he manufacture drugs; sent information about how to accomplish this; and answered questions about the process. *See* 662 F.2d at 387.

In *Tobias*, the DEA, in order to conduct undercover investigations of clandestine drug laboratories, established a chemical-supply company, which operated as a typical business of this sort. *See id.* at 383. It placed a magazine advertisement offering chemicals and equipment. *Id.* Thomas Tobias placed an order with the company, but he subsequently attempted to cancel it because he discovered he could not "manufacture cocaine without 'more knowledge . . . and a lot of equipment.'" *Id.* In response, a DEA agent suggested that Tobias manufacture PCP instead, because it was easy and cheap to make. *Id.* at 383-84. Tobias then changed his order and requested all the materials needed to make PCP. *Id.* at 384. The DEA shipped Tobias the formula for PCP as well as some of the chemicals needed to manufacture it. *Id.* He called the supply company 13 times after receiving the materials to discuss further how to make PCP. *Id.* When the DEA executed a search warrant at Tobias's home, they discovered liquid PCP. *Id.*

After his conviction related to the drug manufacturing and possession, Tobias appealed and argued that the government's involvement in his criminal activity was "so outrageous that due process principles bar his convictions." *Id.* at 385. The Fifth Circuit disagreed and explained that "government infiltration of criminal activity is a recognized and permissible means of investigation . . . even" where a government agent "supplies something of value to the criminal." *Id.* at 386 (internal citations and quotation marks omitted). The Court added that analysis of this issue "turns upon the totality of the circumstances with no single factor controlling." *Id.* at 387. Among the key factors in reaching its decision was the DEA not initiating contact with Tobias. *Id.* Thus, because Tobias was a "predisposed active participant" who engaged in active and insistent participation in the crimes, there was no due-process violation. *See id.*

In the same vein, the Court similarly did not find outrageous government conduct in *United States v. Garrett*, where the government had established a fictitious insurance agency that provided money for bribe payments made to city officials putatively to secure a significant insurance contract for the fictitious agency. *See* 716 F.2d 257, 274-75 (5th Cir. 1983). There, after establishing this fake business, FBI agents and an informant met defendants Garrett and Moore, who would later serve as conduits to assist in securing this contract in return for a portion of future commissions. *Id.* at 260-61. The FBI agents later provided money to Garrett and Moore to be paid as a bribe to a Houston City Council member in order to secure his vote on the insurance contract. *Id.* at 263.

After convictions related to the bribery scheme, both Garrett and Moore argued the government engaged in outrageous conduct because the crime would not have

occurred but for the government's involvement and it created outrageous risks of harm. *Id.* at 274-75.  The Fifth Circuit found this insufficient to support dismissal of the charges against them.  *See id.*  This decision was undergirded by Garrett's "originat[ion of] the idea" of calling the city councilman for the purpose of setting up a bribe and that both defendants had taken part in meetings and discussions to carry out the bribery scheme. *See id.* at 262, 274-75; *see also United States v. Asibor*, 109 F.3d 1023, 1039-40 (5th Cir. 1997) (holding outrageous government conduct defense inapplicable where government provided drugs to defendants and bought them back with government funds).

Similarly, in *United States v. Pawlak*, the Fifth Circuit held that the government permitting a hidden dark-web child pornography site to operate while monitoring its users for a nearly two-week period was not outrageous conduct.  *See* 935 F.3d at 345-46.  In *Pawlak*, the Court considered the propriety of a government sting operation through which it allowed a child pornography website to operate on government servers so that the government could identify the site's otherwise-anonymous users.  *See id.* at 341-42. This operation identified Pawlak, who alleged the government engaged in outrageous conduct by operating the website, which he claimed aided the public distribution of child pornography.  *Id.* at 344.  The Fifth Circuit disagreed.  It held that, given the government's receipt of judicial approval for its sting operation and mitigation of further exploitation of children, the government did not engage in outrageous conduct.  *See id.* at 346.

Based on the Fifth Circuit's principles, "leaving" Council Member Davis in place and recording meetings between Caraway and Hamilton do not nearly approach a

standard the Fifth Circuit has yet to apply to dismiss a case against a criminal defendant.

By claiming the government engaged in outrageous conduct by "leaving" Council

Member Davis in place, Hamilton presupposes that the government had a mechanism

through which it could simply remove her from office in 2015 based on an ongoing

investigation into her criminal conduct.  (*See* Motion at 2 (asserting that the government

"allowed [Davis] to finish out her term in June 2015").)  He does not explain how the

government would accomplish this goal, nor is the government aware of any.  Thus,

Hamilton's argument about the government's conduct towards Davis is really a claim that

it did not take an action he does not specify in order to accomplish a goal in a manner he

fails to explain.  As the Fifth Circuit did not find it outrageous in *Garrett* when the

government created a fictitious insurance entity to make bribe payments to secure a

contract that could never be fulfilled, it cannot be outrageous conduct for the government

not to have taken an action towards Davis that does not actually exist (removing her from

office through a course of action Hamilton never explains).  Moreover, Caraway resigned

from his position just days after Hamilton initiated contact with him and eagerly paid him

a bribe.  Hamilton initiated this contact, undermining any claim of outrageous conduct,

which requires government "overinvolvement" with the offense that is not present here.

