IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:19-cr-083-S |
| | ) | Chief Judge Barbara M. G. Lynn |
| RUEL M. HAMILTON | ) | |

**MR. HAMILTON'S MOTION FOR A HEARING AND TO DISMISS THE SUPERSEDING INDICTMENT FOR DUE PROCESS VIOLATIONS IN THE GOVERNMENT'S MANUFACTURING OF A CRIME AND OTHER CONDUCT (MTD 2)**

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

I.      CAROLYN DAVIS ................................................................................................... 2

II.     DWAINE CARAWAY ............................................................................................. 4

        A.      Government Involvement In Caraway's Election ....................................... 4

        B.      Government Involvement In The Set-Up Of Mr. Hamilton ....................... 6

ARGUMENT ...................................................................................................................... 10

I.      OUTRAGEOUS GOVERNMENT CONDUCT IN MANUFACTURING CRIMES
        INVOLVING DAVIS ............................................................................................. 12

II.     OUTRAGEOUS GOVERNMENT CONDUCT IN MANUFACTURING CRIMES
        INVOLVING CARAWAY ...................................................................................... 14

CONCLUSION ................................................................................................................... 18

## TABLE OF AUTHORITIES

Page

Cases

*Collier v. United States*,
301 F.2d 786 (5th Cir. 1962) ...................................................17

*EDS IDAB, Inc. v. NLRB*,
666 F.2d 971 (5th Cir. Unit B 1982)...........................................4

*Ocasio v. United States*,
136 S. Ct. 1423 (2016)...........................................................13

*Sherman v. United States*,
356 U.S. 369 (1958)...............................................................17

*Sorrells v. United States*,
287 U.S. 435 (1932)...............................................................17

*United States v. Arteaga*,
807 F.2d 424 (5th Cir. 1986) .............................................. 10-11

*United States v. Combs*,
827 F.3d 790 (8th Cir. 2016) ..................................................10

*United States v. Graves*,
556 F.2d 1319 (5th Cir. 1977) ................................................10

*United States v. Jackson*,
700 F.2d 181 (5th Cir. 1983) ..................................................17

*United States v. Nations*,
764 F.2d 1073 (5th Cir. 1985) .............................................11, 17

*United States v. Perez*,
227 F. App'x 357 (5th Cir. 2007) ...............................................4

*United States v. Russell*.
411 U.S. 423 (1973)...............................................................10

*United States v. Smith*,
547 F. App'x 390 (5th Cir. 2013) ............................................17

*United States v. Theagene*,
565 F.3d 911 (5th Cir. 2009) ..................................................17

*United States v. Twigg*,
   588 F.2d 373 (3d Cir. 1978)......................................................................................14

Other Authorities

U.S. CONST. amend. V ...........................................................................................2, 18

Press Conference, U.S. Attorney Erin Nealy Cox, (March 1, 2019),
   https://www.youtube.com/watch?v=2ctAYWI7SVs (Mar. 1, 2019)......................................13

## INTRODUCTION

If you read that federal government agents intentionally delayed prosecuting and exposing a corrupt public official against whom they had all the evidence they needed to indict her, so that she could stay in office for the purpose of ensnaring innocent citizens, or you read that the government encouraged and financially supported a corrupt candidate in a contested election, so that he could ensnare innocent citizens once he was in office, you might think that you were reading a John Grisham or Scott Turow novel that had gone too far.  But you would be reading the facts of this case.  Sometimes, even well-intentioned prosecutors and agents can lose their perspective.  Whatever may have started as a proper investigation by federal law enforcement to uncover public corruption in Dallas fell victim to bureaucratic momentum and confirmation bias, a combination that often leads to government excess.  Here it did just that.

The prosecution claims to prosecute Mr. Hamilton in the name of combatting public corruption, but the supposed crimes the prosecution alleges Mr. Hamilton committed occurred due to the *government's* actions.  The prosecution concluded that Carolyn Davis and Dwaine Caraway, then Members of the Dallas City Council (DCC), were corrupt years before it took any legal action to expose them.  Despite such knowledge, the prosecution allowed Davis to remain in public office, and—as recently revealed—put its thumb on the scale in a contested city election by giving substantial money to Caraway *while* he was seeking re-election to public office.  In both instances, explicit conversations—documented on tape and in government documents—demonstrate that the prosecution's plan was to then have these corrupt individuals extort money from citizens seeking the lawful assistance of their elected officials.  Some of this conduct was addressed in a motion filed against the original Indictment with the discovery available at that point.  (Dkt. 79.)  The

Court denied that motion then. However, information withheld by the government has come to light since that ruling and it raises further concern with the government's actions.

