IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:19-cr-083-S |
| | ) | Chief Judge Barbara M. G. Lynn |
| RUEL M. HAMILTON | ) | |

# MR. HAMILTON'S RESPONSE TO THE
# GOVERNMENT'S PROFFER FOR THE *JAMES* HEARING

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1700 K Street, NW
Washington, DC 20006
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

The government's so-called "proffer for *James* hearing" (Dkt. 190) is an abdication of its burden to seek the introduction of any of the statements that it professes to want to use at trial. Recognizing the defense's challenge to the use of any statements by Carolyn Davis given her death and the lack of first-hand knowledge by Jeremy Scroggins, the Court ordered the prosecution to "proffer the statements it plans to offer under Rule 801(d)(2)(E) and the evidence it will offer to convince the Court of the existence of a conspiracy." (Dkt. 118 at 2.)[1] The Court clarified that the prosecution should provide in advance of the hearing the out-of-court statements it intends to offer and a list of witnesses that it intends to call. (Dkt. 189.) In doing so, the Court made clear:

> While the content of such statements must be considered, the Government cannot establish admissibility based on the statements alone. *United States v. Fairley*, 880 F.3d 198, 213 (5th Cir. 2018). "There must be 'independent evidence' establishing the conspiracy." *United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) (internal citation omitted).

(Dkt. 118 at 4.)[2] Nevertheless, the prosecution offers no independent evidence of a conspiracy whatsoever, no witnesses, no evidence of first-hand knowledge by Scroggins, and no statements that demonstrate that Mr. Hamilton committed any crime charged in the Superseding Indictment. Thus, the prosecution has failed to prove that any of the statements that it has identified for use at trial are admissible. And a careful read of the submission reveals that the "basis" they put forward to establish that the conspiracy they charge exists is cutting and pasting large portions of a post-alleged-conspiracy, testimonial fact resume of two pleas that the prosecution itself wrote. This surely is not the type of independent evidence the case law requires.

---

[1] The prosecution cites *United States v. Nichols*, 695 F.2d 86, 90 (5th Cir. 1982), to support its decision to proceed by proffer, but *Nichols* does not give the prosecution the right to decide how it should proceed. Rather, *Nichols* gives the District Court's discretion to decide how to proceed, and the Court here ordered a hearing with the requirements stated above.

[2] The prosecution omits these requirements in stating the elements of the co-conspirator exception. (Dkt. 190 at 3.)

Worse yet, the prosecution seems to think that this hearing is some sort of meaningless exercise or is attempting to ignore the order to present its evidence at the hearing. The prosecution claims that it has unspecified other evidence of a conspiracy that it will seek to introduce at trial (Dkt. 190 at 4), that its proffer "is not intended to contain all the statements the government may offer at trial" (*id.* at 14), claims the statements' "admissibility on other grounds must be considered on a case-by-case basis at trial" (*id.* at 3), and that it believes Davis' guilty plea will be corroborated by "the anticipated testimony of Scroggins" without even bothering to proffer what that testimony will be or calling him as a witness at the hearing (*id.* at 9).[3] Obviously, the whole purpose of the pre-trial *James* hearing is to decide the admissibility of such statements and evidence *before* trial. The prosecution has waived its right to introduce any statements through a hearsay exception that it has not advanced in this Court-required notice to list the statements that it intends to use at trial.

### THE STATEMENTS IDENTIFIED BY THE PROSECUTION

The statements that the prosecution has identified that it would like to admit at trial all fit within various categories, addressed below, which would render the statements inadmissible. The prosecution's lead argument is a telling once, which essentially concedes that it has no evidence to prove that Mr. Hamilton bribed Davis or conspired to do so. The prosecution makes no effort to argue that any of its statements prove bribery or a conspiracy to commit bribery, but instead argues that the statements reflect some sort of lawful joint undertaking. (Dkt. 190 at 5-6.) But that only begs the question as to why evidence of this lawful joint undertaking would even be admissible as relevant – other than to provide an exculpatory explanation for Mr. Hamilton's

---

[3] Because the prosecution indicated it would not call the key witness to establish whether any conspiracy existed and how various statements furthered such a scheme, defense counsel has endeavored to subpoena Scroggins even though Mr. Hamilton bears no burden at the hearing.

conduct (*e.g.*, Davis telling someone Mr. Hamilton provided her real work or she explained to him the campaign contribution rules).

