IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:19-cr-083-M-1 |
| | ) | Chief Judge Barbara M. G. Lynn |
| RUEL M. HAMILTON | ) | |

**MR. HAMILTON'S SUPPLEMENT TO HIS MOTION TO DISMISS COUNTS 1
THROUGH 3 FOR FAILURE TO ALLEGE AN OFFENSE BASED ON
*KELLY v. UNITED STATES*
(MTD 6; DKT. 159)**

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

## INTRODUCTION

The Supreme Court's unanimous decision in *Kelly v. United States* (May 7, 2020) provides further support for dismissing the substantive Section 666 charges in Counts 2 and 3 and the conspiracy to violate Section 666 charge in Count 1. (MTD 6; Dkt. 159.) *Kelly* built upon the Court's prior unanimous decision in *Cleveland v. United States*, 531 U.S. 12 (2000), to clarify that statutes that target the deprivation of property are not violated by merely "an exercise of regulatory power," instead there must be an intent to obtain the property of the alleged victim. Thus, fraudulently obtaining a video poker license from a state does not qualify as a deprivation of property from the state (*Cleveland*),[1] nor is a state deprived of property when its regulatory process is corruptly invoked to harm a political opponent (*Kelly*).

Under the same analysis, the Dallas City Council (DCC) would not have been deprived of property had Councilmember Dwaine Caraway asked the Mayor to place on the DCC agenda whether to place a referendum supporting paid medical leave on the ballot (Count 3), or by Councilmember Carolyn Davis' efforts to persuade the Texas Department of Housing and Community Affairs (TDHCA) to award tax credits to the Royal Crest project (counts 1 & 2). Thus, Counts 1 through 3 should be dismissed.

---

[1] *Cleveland* reversed a conviction under the wire fraud statute for fraudulently obtaining a video poker license from the state. Although such a license may confer a property right upon the licensee, "such a license is not 'property' in the government regulator's hands." 531 U.S. at 20. The Court rejected a broader construction of the statute that would "approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress," *id.* at 24, and it applied the rule of lenity "to the extent that the word 'property' is ambiguous," *id.* at 25.

## ARGUMENT

I.    *KELLY* CLARIFIES THE LIMITED REACH OF SECTION 666

    A.    *Kelly*'s Holding

*Kelly* involved an abuse of power by New Jersey officials who closed lanes at the entrance of the George Washington Bridge, administered by the federally-funded Port Authority of New York and New Jersey, in an effort to punish the Mayor of Fort Lee by causing traffic backups in his city in retaliation for the Mayor's decision not to support the reelection of New Jersey's Governor. The Court stated that there was no doubt that the defendants in *Kelly* had engaged in corruption, but focused upon whether that conduct could be charged and whether there was sufficient proof of the requirements of wire fraud (18 U.S.C. §1343) and theft or bribery concerning federally funded programs (18 U.S.C. §666):

> The question presented is whether the defendants committed property fraud. The evidence the jury heard no doubt shows wrongdoing—deception, corruption, abuse of power. But the federal fraud statutes at issue do not criminalize all such conduct. Under settled precedent, the officials could violate those laws only if an object of their dishonesty was to obtain the Port Authority's money or property.

(slip op. at 2.)

The Supreme Court rejected the government's claim that this scheme, which depended on the use of the Port Authority's materials and personnel to succeed, deprived the Port Authority of its property. As the Court explained: "The realignment of the toll lanes was an exercise of regulatory power—something this Court has already held fails to meet the statutes' property requirement. And the employees' labor was just the incidental cost of that regulation, rather than itself an object of the officials' scheme." (slip op. at 2.)[2] To violate the statute, "the deceit must

---

[2] Ordinarily, three toll lanes are dedicated to Fort Lee and toll operators would stagger their breaks. The plan to have only one toll lane dedicated to Fort Lee required the Port Authority to pay an

2

also have had the 'object' of obtaining the Port Authority's money or property." (slip op. at 8.) Here, the "plan never had that as an object. The use of Port Authority employees was incidental to—the mere cost of implementing—the sought-after regulation of the Bridge's toll lanes." (slip op at 8-9.)

The Supreme Court compared the situation to *Cleveland*, emphasizing the distinction in the fraud being directed to the state as a regulator and not as a property holder.

