IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **Filed Under Seal** |
| | ) | |
| v. | ) | No. 3:19-cr-083-M-1 |
| | ) | Magistrate Judge Renee Harris Toliver |
| RUEL M. HAMILTON | ) | |

# MR. HAMILTON'S RESPONSE TO THE PROSECUTION'S MOTION TO REVOKE OR MODIFY CONDITIONS OF PRETRIAL RELEASE

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 24114011TX
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

Without as much as a call for clarification of events or a simple courtesy call, the prosecution now complains of an event that was so serious as to warrant its extreme motion to revoke conditions of release, but for which it waited *six* months after the allegedly improper conduct occurred to file.  The timing is getting to be more than a coincidence: when Mr. Hamilton criticized the prosecution for failing to provide discovery that showed its improper involvement with Dwaine Caraway, it brought a superseding indictment on facts it had known for four years; when Mr. Hamilton questioned the timing for filing a superseding indictment weeks before trial, the prosecution informed his counsel that it was now looking into a *2010* payroll tax issue nine years after the events took place; when Mr. Hamilton sought and received a continuance over the prosecution's opposition, it now has moved to revoke bail six months after the supposedly alarming incident that it now raises had occurred.

Despite the dramatic presentation and excited tone, the prosecution spins an innocent call from an employer to a former employee to ask if she would help his attorney learn needed facts and to let her know that, as other employees, she had the right to have an attorney in dealing with government or defense counsel, that would be paid for by the company, as it was company events being questioned.  While the prosecution characterizes the conversation as one being "carefully framed" and being a "faux" attempt to tell her she could do what she wanted, that is exactly what the conversation was.  And, at the time of the contact, counsel for Mr. Hamilton asked him to make the introduction so they could follow up (as the employee no longer worked at AmeriSouth and would not recognize an incoming phone number from counsel).  Equally important, at the time of the contact, while Mr. Hamilton knew that the employee had information that his counsel sought to obtain, he was likely unaware that she had been listed among many names in an email the prosecution had recently sent to his counsel.  His comments about his distrust for the FBI had a

sound basis, and the distributions of investment returns addressed in the prosecution's motion were totally disconnected with any investigation. For whatever reason, the prosecution keeps pounding on Mr. Hamilton disproportionately to the conduct they allege in their charge violated the law and, this time, it has distorted events to do so. No change in any conditions is warranted.

**A.      Call to Leslie Martin**

While it is true that Mr. Hamilton did make contact with Leslie Martin, nothing nefarious happened on those taped conversations. Mr. Hamilton called Martin for two reasons. First, to let her know that his defense counsel wanted to arrange an interview with her and, second, to offer to pay for her to have the counsel of her choice in advising her with respect to this matter. Mr. Hamilton's contact was for the limited purpose of aiding in his own defense by facilitating an interview with counsel, and to make a fairly standard offer for an employer to provide indemnified counsel to a former employee.

Strangely, the prosecution faults Mr. Hamilton for having been careful not to have crossed any line. The prosecution explains that Mr. Hamilton "carefully framed the conversation with disclaimers that Martin was free to speak with the FBI and that he was not telling her to refuse to be interviewed." (Dkt. 227 at 2.) Imagine what the prosecution would now say, however, if Mr. Hamilton had not been so careful as to make explicitly clear that he was not seeing to do anything improper.

Martin worked at Mr. Hamilton's company, AmeriSouth from 1987 to 2015. Her responsibilities included payroll. When Mr. Hamilton learned that questions were being raised about how payroll and payroll taxes were done, he reached out to her to see if she would accept a call from his counsel. Before the FBI persuaded Martin—who was terminated by AmeriSouth— to call Mr. Hamilton in their presence so they could record the conversation, Mr. Hamilton simply

3

left Martin a voicemail on January 8, stating that "one of the things [the government is] focusing on now is the payroll tax issue from 2010." (Dkt. 227-2 at 2.) Mr. Hamilton called Martin to bring this to her attention because Martin—as AmeriSouth's former Director of Human Resources—had been in charge of actually *making payments* on the company's payroll taxes. Mr. Hamilton ended the message by explaining, "I've been offering to engage and pay for attorneys to represent all the corporate employees and since this issue is one that may come up, you may be contacted, I'd like to make the same offer to you." (*Id.*)

Mr. Hamilton conveyed a similar message when he spoke with Martin on January 13. Again offering Martin counsel, Mr. Hamilton stated, "[i]f the FBI contacts you and you want to speak with them, you can. You don't have to. You can get Counsel. You can hire anybody you want and obviously that costs money. Or the company is willing to pay for Counsel for everybody." (Dkt. 227-3 at 5.) Mr. Hamilton explained to Martin that the FBI can be "very intimidating" (*id.* at 7) and informed her that "the FBI has been -- has contacted and reached out to a number of our employees . . . and you know, like, showing up at their door, calling them, and so forth" (*id.* at 5.).