The government will address Hamilton's claim that charging Hamilton in 2019

with crimes he committed in 2015 is somehow outrageous in greater detail in its response

to his Motion to Dismiss Due to Pre-Indictment Delay.  *See* Motion to Dismiss (Dkt. 78.)

But, there is nothing in the Fifth Circuit's jurisprudence that suggests charging a

defendant within the bounds of the statute of limitations for the crime he committed is somehow outrageous.

Further, the government operation involving Caraway was well within bounds of similar sting operations the Fifth Circuit has previously approved in similar contexts. In *Garrett*, for example, the defendants had originated the idea of the bribe payments, which led to the sting operation. *See Garrett*, 716 F.2d at 262, 274-75. Similarly, here, Hamilton called Caraway and initiated the payment to him in return for official actions. There is nothing in the conversation between Hamilton and Caraway that suggests Hamilton, who, by August 2018, was a well-seasoned payer of bribes, needed even slight encouragement to commit his crime. As his actions with Davis show, Hamilton was a "predisposed active participant" in the bribe-paying scheme in which Hamilton involved Caraway in 2018. *See Tobias*, 662 F.2d at 386. Thus, the government's recording meetings between Caraway and Hamilton which Hamilton initiated showed far less active participation than that evident in the operation of the PlayPen website in *Pawlak*, the creation of a company in *Tobias*, or the participation of agents in *Garrett*.

While Hamilton claims his meeting with Caraway was driven by nothing more than pure-hearted altruism, when the conversations are viewed in their full contexts, the true purpose of the paid sick-leave initiative, in Hamilton's view, was to serve his preferred political ends. Throughout his conversations with Caraway, Hamilton made clear why he wanted that initiative on the Dallas ballots, telling Caraway that "this issue runs a lot deeper than just paid sick leave" and explaining that "it's not just about paid sick leave for employees, which I think everybody should have, it's also about carrying

some of these other races, you know, all across the county just because we can get, you know, people out for it.  It will get people out." (**Exhibit D** at 3-4.)  And Hamilton's argument that it was kind-hearted charity towards Caraway that led him to make the payment is belied by Hamilton—only seconds after Caraway made the payment request—confirming that Caraway would make contact with the Mayor concerning the ballot initiative he favored, before he signed any check to him.  (*See* **Exhibit E** at 20-21).

Further, the claim that he was not requesting anything from Caraway concerning the Eleventh Street project is preposterous when the full conversation is reviewed—just one sentence after telling Caraway he needed his help for that project, Hamilton said "What I'm saying is, I'm there, you know, and so if there is anything I can help you with, I mean, I hope you feel like you can reach out." (**Exhibit E** at 11.)  Then when Caraway said there was a method of accomplishing this, Hamilton paid him thousands of dollars. And, contrary to his claim in the motion, Hamilton on his own initiative obscured the true purpose of the payment on the check's memo line, and he paid Caraway far more than Caraway said he needed.  (*See* **Exhibit F**).  Thus, Hamilton's version of events crumbles under even mild scrutiny.

The remainder of his putative arguments and claims, like his dubious claims seeking to contradict Councilwoman Davis's sworn statements based on attached declarations, are of dubious evidentiary value and are not even connected to his outrageous government conduct defense.  They are little more than arguments that he can attempt to present to the jury when his case proceeds to trial.  Accordingly, Hamilton has

wholly failed to meet the "extremely" high burden to show the Court should dismiss his case because of purported outrageous government conduct.

## **CONCLUSION**

Hamilton has not set forth any facts that would even approach the Fifth Circuit's standard for outrageous government conduct, or even apprehended what that standard is. Because he was an active and predisposed participant in the criminal conduct, and the government's garden-variety recording of criminal conduct is not in any sense outrageous, the government respectfully requests the Court deny the defendant's baseless motion without a hearing.

Respectfully submitted,

ERIN NEALY COX
UNITED STATES ATTORNEY

*/s/ Joseph A. Magliolo*
MARCUS BUSCH
Assistant United States Attorney
Texas Bar No. 03493300
JOSEPH A. MAGLIOLO
Assistant United States Attorney
Texas Bar No. 24074634
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
E-mail: joseph.magliolo@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that on October 10, 2019, I filed this document via the Court's ECF system that will provide notice to all attorneys of record.

*/s/ Joseph A. Magliolo*
JOSEPH A. MAGLIOLO
Assistant United States Attorney