During the government's misdirected actions, both Davis and Caraway solicited Mr. Hamilton—Davis for donations to a children's educational trip and campaign contributions for up-and-coming candidates, and Caraway for personal financial help in paying medical bills. Now, the prosecution seeks to mischaracterize Mr. Hamilton's acts of charity as bribe payments, but only because it is bribery that the prosecution hoped to catch when it went fishing for a crime. Accepting the prosecution's theory as true, that the corrupt public officials who the prosecution helped win and retain their offices to shake-down citizens, had extorted bribes from Mr. Hamilton, that would constitute outrageous government conduct in violation of Mr. Hamilton's due process rights under the Fifth Amendment.

## BACKGROUND

### I.      CAROLYN DAVIS

The prosecution determined that former Councilmember Davis was corrupt as early as November 2014. At that time, an undercover FBI agent met with Davis and discussed paying her a monthly retainer in exchange for her help in securing the necessary city approvals to develop real estate in her district. Rather than indict Davis or turning her over to local authorities, the prosecution allowed Davis to continue to serve on the DCC until her term expired, creating additional opportunities for her to interact with others who had interests before the DCC.

When it came to Davis's interactions with Mr. Hamilton, however, the prosecution's hope of ensnaring a businessman in a bribery scheme failed. Instead, Davis solicited Mr. Hamilton's help on two lawful matters: (1) raising funds for the Freedom Ride Tours, a series of trips designed for students from South Dallas to retrace the events of the Civil Rights Movement, and (2) raising

campaign funds for up-and-coming local candidates in the South Dallas community.  Davis later explained to the government that Mr. Hamilton was acting solely out of generosity, as evidenced in the FBI 302 reports.  (Dkt. 87-1; Davis 2/13/19 FBI 302.)

Discovery (in the form of memoranda summarizing interviews of others who dealt with Davis) now includes statements that she never mentioned receiving money from Mr. Hamilton. For example, when the government started to de-brief Caraway in August 2018, he explained how Davis "ask[ed] for money from lots of people" (including Caraway himself), but that Davis "never suggested she was getting money from [Mr. Hamilton]."   (Caraway 8/2/18 FBI 302, GOV_00035811.)[1]  In another interview with Davis' cohort Jay Scroggins, he said more about his lack of personal knowledge on the very issues the government wants to have him testify about at a trial.  Scroggins said he "does not believe he's ever met [Mr.] Hamilton, nor had any telephone conversations with him," he "was not present when Davis got money from [Mr.] Hamilton," and he "did not know that [Mr.] Hamilton sought Low Income Housing Tax Credits (LIHTC)." (Scroggins 9/6/18 FBI 302.)

These interviews in memoranda the prosecution was incredibly (and we contend improperly) reluctant to disclose, support what Mr. Hamilton put forward in his earlier motion— that his relationship with Davis was proper and the charges stem from the government's improper conduct.  As witnesses have now recounted, Davis reported that the prosecution intimidated her into pleading guilty and characterizing Mr. Hamilton's charitable donations as bribes.  Before her death, Davis told at least *four* people that she only pled guilty because the government threatened

---

[1] While the prosecution gave defense counsel access to these FBI 302s at an FBI field office, it rejected the defense's request for copies of them.  The Court should request these materials from the prosecution and review them to confirm the conduct now exposed.  Bates numbers for these documents are included.

her with a lengthy sentence that would leave her daughter, who suffered from mental illness, uncared for.  Davis also told these people she intended to reverse her guilty plea, and if called to testify, would admit that Mr. Hamilton never bribed her or did anything wrong.  (Dkts. 77-1, 77-2 & 77-3.)[2]  Crediting these statements as true is alarming, as it suggests that the government created a plan to charge an innocent man for a crime that it knew or should have known he did not commit.