The key is to keep focused on the scope of the joint undertaking that the prosecution claims it can establish and how the law treats that assertion. The prosecution seems to have a bizarre notion that agreements are like some sort of communicable disease, where if someone (here, Mr. Hamilton) makes any agreement to do anything (for example support a candidate) with anyone (here, Davis), that person somehow becomes a party to every other agreement that new person has made with anyone else. For example, the prosecution seems to believe that because it can show that Mr. Hamilton agreed to "have a beer" with Davis (Dkt. 190 at 18) or help her raise campaign money for Tiffinni Young (*id.* at 15) those agreements somehow become a hook to introduce as evidence against Mr. Hamilton statements by Davis to undercover agents concerning some sort of sting operation that they were running that had nothing to do with Mr. Hamilton.

The prosecution is right that it does not matter for Rule 801(d)(2)(E) whether the alleged joint venture is criminal or not (Dkt. 190 at 5 (citing, *inter alia*, *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983)),[4] but the scope of what is agreed upon certainly matters in deciding what statements become admissible. As the case law cited by the prosecution explains:

> Of course, the government must establish that the statements it seeks to admit were in the course and in furtherance of the particular joint venture it has established. It would not suffice in the instant case for the government simply to show that the appellants were all on a joint venture when they were arrested in Springfield. Even if Korenak and Joseph were indeed on a joint venture with Coe, statements Coe made regarding a *different* joint venture with *other* parties for *another* purpose would still be inadmissible. The government must prove by a preponderance of independent evidence that the appellants were on a joint venture and that the

---

[4] The prosecution essentially conflates the co-conspirator hearsay exception Rule 801(d)(2)(E) with Rule 801(d)(2)(D) involving agency generally and suggests that both are applicable for the same reason. (Dkt. 190 at 27.) But because the analysis is the same, the prosecutions arguments under Rule 801(d)(2)(D) fail for the same reasons.

3

statements sought to be admitted were in the course and in furtherance of *that* joint venture.

*Coe*, 718 F.2d at 835-36 (emphasis in original).

The first bucket of statements offered by the prosecution involve statements by or conversations with non-conspirators. Although the prosecution claims that it "intends to offer at trial nontestimonial statements of Hamilton, Davis, and Scroggins under Rule 801(d)(2)(E)" (Dkt. 190 at 2) and claims "[t]here can be little question here that the proffered statements were made by Hamilton's coconspirators, Davis and Scroggins" (*id* at 3), the chart of statements it attaches includes statements from various other people – Undercover Confidential Employees (UCEs) (*id.* at 15 entry 6,[5] 22 entry 2, 3, 4, 6, 24 entry 4, 5), Casey Thomas (*id.* at 24 entry 1); John Proctor (*id.* at 24 entry 2); and Harriet King (*id.* at 24 entry 5). Obviously, these statements are improper under Rule 801(d)(2)(E) because they are not statements "made by a co-conspirator of the opposing party." (Dkt. 118 at 4 (Court Order).)

That the prosecution would attempt to introduce statements by its own undercover agents is particularly shocking. In the first place, the law is firmly established that a government agent cannot be a co-conspirator. *See, e.g.*, *United States v. Delgado*, 672 F.3d 320, 341 (5th Cir. 2012) (addressing "a *Sears* instruction") (citing *Sears v. United States*, 343 F.2d 139, 142 (5th Cir.1965) ("[A]s it takes two to conspire, there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy."). Additionally, statements by government agents made in an effort to manufacture evidence on recorded conversations for trial is obviously testimonial and subject to the Confrontation Clause. *See, e.g.*, *United States v. Kizzee*, 877 F.3d 670, 678 (5th Cir. 2012); *United States v. Rodrigez-Martinez*, 480 F.3d 303, 308 (5th Cir. 2007);

---

[5] The prosecution does not number its list of statements. The defense will identify the prosecution's selected statements by the page number in its filing and will number the first full entry on each page as "entry 1," with a higher number given to each subsequent entry on that page.