> Rather, the Court stated [in *Cleveland*], those rights "amount to no more and no less than" the State's "sovereign power to regulate." Or said another way: The defendant's fraud "implicate[d] the Government's role as sovereign" wielding "traditional police powers"—not its role "as property holder." And so his conduct, however deceitful, was not property fraud.

(slip op. at 9 (quoting *Cleveland*, 531 U.S. at 20, 23-24).) The *Kelly* defendants reallocated the bridge lanes

> for bad reasons; and they did so by resorting to lies. But still, *what* they did was alter a regulatory decision about the toll plaza's use—in effect, about which drivers had a 'license' to use which lanes. And under *Cleveland*, that run-of-the-mine exercise of regulatory power cannot count as the taking of property.

(slip op. at 10.)

In doing so, the Court rejected any argument that the incidental costs of the plan thrust onto the Port Authority could constitute the requisite property deprivation. "But that property must play more than some bit part in a scheme: It must be an 'object of the fraud.'" (slip op. at 10 (internal citation omitted).)

> To rule otherwise would undercut this Court's oft-repeated instruction: Federal prosecutors may not use property fraud statutes to "set[] standards of disclosure and good government for local and state officials." Much of governance involves (as it did here) regulatory choice. If U.S. Attorneys could prosecute as property fraud every lie a state or local official tells in making such a decision, the result would be—as *Cleveland* recognized—"a sweeping expansion of federal criminal

---

extra toll operator to be available, so that a single lane could remain open when that lane's toll operator took a break. (slip op. at 5.)

3

> jurisdiction." And if those prosecutors could end-run *Cleveland* just by pointing to the regulation's incidental costs, the same ballooning of federal power would follow. In effect, the Federal Government could use the criminal law to enforce (its view of) integrity in broad swaths of state and local policymaking. The property fraud statutes do not countenance that outcome.

(slip op at 12 (first quoting *McNally v. United States*, 463 U.S. 350, 360 (1987), second quoting *Cleveland*, 531 U.S. at 24).)

### B. *Kelly* Applies to Section 666's Bribery Provision

Section 666, entitled "Theft or bribery concerning federal funds," is a Spending Power statute and its subsections "must be read in the context of that statute whose purpose is to protect the integrity of federal funds." *United States v. Phillips*, 219 F.3d 404, 411 (5th Cir. 2000); *see Sabri v. United States*, 541 U.S. 600, 606 (2004) (Section 666 is a Spending Power statute). Where a jurisdictional nexus is crossed in which federal benefits exceeding $10,000 are provided to an entity, Section 666 protects those federal funds from both theft or bribery.

That *Kelly* involved Section 666(a)(1)(A) provision concerning theft or fraud, while this case involves Section 666(a)(1)(B) and (a)(2) concerning bribery, makes no difference – both sets of provisions concern property crimes as defined by *Kelly* and *Cleveland* (a wire fraud case). The premise for any Section 666 offense is the same where the federal government seeks to find the basis to charge state or local conduct. Section 666(a)(1) references obtaining "property" by theft or fraud "valued at $5,000" or more. Similarly, Section 666(a)(1)(B) and (a)(2) address obtaining "anything of value of $5,000 or more" through bribery. There is no difference between property valued at $5,000 or more and anything of value of $5,000 or more – both are property offenses of the sort addressed in *Kelly* and *Cleveland*.

Given that they are two subsections of the same statute, with the same federal benefits jurisdictional nexus and same dollar threshold, they should be construed *in pari materia*. *See, e.g.*,

*Branch v. Smith,* 538 U.S. 254, 281 (2003) ("[C]ourts do not interpret statutes in isolation, but in the context of the *corpus juris* of which they are a part"); *McFarland v. Scott*, 512 U.S. 849, 858 (1999) (construing related provisions *in pari materia* to equate "habeas corpus proceeding" and "post-conviction proceeding"); *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("The rule is but a logical extension of the principle that individual sections of a single statute should be construed together."). Likewise, statutory language should be construed in the context of its purpose and its role in the statute as a whole. *Gundy v. United States*, 139 S. Ct. 2116, 2126 (2019). The difference in the two sections is not in terms of what is taken – property worth $5,000 or more – but in how it is obtained. Section 666(a)(1)(A) requires it to be obtained through theft or fraud, and Sections 666(a)(1)(B) and (a)(2) requires that it be obtained through "business" or "transactions" based on bribery. In either case, the subject is the same, only the actions concerning how the property was obtained are different. Thus, *Kelly* is applicable to both sections of the same statute (a result further confirmed by the rule of lenity and the clear statement rule before disrupting the federal-state balance or setting federal standards for state governments).