In making this statement, Mr. Hamilton was referencing the experience of one of his current employees that had just occurred (which is confirmed with reference to the unredacted transcripts of the conversations the prosecution has filed). FBI agents came to Kristie Bonner's home one night in November after dark. At the time, Bonner was at home with her son (her husband was still at work). The agents aggressively knocked on her door and would not go away. She would not open the door because she was not sure whether they were truly with the FBI. Bonner eventually called the local police department because the agents kept knocking and waiting and would not go away. The police subsequently responded to her home. Only after

4

Bonner's husband arrived and the police were able to verify that the agents were with the FBI did Bonner agree to speak with the agents.  This entire event lasted 30-45 minutes.  Bonner later told Mr. Hamilton that the experience shook her and was extremely intimidating.  Bonner's initial understanding was that she was finished with the FBI after she spoke with them.  However, she received a call from an agent a couple of days later stating that the FBI wanted to talk to her again.  She also found this intimidating.  It was with this in mind that Mr. Hamilton further explained, "if you were engaged with Counsel, they, FBI, if they wanted to speak to you would have to speak to the attorney and not you." (*Id.* at 5.)

And even on the January 22 set-up call, Mr. Hamilton, even in his pique with the FBI, said all the correct things.  Mr. Hamilton explained, "the only reason that I even reached out to you is because [the prosecution] raised [the payroll tax] issue with my attorney." (Dkt. 227-4 at 3.)  Mr. Hamilton explained the significance of having an attorney, stating that "the minute you're represented by Counsel . . . [the government has] to go through your attorney.  So they can't talk to you, essentially, unless your attorney says they can." (*Id.* at 4.)  When Martin questioned why she would need an attorney when she has not done anything wrong, Mr. Hamilton explained—speaking from his own experience—that "the mere fact that you did nothing wrong does not keep you out of trouble with [the government]." (*Id.* at 14.)  Mr. Hamilton then left Martin with a piece of sound advice: "[I]f anybody asked me what should I -- what should I do, this is anybody, anywhere, any time, I would say don't speak to law enforcement without -- guilty or not without legal representation." (*Id.* at 19.)  If saying that is something wrong, undersigned counsel has committed that offense likely hundreds of times in their work.

### B.     Mr. Hamilton's Statements About the FBI

The real issue for the prosecution it seems is that Mr. Hamilton revealed that he does not hold the FBI in the high regard to which it feels entitled.  When Martin asked Mr. Hamilton why she might want counsel, the first thing that he told her was that the FBI would be communicating with her through her attorney.  (Dkt. 227-3 at 6.)  A lawyer would serve as a buffer and a witness.  The prosecution complains that Mr. Hamilton said that the FBI "can be very intimidating" and that she should not have to "count upon them telling you the truth."  (Dkt. 227 at 4.)

But there can be no denying the absolute truth in this, or Mr. Hamilton's First Amendment right to voice his opinion.  As to Mr. Hamilton's view of the FBI, at the time of the call, he had learned (1) the FBI agents had so intimidated another employee (Kristie Bonner) that she actually called the police, (2) the FBI had resisted disclosing to him discovery that demonstrated that they had paid Dwaine Caraway tens of thousands of dollars while he was running for office and Caraway had exculpated him before the FBI convinced Caraway to do a set-up of Mr. Hamilton, Dkt. 155, and (3) that three people swore that Carolyn Davis told them that the FBI intimidated her into pleading guilty so she would not be taken away from her disabled daughter.  (Dkts. 77-1 – 77-3.)  The comments Mr. Hamilton made were understandable given these events.

Furthermore, it was apparent that the prosecution would go to even greater lengths, however questionable, in its pursuit of him.  Mr. Hamilton knew that the government even entered into the sweetest of deals (a misprision of a felony) to a twice-convicted felon Jeremy Scroggins, where he admitted to a far more serious offense of defrauding a charity and aiding and abetting and getting funds from Davis's taking bribes from many other people.

At the time Mr. Hamilton was having these conversations, many public officials, including the President of the United States, respected congressional leaders, former Justice Department

6

officials, and the current DOJ Inspector General, were criticizing the FBI for their tactics. Some were calling them names far worse than anything Mr. Hamilton said based on what he had learned happened in his case.