## II.     DWAINE CARAWAY

### A.  Government Involvement In Caraway's Election

The government's involvement with former Councilmember Caraway is even more shocking.  Not only did the government allow Caraway to stay in office for more than a year while engaging in illegal activity, it actually *facilitated* him in getting elected in the first place by paying him bribe money throughout his campaign.[3]  In February 2016, two undercover FBI agents posing

---

[2] The Court previously declined to consider these declarations as hearsay.  (Dkt. 119 at 3.)  Whether these declarations constitute hearsay, however, was never briefed as the prosecution did not argue that the declarations were inadmissible as hearsay.  (Dkt. 84.)  Because Mr. Hamilton may seek to use the declarations at trial, he now has briefed why those declarations fall within various hearsay exceptions.  (MIL 1.)  In any event, Mr. Hamilton now requests an evidentiary hearing in which he can call the declarants as live witnesses.  *See, e.g.*, *EDS IDAB, Inc. v. NLRB*, 666 F.2d 971, 975 (5th Cir. Unit B 1982) (explaining that the NLRB could not reject "affidavits solely on the basis of their hearsay nature" because "a hearing would eliminate the hearsay problem. While [the named declarants] are hearsay declarants in the affidavits, their testimony as witnesses subpoenaed at a hearing of course would not be hearsay").  The declarations provide an offer of proof that warrants an evidentiary hearing.  *See, e.g.*, *United States v. Perez*, 227 F. App'x 357, 360 (5th Cir. 2007) (reversing because defendant "was entitled to an evidentiary hearing at which he could try to demonstrate the validity of his own declaration and the two affidavits").

[3] The government's involvement in Caraway's 2017 campaign for DCC is detailed in a number of FBI 302 reports, access to which were finally provided to Mr. Hamilton's counsel on November 27, 2019 following his Motion to Compel (Dkt. 104).  The prosecution delayed all it could in providing these reports (and still restricts defense counsel's access to them to the FBI field office).  Had the prosecution provided the 302 reports when they were initially requested, these issues would have been raised in Mr. Hamilton's original Motion to Dismiss (Dkt. 79), and the Court would have had the benefit of a much more disturbing record.  In addition, to compound the government's over-involvement in Caraway's election and subsequent resistance to reveal its conduct, the prosecution actually misrepresented its actions to the Court, stating in a December 5, 2019 filing that "[t]he government never dealt with 'Caraway while he was running for the City

as developers were introduced to Caraway.  Several months later, those undercover agents learned that Caraway planned to run for DCC.[4]  From that point on, on various occasions, the undercover agents began not just encouraging Caraway, but also paying him in exchange for his promise to help them with real estate development in his district once he was elected.

That is right—the federal government assisted a local candidate that it knew was corrupt (because its payments were used to demonstrate his corruption) in getting elected to have him on their retainer to carry out his impropriety once elected.  In fact, on one occasion, an undercover agent paid Caraway $1,000 and Caraway agreed the payment would serve "as a retainer." (10/18/16 FBI 302, GOV_00073504.)  On another occasion, an undercover agent paid Caraway $1,000 and told him he would let Caraway know what he needed after the election.  (12/15/16 FBI 302, GOV_00073507.)  At Caraway's actual campaign announcement party in February 2017, an undercover agent gave Caraway *$8,000 in a cigar box*.  (2/1/17 FBI 302, GOV_00073515.)  And the night Caraway was elected, undercover agents gave him another *$5,000 in a cigar box*, telling him that they were "in a new relationship."  (5/6/17 FBI 302, GOV_00073520.)  During the campaign, federal agents routinely took Caraway to dog racing tracks and so-called "mens' clubs" – it remains unclear what sort of entertainment for Caraway the federal government paid for at these clubs – and the federal government even took him and a friend of his to Oklahoma[5] to gamble at the WinStar Casino to celebrate his victory.  (5/7/17 FBI 302, GOV _00073521.)

---

Council . . . .'" (Dkt. 142.)  Whatever the phrase "dealt with" means to the prosecutors, to the rest of us meeting with him, encouraging his candidacy, giving him tens of thousands of dollars while he was a candidate and securing his position as a corrupt official once he was elected would be "dealing with" him.

[4] Caraway was Councilmember for District 4 from 2007 to 2015, and then termed off, before campaigning for re-election to the position in 2016-17.

[5] It is ironic that the prosecution's Superseding Indictment adds a Travel Act charge, despite its inapplicability because there was no interstate travel in Mr. Hamilton's dealing with Caraway (MTD 9); the only time we are aware of Caraway crossing state lines to receive a bribe was when

Even after all this, the prosecution refused to pull the plug on Caraway.  Federal agents continued to bribe Caraway immediately after he took office.  In August 2017, the agents gave Caraway another *$10,000 in a cigar box* in exchange for his official action advancing their "development plan" for Cadillac Heights.  (8/28/17 FBI 302, GOV_00073527.)  Caraway went on to engage in other illegal activities, including his role in the DISD school bus camera bribery scheme.  Caraway continued to serve as a Councilmember until August 2018, when the federal government, which had given him more than $20,000 between 2016-17, finally shut him down.