*United States v. Lopez-Medina*, 596 F.3d 716, 730 (10th Cir. 2010); *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004).

The second bucket of statements is an extension of the first, involving statements by Davis or Scroggins to third parties, including the undercover government agents. (Dkt. 190 at 15 entry 6, 22 entry 1, 2, 3, 4 ,6, 23 entry 1, 24 entry 3, 25 entry 3, 4 (statements to UCEs), 23 entry 2, 24 entry 2, 25 entry 2 (statements to Proctor), 23 entry 3 (statements to Young), 23 entry 4 (statements to C. King), 23 entry 5 (statements to Duncan), 24 entry 1 (statements to Thomas), 24 entry 4 (statements to Myers), 24 entry 5 (statements to H. King), 25 entry 1 (statements to Muhammad). None of these statements are in furtherance of any conspiracy involving Mr. Hamilton.

The statements to the undercover agents concerning their separate sting operation from anything involving Mr. Hamilton by necessity would involve separate conspiracies. The prosecution's theory is that Davis and Scroggins had a scheme in which Davis would solicit bribe money and have it paid to them through Scroggins' Hip Hop Government charity, and that she solicited bribes from Mr. Hamilton and the undercover agents in a similar manner. But while that may show a common conspiracy among Davis and Scroggins, it does not constitute a conspiracy between Mr. Hamilton and the undercover agents.

This defect is known as a rimless wheel conspiracy, where the conspirators at the hub of the wheel (here, Davis and Scroggins) have *separate* conspiracies with those who they deal with down the separate spokes of the wheel (allegedly Mr. Hamilton and the undercover agents). There is no rim linking the outside spokes – Mr. Hamilton and the undercover agents do not know of one another, their alleged agreements with Davis/Scroggins are separate, and they are working toward different purposes (here, different *quos*) based on the payment of different alleged bribes. *See,*

5

*e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 756-59 (1946); *United States v. Levine*, 546 F.2d 658, 663 (5th Cir. 1977).

Nor could the statements made to others be "in furtherance of the conspiracy." Courts consider a statement to be "in furtherance of the conspiracy" where it "advance[s] the ultimate objects of the conspiracy." *United States v. Warman*, 578 F.3d 320, 335-6 (6th Cir. 2009). By contrast, "mere idle chatter or … narratives of past conduct are not in furtherance of the conspiracy" will not suffice, as they "were not intended to further the conspiracy." *United States v. Ebron*, 683 F.3d 105, 136 (5th Cir. 2012); *see also United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014) ("To be in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another.").

The various statements the prosecution identified where Davis is speaking to third-parties about Mr. Hamilton is that sort of chatter about past conduct, which does not further any agreement between Davis or Hamilton or suggest anything unlawful. (*See, e.g.*, Dkt. 190 at 23 entry 1 (Davis telling Proctor that Mr. Hamilton gave her money for candidates), 23 entry 2 (Davis telling Young that Mr. Hamilton's family donated a lot of money to her); 23 entry 3 (Davis telling King that Mr. Hamilton plans to hire her).) Additionally, some of the statements are plainly exculpatory and do not support any claim of a conspiracy. For example, after the news reported that Mr. Hamilton had written multiple checks and written different people's names on the memo lines of those checks, Larry Duncan told Davis that Mr. Hamilton "outta know better." (Dkt. 190 at 23 entry 5.) Davis corrected him, explaining that she told Mr. Hamilton how to fill out the checks and explained that she had checked with "the City Secretary" and "[t]hey said Ms. Davis . . . it can be under the same check book but it has to have different names in the memo," so it was permissible for him to write multiple checks. (*Id.*; *see also id.* at 19 entry 2 (Davis telling Scroggins that she told Mr.

6

Hamilton how to fill out the checks and "the city Secretary" approved).) Similarly, she told people that Mr. Hamilton was hiring her to do legitimate work. (*Id.* at 24 entry 3.)