**II.     THE ALLEGED CARAWAY SECTION 666 SCHEME IS BARRED BY *KELLY***

Given *Kelly*, the prosecution should acknowledge that the alleged Section 666 scheme is barred by *Kelly*. Mr. Hamilton's alleged request that Caraway ask the Mayor to allow a paid medical sick-leave ballot proposal to be put on the DCC agenda is purely a sovereign decision and would in no sense confer a property right upon Mr. Hamilton. It is even farther afield than *Cleveland*, where the license once granted would be property in the licensee's hands. Here, no special right would be conferred on Mr. Hamilton had the ballot initiative been placed before the DCC by the Mayor (or been placed on the ballot or then passed).

5

Even the prosecution's strained theory that the alleged bribery concerned some unspecified future action concerning Eleventh Street fails. To be clear, not even the prosecution has identified whatever it is that it claims was the ask in this context. But whatever it could have become, ranging from Caraway's words of encouragement for someone to sell or for the community to welcome whatever development Mr. Hamilton may later devise, or even granting some sort of preferential zoning, would at most constitute the same sort of sovereign, regulatory exercise held inadequate in *Kelly*. Again, whatever the theory, there was no request for any property that would then trigger the jurisdictional requirement to apply a federal statute to state or local conduct.

### III. THE ALLEGED DAVIS SECTION 666 SCHEME IS BARRED BY *KELLY*

The alleged Davis scheme was for the DCC to encourage TDHCA to part with its tax credits and use them to spur investment in the Dallas community. As in *Cleveland*, these tax credits are not property in the hands of TDHCA. More importantly, as in *Kelly*, where "officials could violate [Section 666] only if an object of their dishonesty was to obtain the Port Authority's money or property" (slip op. at 2), because the Port Authority was the federally-funded entity (Dkt. 139 ¶6), here the DCC is the alleged federally-funded entity, and the tax credits are not in the DCC's hands at all.

To be sure, the DCC sought to influence the TDHCA's decision, but as in *Kelly*, any use of DCC property was purely incidental. The DCC passed resolutions encouraging TDHCA to provide the tax credits to show community support and – contingent upon the award of TDHCA tax credits – the DCC agreed to lend the project money and ask the Dallas Housing Finance Corporation (DHFC) to issue bonds to fund a loan to the project. But unlike *Kelly*, where the Port Authority actually had to pay additional toll operators, none of the contingencies that would have required the DCC to spend money came to pass. The only thing that mattered was getting the

6

TDHCA tax credits – without those, the DCC would spend nothing. Conversely, nobody on the DCC would have to be bribed to go along with TDHCA requirements if TDHCA could be persuaded to use its scarce tax credits to promote development in Dallas.[3]

The prosecution's broader, more amorphous theories of Davis' bribery fail as well. The prosecution imagines that Mr. Hamilton bribed Davis in 2013 and after so that she could be a more effective lobbyist on his behalf when she left the DCC in 2015 – something that in no sense deprives the DCC of property. Similarly, the prosecution ambiguously suggests that Davis was bribed to promote other unspecified "business interests." (Dkt. 139 ¶2.) But there is no allegation that this would involve a deprivation of DCC property. The DCC is a regulator and any benefit it could confer would likely have been in a sovereign, regulatory capacity, addressing issues such as licenses and zoning as in *Cleveland* or perhaps adjusting traffic patterns to favor his developments as in *Kelly*.

## CONCLUSION

There were fatal flaws in Counts 1-3 before the Supreme Court's decision, as demonstrated in the existing motions. The Court's newest decision should be the proverbial "nail in the coffin" of these counts which should be dismissed for failure to allege an offense.

---

[3] The critical local involvement is the issuance of a loan funded by DHFC's issuance of bonds, which is not a big ask as neither DHFC nor DCC is at risk. The bondholders who financed the loan would be at risk if the loan were not repaid, a risk mitigated by the tax credits issued to the project.

Dated: May 11, 2020

                                  Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 488888GA
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

## CERTIFICATE OF SERVICE

      I certify that on May 11, 2020, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

                                  /S/Abbe David Lowell
                                  Abbe David Lowell