**C.     Distribution Checks to Employees**

Another distorted allegation by the prosecution concerns the distribution checks provided to Martin. The prosecution misleads by suggesting Mr. Hamilton provided Martin a distribution on an investment as if that was also something to induce her not to cooperate, as opposed to a regular distribution based on a partnership interest that she had owned for many years.

The prosecution represented to the Court in its motion that, "Notably, Martin did not receive a distribution check for her investments for nearly 17 years prior to September 2018— about a month after the government informed the defendant that he was the subject of the federal bribery investigation." (Dkt. 227 at 3.) The only fact the government correctly states is the timeframe when Mr. Hamilton was made aware that he was the subject of an investigation, and even that is misleadingly stated. Everything else is demonstrably false.

The distribution the prosecution appears to be referring to, in the amount of $47,500.00, actually cleared the bank in *July* 2018—one month *before* Mr. Hamilton was notified he was the subject of an investigation. (Ex. A.) Even this timing is misleading, given that, at that time, the only thing Mr. Hamilton was notified about by the prosecution was related to the August 2018 meeting with Caraway, which occurred years *after* Martin had left AmeriSouth and had nothing to do with her or anything about which she would know or about which she would ever be questioned. And that Caraway meeting had not even occurred when the July 2018 distribution check to Martin cleared the bank.

7

The July 2018 distribution related to the sale of a property, Prince Hall Apartments, in June 2018. Martin received the exact same *pro rata* treatment of her 6.67% partnership interest as the eleven other investors, based upon their respective partnership interests and the terms of the agreements. No more, no less. AmeriSouth made the distributions it was legally obligated to make in accordance with the partnership agreements after the sale occurred.

Furthermore, this was far from the first distribution Martin had received in 17 years, as the government represents. In fact, Martin has received at least 47 distributions since 2002, totaling $304,034.62. In the 17-year period the prosecution represents to the Court that Martin had received zero distributions, she had in fact received approximately 40 distributions. While Martin did receive a distribution of $1,562.80 on September 19, 2018, again based upon her pro rata share of the total distribution made to the ten other investors in that partnership at that same time, it was far from the first distribution she had received in 17 years—it was not even the first distribution *that year*. (Ex. B.)

The prosecution then references a distribution Martin received on January 9, 2020, in the amount of $1,650.00, suggesting the timing must be suspicious since Mr. Hamilton had attempted to contact her by phone the day before. (Ex. C.) But this year-end distribution check was issued by mail on *December 31, 2019*. One might further conclude from the prosecution's timeline that this check was an improper distribution outside the ordinary course of business that was specifically intended to influence Martin. Yet the facts again get in the way of the prosecution's false narrative. The total year-end distribution for the Springdale Apartments partnership was $100,000.00, and Martin received exactly $1,650.00 for her 1.65% interest. Again, AmeriSouth was legally obligated to distribute to Martin her pro rata share based upon her partnership interest,

8

and it did so appropriately and without special treatment. It made similar distributions to the other investors then.

\*           \*           \*           \*           \*           \*

In context and without the prosecution's spin, there is nothing that happened six months ago and surely since that warrants any change in Mr. Hamilton's conditions of release. Indeed, the defense recently learned that the prosecution, during the last few weeks in the spiking COVID-19 crisis, insisted that other AmeriSouth employees testify in a grand jury and that all of them recounted that Mr. Hamilton never told them not to cooperate and even offered to make the AmeriSouth office available for interviews if that was more convenient for them to talk to government agents.

The now-dated event the prosecution raises was completely isolated and again months ago. At most,[1] Mr. Hamilton and counsel have now discussed who is on the witness list and any needed contacts that have to be made for case preparation will come from counsel.

---

[1] After the prosecution shockingly opposed Mr. Hamilton's request for a trial delay because of what was then a 450+ a day upward spike in COVID-19 cases in Dallas (now over 1,000 daily) and in light of public and health officials stating that people should stay home, wear masks, social distance and avoid indoor activities, the prosecution now wants to revoke bail and detain an older defendant with a severely compromised immune system following his battle with cancer, no doubt at a prison facility when statistics show that jails (next to senior facilities) are the worst incubators of the virus. The USAO's opposition to protect all the trial participants' heath and this overreach to detain Mr. Hamilton only add to the shocking behavior of the government in this case.

Dated: July 10, 2020

Respectfully submitted,

/s/ Abbe David Lowell
Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 24114011TX
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

## CERTIFICATE OF SERVICE

I certify that on July 10, 2020, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

/S/Abbe David Lowell
Abbe David Lowell