Despite the government asserting it did not "deal with" Caraway during his campaign, it not only did so, but did so without telling Caraway's opponent, Carolyn King Arnold, or the voters of Dallas, or the other Councilmembers who elected him Mayor Pro Tem, what the government knew and the others did not—Caraway was a bought and paid-for candidate and elected official. Under any definition of government "over-involvement" in an offense, it would have to include the federal government clandestinely intervening in a contested state or local election to help the corrupt candidate win so that when that candidate won, he could be used to shake down citizens to see who would acquiesce into paying bribes.  This shocks more than the conscience, it is a direct assault on fair elections and the democratic process.

### B.  Government Involvement In The Set-Up Of Mr. Hamilton

In mid-2018, the prosecution approached Caraway about his various unlawful activities. In an attempt to reduce his exposure to punishment, Caraway met with both prosecutors and the FBI on August 2, 2018.  During his meeting with the FBI, Caraway explicitly told agents that he "never received cash" from Mr. Hamilton and that any contributions he received from Mr.

---

the federal government took him from Texas to Oklahoma to bribe him with an evening of entertainment at a casino on the federal government's dime.

Hamilton were not for official acts.  He did this while recounting his interactions with numerous others from whom he did solicit cash, services or other things of value in exchange for his official help.  (8/2/18 FBI 302, GOV_00035811.)  On August 2, 2018, there was no reason, then, for the government to target Mr. Hamilton with Caraway and to arrange for Caraway to get Mr. Hamilton to a meeting where he could be solicited again and taped.  But the government would let Caraway see if he could entice Mr. Hamilton to give him money, when Mr. Hamilton had never done so before.

During the August 2 meeting, Caraway received a call from his office informing him that he missed a call from Mr. Hamilton (which we all know now was to promote the public initiative of paid sick-leave for Dallas workers).  Caraway, now working for and directed by the government, agreed to return Mr. Hamilton's call with the FBI taping the conversation.  During that call, on August 2, 2018, Mr. Hamilton simply gave Caraway his pitch for why paid sick leave would benefit the people of Dallas, and asked for Caraway's help in talking to the Mayor about getting a referendum item on agenda for the next DCC meeting.  Mr. Hamilton never suggested he would pay Caraway or provide him with any benefit, which was consistent with Caraway's prior statements that Mr. Hamilton never paid him.  A review of every word of the August 2 call demonstrates Mr. Hamilton's only concern was paid sick leave.  (Dkt. 85-1D (transcript of call).) He made his pitch for it and was done.  It was Caraway who made up some excuse to want more time with Mr. Hamilton and requested that Mr. Hamilton meet with him in person the next day. After Mr. Hamilton exclaimed, "that's it.  I finished saying what I was going to say," Caraway—likely at the suggestion of the government—injected the topic of Eleventh Street, a blighted area that both Caraway and Mr. Hamilton had vague hopes of seeing improved.

The following day, Mr. Hamilton unknowingly showed up to the trap laid by Caraway and the government.  When Mr. Hamilton first entered Caraway's office, in one of the most outrageous aspects of this set-up, Caraway was on the phone with his mother talking about her fragile health and the need to pay her medical bills.  He made sure Mr. Hamilton heard the exchange by putting his mother on speakerphone.  After Caraway finished with this display, he listened as Mr. Hamilton gave the same policy pitch for paid sick-leave he had given by phone the day before.  Mr. Hamilton highlighted that paid sick-leave would benefit constituents and that Caraway's support of the initiative would help his re-election campaign.  Mr. Hamilton pitched his request based on policy, he did not offer any bribe, and Caraway did not suggest that one was necessary to obtain his help in getting this noteworthy initiative before the DCC.

Mr. Hamilton then encouraged Caraway, who repeatedly claimed to be tired and run down, to run for another term in office, at which point Caraway brought up his own poor health.  Discussing his apparent fight with cancer and the related medical bills, Caraway only then told Mr. Hamilton that he needed to find $6,200 that day.  Exasperated, Caraway told Mr. Hamilton that he was just "trying to survive," and that "it[] [was] difficult," even without the campaign.  Caraway told Mr. Hamilton, "I'm dealing with so much shit . . . I'm tired.  I'm bleeding out my ass . . . ."  Mr. Hamilton—who survived his own battle with cancer—tried to reassure Caraway that he would "get through this" and that there were "people who support[ed] him."  (Dkt. 85-1E (transcript of meeting).)