The third bucket includes statements that were not made during the course of the alleged conspiracy at all. The Superseding Indictment claims the conspiracy ended in June 2015, when Davis left office (Dkt. 139 ¶61), and the prosecution now tells us there "can be little question" that the various statements were made during the course of the conspiracy, "as indicated by their dates" (Dkt. 190 at 3). But those dates do not all match up either. (Dkt. 190 at 21 entry 6 (7/10/15), 7 (7/13/15), 8 (7/13/15), 25 entry 3 (8/27/15), entry 4 (10/15/15), entry 5 (3/14/16).) Obviously, statements made after the close of a conspiracy are neither made *during* or in *furtherance* of the conspiracy.

The fourth bucket of statements are those that the prosecution seeks to use to charge a non-crime – the alleged conspiracy to engage in constitutionally protected First Amendment activity. The Superseding Indictment now splinters off from bribery to allege a conspiracy with no criminal object, in which Mr. Hamilton agrees to help Davis become a consultant who can lobby on his behalf after she leaves office. Mr. Hamilton engages in First Amendment-protected speech and petitioning activity in enlisting a lobbyist to assist him, and in making campaign contributions with the hope of helping to secure Davis' access and influence. (Dkt 160 (MTD 7), Dkt. 187-4 (MTD 7 Reply).) These allegations should be struck, which would eliminate the relevance of the evidence to the prosecution's effort to prove bribery. To the contrary, evidence that Davis and Mr. Hamilton were working together to engage in First Amendment-protected activity would *disprove* bribery by providing a constitutionally innocent explanation for Mr. Hamilton's assistance to Davis.

The prosecution has offered a variety of statements reflecting that Mr. Hamilton agreed to help Davis raise money for a variety of campaigns – none of which comes remotely close to being

7

the sort of explicit *quid pro quo* necessary to charge a campaign contribution as a bribe. (Dkt. 190 at 15 entry 1, 2, 3, 16 entry 3, 17 entry 1, 2, 18 entry 1, 2, 19 entry 2, 3, 4, 20 entry 1, 2, 3, 4, 21 entry 1, 3, 4, 5, 6, 23 entry 1, 2, 4, 24 entry 1, 2, 3, 4, 5; *see also id.* at 15 entry 4 (Davis telling Scroggins that Mr. Hamilton will fund a political think tank), 24 entry 3 (Davis telling UCE that Mr. Hamilton will hire her to help with campaign work), 25 entry 1 (same to Muhammads), 2 (same to Proctor).) This is especially the case when dealing with someone who regularly made campaign contributions in the past and where none of the conversations ever links any contribution to a *quid pro quo* of any kind.

      The prosecution has a new related theory that Mr. Hamilton violated local campaign finance laws. To begin with, this federal indictment cannot charge a conspiracy to violate *local* campaign laws. The new prosecution theory is that contributions were not themselves illegal but made to promote Davis' clout when she left the City Council. Second, it is far from clear that there was any knowing or even inadvertent violation of those laws. Davis actually states that she instructed Mr. Hamilton how to fill the checks out and that it was proper (Dkt. 190 at 17 entry 2 (Davis has Mr. Hamilton re-write checks), 20 entry 1 (advising how to write checks), and she told two other people that as well (*id.* at 19 entry 2; 23 entry 5) and reminded a candidate that she had been given multiple checks from Mr. Hamilton signed in that manner (*id* at 23 entry 3). With respect to the prosecutors' original charge that the cash Mr. Hamilton provided were not for contributions but were somehow to provide funds to Davis, Davis also tells Mr. Hamilton that she spent "every bit" of the money he gave her on the campaigns (Dkt. 190 at 21 entry 5) – in other words, that she did not keep any for herself as bribes or otherwise – and that the candidates that he supported were "the best qualified" (*id.* at 19 entry 4).

Looking to the scope of the agreement, these statements show that Mr. Hamilton agreed to help Davis raise money for her (and his) preferred candidates. The prosecution has not met the heightened explicit *quid pro quo* standard for proving bribery, and none of these statements involve any discussion of bribery, so they should be excluded as irrelevant, because they risk juror confusion as to the crime charged, and risk a jury's prejudice against those who contribute to campaigns leading to a conviction based on constitutionally-protected activity.