Then—knowing what the government needed (additional discovery could reveal what agents and he discussed[6])—Caraway abruptly changed the topic back to Eleventh Street.  Caraway

---

[6]  During the August 3, 2018 taped meeting, Caraway received a call on his cell phone from an unknown person while he was sitting with Mr. Hamilton and talking to his mother on his office phone.  Despite repeated inquiries by defense counsel, the prosecution has not disclosed who called

told Mr. Hamilton that he "saw opportunity" even through the blight, and that the transformation of the area was "so important" to him.  Mr. Hamilton agreed the area was blighted, and said he was interested in investing in something there because he believed it was a good opportunity, but noted that he just learned that the last two lots he was interested in purchasing were under contract. They then discussed the available properties and a desire for redevelopment generally, rather than any specific proposal for redevelopment.  Mr. Hamilton was just responding to a topic Caraway had raised and brought him up to date.  He asked for nothing.  Caraway stated that he would like to help Mr. Hamilton redevelop that part of Caraway's blighted district.  Again, this was Caraway's suggestion.  Neither Mr. Hamilton nor Caraway proposed any specific course of action for either to take, nor did they discuss anything illegal.  It was simply an unremarkable conversation in which a public official, who in the past was properly concerned about blighted areas of his district, encouraged a local developer, who had made a career of expanding access to housing, to pursue some kind of unspecified redevelopment project in a blighted part of the official's district.

Caraway, working to get himself out of his massive wrongdoing by helping the government, then asked again for help with his medical expenses, explaining the money was going "to go pay for [his] mama."  With all that had transpired—putting his mother on the speakerphone talking about her illness, complaining about his own illness—this was a plain appeal to sympathy, as Caraway knew that Mr. Hamilton had barely survived a long ordeal with cancer and emerged from the experience looking to help others in similar situations.  Indeed, that is precisely why Mr. Hamilton called Caraway in the first place, to help other people gain access to paid sick-leave.

---

Caraway on his cell phone.  It was only after that call that Caraway began complaining about his illness and the topic of Eleventh Street.

Recognizing that Caraway was not just discussing his medical troubles, but was hitting him up for payment, Mr. Hamilton tried to signal discomfort with how this could be interpreted.  Mr. Hamilton told Caraway, "you may want to keep everything completely straight."  Mr. Hamilton asked whether Caraway wanted him to make a check out to Caraway personally and how the reference on the check should be framed, "just for posterity's sake," in case "somebody ever asks," so that Caraway would think twice about appearances before hitting him up again.  But Caraway failed to back down.  Believing the situation must be dire, Mr. Hamilton responded as Caraway knew he would—by providing charity so that Caraway could pay the medical bills.  As to this being a scheme, Mr. Hamilton did not give or arrange to give Caraway cash, he wrote a check on his own account, with his name printed, and his own signature affixed.

## ARGUMENT

The Due Process Clause bars the prosecution of a defendant where the prosecution arises from fundamentally unfair government conduct.  *United States v. Graves*, 556 F.2d 1319, 1322 (5th Cir. 1977).  This bar to prosecution, known as the outrageous government conduct defense, was first identified by the Supreme Court in *United States v. Russell*.  411 U.S. 423, 431-32 (1973). In *Russell*, the Court revisited whether entrapment is a subjective standard—examining the "predisposition" of the defendant to commit the crime—or an objective standard—examining only whether the government "instigated the crime."  *Id.* at 429.  The Court held that entrapment is a subjective standard, but noted that it could "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction."  *Id.* at 431-32.

Most courts see this shift in focus from the defendant's conduct to the government's conduct as what differentiates the two defenses: "[The outrageous government conduct] defense

10

is sometimes raised together with the defense of entrapment, but the two are distinct: 'Whereas the defense of entrapment focuses on the predisposition of the defendant to commit the crime, the defense of outrageous government conduct focuses on the government's actions.'" *United States v. Combs*, 827 F.3d 790, 794 (8th Cir. 2016) (quoting *United States v. Hunt*, 171 F.3 1192, 1195 (8th Cir. 1999)).  The Fifth Circuit seems to agree: "The due process clause protects defendants against outrageous conduct by law enforcement agents.  While entrapment focuses on the defendant's intent and his predisposition to commit the crime, the due process clause forbids the government to act improperly *even against culpable persons*."  *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986) (emphasis added).  While the entrapment defense is raised at trial for the jury, a due process challenge is made before trial, focusing on the government's actions.