There is a fifth bucket of discussions between Davis and Mr. Hamilton that are simply irrelevant, where they discuss meeting without any stated purpose. (Dkt. 190 at 17 entry 3, 4, 5, 6.) These are not in any sense co-conspirator statements or even relevant. Davis would describe Mr. Hamilton as "my friend" (Dkt. 190 at 23 entry 4) and they would socialize, with her stopping by to "have a beer" with him (*id.* at 18 entry 3). They had a social and professional friendship that included community activism in supporting candidates and causes. There is no shortage of reasons why the two would meet for legitimate reasons, and for people who knew each other and worked together for years, a conversation where they discuss getting together should not be admitted with the guess that it was for some improper purpose, let alone in furtherance of a conspiracy never identified in the conversations.

The sixth bucket of statements are those between Davis and Scroggins. (Dkt. 190 at 15 entry 3, 4, 5, 16 entry 1, 2, 17 entry 7, 18 entry 3, 19 entry 1, 2, 21 entry 6.) The facts may be that Davis and Scroggins were corrupt, but there is no evidence that Mr. Hamilton was part of that corruption. Scroggins has told the prosecutors that he never met or communicated with Mr. Hamilton and never saw him give Davis money or even knew there was a tax credit issue pending at the Council – the FBI had to tell him that. So, he has no first-hand knowledge of anything Mr. Hamilton did or agreed to do or why he agreed to do it. (Dkt. 80 at 5.) The tapes also show that

9

Davis would talk openly about corruption with "provocative" language with Scroggins and the UCEs, but *never* with Mr. Hamilton. She asked Mr. Hamilton for money for the Freedom Ride Tour charity and – like the City of Dallas and Dallas Independent School District – Mr. Hamilton had no reason to know that Davis and Scroggins were skimming the pot. Davis never told him that she was keeping any of the money, and her requests emphasizing that she needed the money for a charity are in stark contrast with her conversations with UCEs discussing what they would be getting in return for bribe money and that she was actually taking money from Hip Hop Government. (*Id.*)

Davis also had plenty of reasons to lie to Scroggins to get him to give her money from checks written to the Hip Hop Government charity that Scroggins controlled. Scroggins had no reason to give any of that money to Davis – the checks were made out to his charity and Scroggins would face severe criminal penalties if he was caught embezzling money from his charity. Davis could have lied to Scroggins by claiming the checks were not really for charity, but were bribes, so that Scroggins would share the money with her on an ongoing basis. The claim of such a bribery conspiracy would both provide a justification for giving money to Davis as, in this sense she earned it, and give Scroggins comfort that Mr. Hamilton would not go to the police if he learned that his money was being stolen from the charity. While such a lie may have been an effective way for Davis to entice Scroggins to join her in a conspiracy to embezzle from a charity, such a lie would not make her statement true, or establish that Mr. Hamilton was part of a bribery conspiracy that never really existed. Thus, the statements themselves do not prove a conspiracy involving Mr. Hamilton.[6]

---

[6] After listing the statements, the prosecution claims "many of the statements" are not hearsay because they would not be offered for the truth of what is asserted, but it does not identify which statements and its claim rings hollow. (Dkt. 190 at 26.) This is always the convenient excuse

### THERE IS NO INDEPENDENT EVIDENCE OF A CONSPIRACY

The prosecution has not identified and apparently will not utilize any evidence at the *James* hearing to prove the existence of a conspiracy. The categories of evidence that the prosecution alludes to, however, proves nothing. The "checks written by Hamilton and negotiated by Scroggins" reflect charitable donations, the same as the checks written by the City of Dallas and Dallas Independent School District to Hip Hop Government. (Dkt. 190 at 8.) The "official acts taken by Davis as recorded in official records" reflect that Davis voted the way one of her supporters wanted on a matter before her – the same is true of the official records of every politician ever elected in America. (*Id.*) The surveillance of Davis and Mr. Hamilton meeting and going to the bank, along with bank records, and intercepted communications only show that Mr. Hamilton gave Davis money that she solicited on behalf of charity and for campaign contributions and which she states went to the purposes intended. (*Id.*) In short, there is no evidence of bribery or any sort of bribery conspiracy at all.

The prosecution argues at length based on the factual resume to Davis' guilty plea, but that is riddled with problems. That is testimonial hearsay by an out-of-court witness that is barred by the Confrontation Clause and it produces a *Bruton* error to the extent that it implicates Mr. Hamilton. (Dkt. 70 at 7-8.) Even the prosecution has conceded that it cannot use this evidence at trial. (Dkt. 88 at 6-7.) Nevertheless, the prosecution maintains that it can determine preliminary questions of admissibility without regard to "evidence rules" under Rule 104(a). (Dkt. 190 at 3.)