Part of the confusion in the Fifth Circuit is that, while cases like *Arteaga* make clear that the defense is available to even "culpable persons," the same cases go on to address whether the defendant was "passive."  *Id.* at 427.  Some clarity may be found in *United States v. Nations*, 764 F.2d 1073, 1077 (5th Cir. 1985), which states that "the outrageous government conduct defense generally is available only upon proof of government *over-involvement* in the charged crime and proof of the defendant's mere passive connection to the government orchestrated and implemented criminal activity."  (emphasis in original).

The defense construes this language as to what is generally true as consistent with the law of other circuits that apply the objective standard focusing solely on the government's conduct.  As the name of the defense implies, outrageous *government* conduct will necessarily focus on the over-involvement of the government in causing the crime.  Where there is such government over-involvement, it would "generally" be true to see the government taking a more active role and the defendant in a more passive, yet culpable, role.  Nevertheless, the defense appreciates that this

Court has construed Fifth Circuit law to require that a "defendant must have played a passive role in the charged crime." (Dkt. 119 at 1 n.1.)

Under either an objective or subjective standard, the prosecution's actions in manufacturing Mr. Hamilton's "crimes" constitute outrageous government conduct, and therefore, the charges against him must be dismissed.

## I.   Outrageous Government Conduct in Manufacturing Crimes Involving Davis

The government engaged in outrageous conduct by manufacturing Mr. Hamilton's alleged "crimes" involving Davis. Even after catching Davis in the act of taking bribes from undercover agents, the prosecution chose to let her finish her term, believing that she would continue to extort citizens seeking her assistance as an elected official. In doing so, it implemented a government-sponsored shakedown to deprive the people of Dallas of honest government services.

When the government was unable to ensnare Mr. Hamilton in an unlawful *quid pro quo*, Davis told numerous people that they pressured her into falsely accusing Mr. Hamilton of bribery. (Dkts. 77-1, 77-2, & 77-3.) The government was aware of Davis's interactions with Mr. Hamilton since December 2014, and even recorded several of their conversations.[7]   Whatever else could be

---

[7]  The government began taping Davis' and others' conversations in early 2015. Pursuant to law, the government ordinarily is required to provide people overheard notice within 90 days of the date the application for an intercept order was filed. On November 25, 2019, the Court directed the government to explain why notices of conversations that occurred in 2015 were not noticed until almost five years later in late 2019. (Dkt. 136.) Needless to say, had the government provided notices when normally required, the events that occurred thereafter would not have happened. The government explains that its "first production dated April 23, 2019 included recordings and one of the thirteen orders delaying notification of the inventory notice" and that on "September 27, 2019, the government provided an electronic copy of the court's wire interception file to defense counsel, including the applications and delaying orders described herein." (Dkt. 144.) But the first discovery production did not include any inventory notices, and the September 27, 2019 production included only some of the orders described in the government's filing, interspersed between thousands of other documents. As pointed out above, *supra* at 4 n.2, the government has made other misstatements to the Court in explaining its errors and conduct.

said about those conversations, it was not enough to charge either Davis or Mr. Hamilton. It was only after the government felt the need to have other agents offer and then give Davis money for official acts having nothing to do with Mr. Hamilton that they then moved forward against her. Even then, they did not seek to charge Mr. Hamilton. It was only after Davis agreed to "cooperate" (which she told people meant she was pressured into pleading guilty) that conduct the government had left alone for four years became the charges in this case. This is a description of the government being "active" and Mr. Hamilton being "passive."

Moreover, even crediting the prosecution's theory of the case, Mr. Hamilton was only a passive participant in the alleged "crimes." As U.S. Attorney Erin Nealy Cox stated in a press conference, Davis "actively sought out" what the government characterizes as bribes."[8] Where a public official engages in extortion, refusing to provide government services absent the payment of a bribe, "the bribe payor [who] is merely complying with an official demand . . . lacks the *mens rea* necessary for a conspiracy." *Ocasio v. United States*, 136 S. Ct. 1423, 1435 (2016); *see id.* at 1436 (explaining that although the payor "has 'consented' to the [official's] demand . . . this mere acquiescence in the demand does not form a conspiracy"). In any event, Davis solicited charitable donations and campaign contributions from Mr. Hamilton; there is no evidence that she solicited funds for herself or in exchange for official acts. The only claim of any *quid pro quo* comes from Davis' inadmissible guilty plea, which she recanted to people close to her, and which is inadmissible testimonial hearsay that was never subject to cross-examination in conformance with the Confrontation Clause. Whether Mr. Hamilton is viewed as giving into an extortionate demand or is entirely innocent and was framed by the government's inducement of false testimony by

---

[8] https://www.youtube.com/watch?v=2ctAYWI7SVs (Mar. 1, 2019) at 1:15.