---

when a party cannot otherwise get the admission of a hearsay statement. Courts must always scrutinize claims that hearsay is not being offered for the truth, or the hearsay rule is too easily gutted. *United States v. Salinas*, 993 F.2d 344, 346 (3d Cir. 1993); *see also Williams v. Illinois*, 567 U.S. 50, 103 (2012) (Thomas, J., concurring) (rejecting dubious claim that hearsay was offered for any reason but its truth); *id.* at 126 (Kagan, J., dissenting) (noting five justices reject argument that hearsay was offered for other than the truth).

11

The Supreme Court has rejected any "construction of Rule 104(a) [that] will allow courts to admit hearsay statements without any credible proof of the conspiracy," emphasizing that purported co-conspirator statements are presumed unreliable and independent evidence is needed to overcome the presumption and establish that a defendant was a member of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 1719 (1987). Moreover, the Confrontation Clause and *Bruton* are not among the "evidence rules" referenced in Rule 104(a), they are constitutional principles and the Court should not ignore those principles in any context. *Williams*, 567 U.S. at 124 (Kagan, J., dissenting) (noting the applicability of the Confrontation Clause to a preliminary hearing); *Crawford v. Washington*, 546 U.S. 31, 66 (2004) ("Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation.").

Additionally, the value of Davis' factual resume is diminished because her guilty plea has been vacated, she recanted her testimony to four people before she died, and Davis does not appear to have admitted to *quid pro quo* bribery in her statements to the FBI, only in signing the factual resume drafted by the government. This is particularly true of the prosecution's new theory – since Davis' death, with which neither she nor Mr. Hamilton were initially charged – that campaign contributions were bribes. Davis never said that in any form, and yet a vast swath of the hearsay statements the government now seeks to introduce are in support of that new theory.

Finally, the prosecution alludes to "the anticipated testimony of Scroggins" (Dkt. 190 at 9), but there will be no such testimony at the *James* hearing. The prosecution has chosen not to call him as a witness, so his unknown testimony cannot be used to meet its burden. In any event, it is abundantly clear that Scroggins – who never met or conversed with Mr. Hamilton or ever saw him give Davis money – lacks any first-hand knowledge of wrongdoing by Mr. Hamilton. A factual statement written by the prosecutors to support a gift deal for a twice-convicted felon of

12

misprision of a felony is not "independent evidence" that a conspiracy existed. It is not credible and is inadmissible. (Dkt. 80 at 8-10 (addressing *United States. v. $92,203.00 in U.S. Currency*, 537 F.3d 504 (5th Cir. 2008), and *United States v. El-Mezain*, 664 F.3d 467, 495 (5th Cir. 2011).)

## CONCLUSION

The prosecution has failed to provide credible independent evidence of Mr. Hamilton's involvement in a conspiracy with Davis or Scroggins, and none of the statements that it seeks to introduce through the co-conspirator hearsay exception satisfy the requirements of Rule 801(d)(2)(E).

Dated: March 12, 2020

Respectfully submitted,

/s/ Abbe David Lowell

| | |
|---|---|
| Abbe David Lowell, Bar No. 358651DC | Dion J. Robbins, Bar No. 488888GA |
| Christopher D. Man, Bar No. 453553DC | WINSTON & STRAWN LLP |
| Kaitlin A. Pierce, Bar No. 242020DC | 2121 N. Pearl Street, Suite 900 |
| WINSTON & STRAWN LLP | Dallas, TX 75201 |
| 1700 K Street, NW | DRobbins@winston.com |
| Washington, DC 20006 | 214-453-6100 (ph) |
| ADLowell@winston.com | 214-453-6400 (fax) |
| 202-282-5000 (ph) | |
| 202-282-5100 (fax) | |

*Counsel for Defendant Ruel M. Hamilton*

## CERTIFICATE OF SERVICE

I certify that on March 12, 2020, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

/S/Abbe David Lowell
Abbe David Lowell