Davis, Mr. Hamilton's role is sufficiently passive that the government should be held accountable for its misconduct.

## II.      Outrageous Government Conduct in Manufacturing Crimes Involving Caraway

Likewise, the government engaged in what cases would label outrageous conduct when it manufactured Mr. Hamilton's alleged "crimes" involving Caraway.   First, the government, through FBI agents, paid Caraway thousands of dollars in bribery money while he was running in 2016-17 for DCC.   These payments (whether used directly on campaign activities or for his own needs which then offset what he would have to spend otherwise) played a part in Caraway's subsequent victory over an incumbent Councilmember.   And while the government was encouraging Caraway's candidacy and giving him money, it did nothing to inform Caraway's opponent or the citizens of Dallas that Caraway was provably corrupt, being supported and paid for by the federal government, and being put in place so he could continue to solicit or demand funds for taking official actions.   This has to be unprecedented over-involvement by the government.  *See United States v. Twigg*, 588 F.2d 373 (3d Cir. 1978) (reversing defendants' convictions due to outrageous government conduct where the government's informant proposed and led a drug operation ensnaring the defendants and the government provided approximately $2,000 in drug-manufacturing supplies).

After Caraway was elected, the government allowed him to serve as a Councilmember for over a year before taking legal action against him.  The government once again deprived the people of Dallas of honest government services, both by elevating a corrupt candidate to office and by allowing him to maintain his position despite his illegal abuses of power.  The outrageous nature of the government's conduct is evidenced by its attempts to conceal it, both by delaying discovery

productions which would reveal its over-involvement and by making misrepresentations to the Court about not "dealing with" Caraway during his campaign.

The government continued in its attempts to manufacture crime when Caraway received a chance phone call from Mr. Hamilton during his meeting with the FBI. Caraway had just finished telling FBI agents about the nature of his prior dealings with Mr. Hamilton, explaining that he "never received cash" from Mr. Hamilton and that any contributions he received from Mr. Hamilton were *not* in exchange for any official action. He explicitly refuted the notion that their relationship was corrupt. Nevertheless, the government decided to target Mr. Hamilton anyway.

Caraway—who at that point was facing a host of federal charges—began acting as an agent of the government, and returned Mr. Hamilton's phone call with the FBI taping. During that phone call, all Mr. Hamilton did was address the merits and policy of an issue of public importance— paid sick-leave. He never mentioned anything about himself or his business and even said, after he made his pitch, "that's it. I finished saying what I was going to say." In response, Caraway— now working for the government and understanding the game of cooperation—did two things: (1) he brought up Eleventh Street out of the blue, hoping Mr. Hamilton would seek help for a more profitable purpose, and (2) he came up with an excuse to delay their exchange to the following day so he could lay a better trap with the government scripting him and videotaping the entire interaction. Then, when Mr. Hamilton showed up the following day, Caraway wove a web, putting his sick mother on speakerphone and then alternating between talk of paid sick-leave, some sort of possible Eleventh Street development, and his desperate need for help paying medical bills. When Mr. Hamilton succumbed to Caraway's pleas for help, the government mischaracterized this act of charity as bribery.

This is not bribery, but if it were, it would be another government-manufactured shake-down.   There is nothing wrong with a citizen asking a Councilmember for help in getting a referendum item placed on the DCC agenda (this is typical First Amendment-protected petitioning activity), but there *is* something wrong with having a corrupt public official deny that citizen his honest services unless some extortionate demand from the public official is met.   The government's elaborate set-up is the type of misconduct that crosses the line and manufactures rather than investigates crime.

Mr. Hamilton's actions in dealing with Caraway could only be characterized as "passive." It was the government that played the "active" role, facilitating a corrupt candidate to public office, and then using him to set up innocent citizens looking for help from their elected representative. If it were up to Mr. Hamilton, his communications with Caraway about paid sick leave would have ended with the August 2 phone call.   On that call, Mr. Hamilton had made his ask and did so without making any statement that could remotely be construed as a bribe.   It was Caraway—seeking to appease the government—who requested that Mr. Hamilton meet with him in person the next day.

When Mr. Hamilton came to Caraway's office, he gave Caraway the same pitch for paid sick-leave, without offering Caraway anything.   In a desperate attempt to fabricate a *quid pro quo*, Caraway began playing on Mr. Hamilton's sympathies by complaining about his apparent cancer and his need to pay his mother's mounting medical bills.   After several pleas by Caraway, Mr. Hamilton wrote and signed a personal check.   Neither Caraway nor Mr. Hamilton ever conditioned Mr. Hamilton's help with the medical bills on Caraway's help in speaking to the Mayor about paid sick-leave.   They were just different topics of conversation in the same meeting.

Again, Mr. Hamilton could not have been more than a passive participant in this supposed offense or there could be no offense at all.  This is merely an attempt by the government to prove that its trap worked, when it had caught nothing at all.  But even if the government had ensnared Mr. Hamilton, having done so by instigating an in-person meeting in which Caraway would be the one to ask for money in a desperate plea for sympathy, it is still hard to see Mr. Hamilton's role as anything but passive.  He merely acquiesced to the pressure placed upon him by the government. Such appeals for sympathy are adequate to render a defendant sufficiently passive to qualify for an entrapment defense, so they should be equally adequate to render Mr. Hamilton sufficiently passive in this context.  *See, e.g.*, *Sherman v. United States*, 356 U.S. 369, 374 (1958) (finding entrapment as a matter of law based on the government agent's "resort to sympathy"); *United States v. Smith*, 547 F. App'x 390, 394 (5th Cir. 2013) ("Persuasion, mild coercion, or pleas based on sympathy can constitute entrapment."); *United States v. Theagene*, 565 F3.3d 911, 922 (5th Cir. 2009) ("'[P]ersuasion or mild coercion' and 'pleas based on need, sympathy, or friendship' can constitute sufficient inducement to permit jury consideration of entrapment.") (quoting *Nations*, 764 F.2d at 1080); *United States v. Jackson*, 700 F.2d 181, 191 (5th Cir. 1983) ("The important inquiry is whether there is any evidence that the government's conduct created a substantial risk that a person, other than one who is ready to commit it, would commit the offense.  To create a substantial risk, however, the government conduct must include an element of persuasion or mild coercion, such as fraudulent misrepresentations, threats, coercive tactics, harassment, promises of reward or pleas based on need, sympathy, or friendship."); *Collier v. United States*, 301 F.2d 786, 787 (5th Cir. 1962) (Bell, J.) ("Ordinarily in an entrapment case the claim is made that the offense was instigated by an appeal for sympathy or friendship by the agent. . . .").

These efforts to manufacture new crimes turn the function of law enforcement on its head. "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States*, 356 U.S. 369, 372 (1958). "The first duties of the officers of the law are to prevent, not to punish crime. It is not their duty to incite to and create crime for the sole purpose of prosecuting and punishing it." *Sorrells v. United States*, 287 U.S. 435, 444 (1932) (internal quotation omitted).

Separately, and especially together (given how the government was content to wait four years after first looking into Mr. Hamilton and felt the need to set up something else before they could charge), the government's conduct with respect to the Davis and Caraway charges passes the threshold for improper manufacturing of a crime. And at the base of the second set of charges is the fact that the federal government encouraged and then financially supported a person running for office, putting the federal government's thumb on the scale in a contested election to help the corrupt candidate win and not telling his opponent or the voters what it knew. It then continued to fund this official who it helped get elected for a considerable time before finding out another scheme in which he was involved and finally pulling the plug. How can this be allowed?

Moreover, the federal government certainly has a duty not to meddle in state and local elections by knowingly—and shockingly—funding corrupt candidates at the expense of non-corrupt candidates, just so that it can coerce the government's favored candidate to shake-down others once elected. These duties were unambiguously violated here and, consistent with the case law, this Court should dismiss the Superseding Indictment so that the government understands that such conduct will not be rewarded.

## CONCLUSION

As a result of the government's conduct, Mr. Hamilton was deprived of his right to due process under the Fifth Amendment.   Accordingly, this Court should dismiss the Superseding Indictment.

Dated:  January 31, 2020

Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

## CERTIFICATE OF SERVICE

I certify that on January 31, 2020, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

/S/Abbe David Lowell
Abbe David Lowell