```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF TEXAS
 2                      DALLAS DIVISION

 3  UNITED STATES OF AMERICA     )  CAUSE NO. 3:19-CR-83-M (1)
                                 (
 4  vs.                          )
                                 (  JULY 17, 2020
 5                               )  DALLAS, TEXAS
    RUEL M. HAMILTON             (  1:00 P.M.
 6  _____

 7

 8  _____

 9              MOTION TO REVOKE OR MODIFY
          DEFENDANT'S CONDITIONS OF PRETRIAL RELEASE
10

11        BEFORE THE HONORABLE RENEE HARRIS TOLIVER
                UNITED STATES MAGISTRATE JUDGE
12

13  _____

14                   A P P E A R A N C E S

15

16  FOR THE GOVERNMENT: UNITED STATES ATTORNEY'S OFFICE
                        1100 COMMERCE, 3RD FLOOR
17                      DALLAS, TEXAS  75242
                        (214) 659-8600
18                      BY:  MS. TIFFANY EGGERS
                             MR. ANDREW WIRMANI
19                           MR. CHAD MEACHAM

20  FOR THE DEFENDANT:  WINSTON & STRAWN, LLP
                        1700 K. STREET, NW
21                      WASHINGTON, DC 20006
                        (202) 282-5000
22                      BY:  MR. ABBE LOWELL
                             MR. THOMAS MELSHEIMER
23
    OFFICIAL COURT REPORTER:   SHAWN M. McROBERTS, RMR, CRR
24                             1100 COMMERCE STREET, RM. 1504
                               DALLAS, TEXAS  75242
25                             (214) 753-2349
```

1          THE COURT:  The Court calls Case No. 3:19-CR-83-M,

2     United States of America versus Ruel--forgive me if I

3     mispronounce that--M. Hamilton.

4          MR. WIRMANI:  Andrew Wirmani, Chad Meacham, and

5     Tiffany Eggers for the Government, Your Honor.

6          MR. MELSHEIMER:  Your Honor, good afternoon.  May it

7     please the Court.  Tom Melsheimer here on behalf of

8     Mr. Hamilton.  I understand my colleague Mr. Lowell is going

9     to be present by video telephone link.

10          THE COURT:  Okay.  Let me see what's going on with

11     that.  We'll wait until they connect with them.  You can have

12     a seat.

13          MR. MELSHEIMER:  Thank you, Your Honor.

14          THE COURT:  Ms. Eggers, is your Cisco microphone on?

15     Is it green.

16          MS. EGGERS:  It is.

17          THE COURT:  And let the record reflect that

18     Mr. Lowell has joined us BY video teleconferencing.

19        Mr. Lowell, can you see and hear what's going on in the

20     courtroom and the participants?

21          MR. LOWELL:  Your Honor, I can see you and the

22     courtroom.  You're not coming in very loud.  I'll try to

23     adjust my volume, but it's not loud for you.  Can you hear me?

24          THE COURT:  Yes, I can hear you very well.

25        Mr. Robbins, will you also be participating in the

1    hearing?

2           MR. ROBBINS:  No, Your Honor.

3           THE COURT:  Okay.  Is the Government ready to

4    proceed?

5           MR. WIRMANI:  We are, Your Honor.

6           THE COURT:  And are you ready to proceed,

7    Mr. Melsheimer, on behalf of Mr. Hamilton?

8           MR. Melsheimer:  May it please the Court, we are,

9    Your Honor, along with Mr. Lowell.

10          THE COURT:  Okay.  And we are here, of course, on

11   the Government's sealed motion to revoke or modify the

12   Defendant's conditions of pretrial release that was filed on

13   July 9th of this year, and a response was filed by Mr. Lowell

14   and Mr. Robbins on the 10th.  There was an email message and

15   there was a response to that email message filed, and I have

16   reviewed all of them.

17       You may call your first witness, Mr. Wirmani?

18          MR. WIRMANI:  Your Honor, given the fact that the

19   parties have extensively briefed this issue and the Court has

20   the actual recordings before it, we don't intend to put on any

21   live testimony.  What I have for the Court is a proffer of

22   some information that I'd kind of like to give in the context

23   of argument.

24       So may I proceed, Your Honor?

25          THE COURT:  You may.

1          MR. WIRMANI:  I think what the Court has before it,

2    Your Honor, is a clear, knowing, willful, and egregious

3    violation of this Court's prior order.  What is more

4    concerning about the situation to the Government is the fact

5    that that violation, given the totality of information before

6    the Court, was clearly calculated to obstruct the Government's

7    access to a key witness in this case, Leslie Martin.  She's a

8    former employee of the Defendant.

9          Just starting with the core violation, Your Honor,

10   obviously the Court's order was unambiguous.  The Defendant

11   was to have no contact, directly or indirectly, or with

12   anybody that he thought might be a witness in this case.  And

13   despite what the -- the they tried to take, Your Honor, it's

14   clear that the Defendant knew when he had this contact with

15   Ms. Martin in January of 2020 that she was a potential witness

16   in this case.  And we know that for a couple of reasons.

17         In this case, Judge Lynn was putting a questionnaire out

18   to potential jurors.  During the process of that, she had the

19   parties in December of 2019 submit to the Court and to

20   opposing counsel a list of potential witnesses.  We did that I

21   believe in mid December of 2019.  It's Exhibit 1 to our

22   filing.  It's Exhibit 1 in the exhibits I put up there for the

23   Court.  And you can clearly see that Ms. Martin was identified

24   as a witness -- a potential witness in this case.

25         In and around that time, the Government also superseded

1   the indictment with allegations that directly implicated

2   Ms. Martin.  Specifically, one of the allegations in the

3   superseding indictment dealt with the fact that as part of the

4   Defendant's bribery scheme, he would give political

5   contributions to individuals at the direction of Carolyn

6   Davis, a former city council member.  To sidestep the fact

7   that there is a thousand dollar limit per donor in the City of

8   Dallas, he would write multiple checks and then he'd attribute

9   them in the memo line to various people--children, relatives

10  and, particularly relevant here, employees such as Ms. Martin.

11  And he did this without Ms. Martin's knowledge and the

12  knowledge of the other AmeriSouth employees.

13           THE COURT:  May I interrupt you just a minute,

14  Mr. Wirmani?  The exhibits you're referring to I have in a

15  book, and I just want to make sure Defense counsel has a book

16  with those exhibits as well.

17           MR. WIRMANI:  They do, Your Honor.  I provided one

18  to Mr. Melsheimer and last night Mr. Lowell received a copy as

19  well.

20           THE COURT:  All right.

21           MR. WIRMANI:  Thank you for reminding me, Your

22  Honor.

23       And if the Court turns to Exhibit 8, on page 2 there,

24  bottom left-hand corner, the Court can see a check written by

25  the Defendant Ruel Hamilton for a thousand dollars made out to

1    the campaign of Dwaine Caraway.  And you'll see in the memo

2    line there Leslie Martin in the Defendant's writing,

3    handwriting, is listed in an attempt to make this check

4    attributable to her.

5        So given that, it is clear that the Defendant knew Ms.

6    Martin was a potential defendant in this case when he made

7    contact with her.

8        And I think most tellingly, Your Honor, this is a

9    situation where this contact takes place in January of 2020.

10   As far back as November of 2019, the Defendant was already

11   hiring counsel on his dime to represent various AmeriSouth

12   employees, current and former, and there's only about four

13   employees that are implicated in this scheme to round out

14   these checks in the names of other people, and that Ms.

15   Martin's obviously one of them.  So we don't think there's any

16   serious dispute that the Defendant knew that Ms. Martin was a

17   potential witness in this case.

18       And, of course, the violation itself, the fact that he

19   made contact with Ms. Martin, is undisputed.  The Court has

20   before it a voicemail and two substantive phone calls, Your

21   Honor, from the January 2020 time period.

22       So just based on that core evidence, I think it's clear

23   that the Government has satisfied its burden under §3148 to

24   show by clear and convincing evidence that the Defendant

25   violated his conditions.

1    And this really isn't a situation that's amenable to any

2    remedy other than revocation, Your Honor.  It is likely that

3    the Defendant will continue to violate his conditions because

4    those conditions were clear and unambiguous from the very

5    beginning.  There is no exception in the Court's conditions

6    for attempting to inform them that he's going to hire counsel

7    for them, and there's no exception for attempting to set up a

8    meeting with Mr. Lowell.  The condition is absolute.  The

9    Defendant stood here before this Court, said he understood the

10   condition, he signed documents to that effect, and he

11   understood full well that if he violated that condition he

12   could end up in a situation like this.

13   But I think beyond that, it's really the content of these

14   phone calls that I think is concerning and I think really

15   warrants the Court's intervention in addressing this issue,

16   Your Honor.

17   On these phone calls you will see that the Defendant is

18   clearly attempting to dissuade Ms. Martin from cooperating

19   with the Government.  Over the course of that 25 minutes, Your

20   Honor, the Defendant tells Ms. Martin that law enforcement

21   lies, that they'll make up facts, that they're stormtroopers,

22   that they're going to intimidate her, and that if she talks to

23   them she might get indicted for a crime she didn't commit.  He

24   also says that if it was him, he wouldn't talk to law

25   enforcement, and even his own lawyer Mr. Lowell, if he had the

1    opportunity to talk to Ms. Martin, he also would tell her that

2    she should not speak to law enforcement.

3        Now, the Court has all of those recordings before it.  I

4    hope the Court, either now or later, has the opportunity to

5    listen to the totality of the recordings.  I think it's

6    important to listen to it in the context.

7        Out of respect for the Court's time, I'm simply going to

8    play some of the key aspects from those recordings that we

9    think are relevant, starting with Government's Exhibit 6, Your

10   Honor, which is a telephone call that the Defendant and

11   Ms. Martin had on January 8th of 2020.

12              (Whereupon, excerpts of Government's Exhibit No. 6

13              were played in open court.)

14              MR. WIRMANI:  And then, Your Honor, a subsequent

15   phone call took place approximately a week later on January

16   22nd of 2020.  I'd just like to play for the Court a few

17   select portions of that phone call as well.

18              (Whereupon, excerpts of an unidentified Government

19              Exhibit were played in open court.)

20              MR. WIRMANI:  So, Your Honor, based on that, it is

21   clear as day what the Defendant was intending to accomplish

22   here.

23        With all due respect to the positions in Defense

24   counsel's motion--and I'm not faulting them because I think

25   that, you know, they have a hard task in this case trying to

1    defend the conduct--this goes well beyond a mere scheduling

2    call.  We're not here because our feelings are hurt.  We're

3    big boys, we do stuff that's much worse than this on a daily

4    basis, and the Defendant's First Amendment rights aren't

5    really the issue.  He doesn't have a First Amendment right to

6    violate his conditions.  He doesn't have a First Amendment

7    Obstruct justice.

8        So based on the totality of that, Your Honor, I think the

9    violation before the Court's clear.  I think the conduct is

10   egregious.  Now, I understand that these types of decisions in

11   this environment have become more difficult for the Court, so

12   ultimately I'm going to defer to the Court's reasoned judgment

13   on how to address this issue.

14       That's all I have, Your Honor.

15            THE COURT:  Thank you.

16            MR. MELSHEIMER:  Your Honor, I'm going defer to

17   Mr. Lowell.

18            THE COURT:  Just a second, Mr. Lowell.  Are you in

19   front of the computer?

20            MR. LOWELL:  Yes.

21            THE COURT:  Okay.  Now I can hear you.  When you

22   first started, I couldn't hear you.  Can you start again,

23   please, sir?

24            MR. LOWELL:  Yes.  I'll wait and not talk when

25   somebody else is talking.

1      I was first thanking you for letting me participate and

2   asking if you could hear me okay.

3      Can you hear me?

4          THE COURT:  We all can hear you.

5          MR. LOWELL:  Okay.  Thank you.

6      Let me start with the premise of what Mr. Wirmani said.

7      In order to use this phrase "to put this in context," I

8   want to take you back to the time period where the Government

9   is alleging the events -- well, showing the events to have

10  occurred.

11     The end of December there was a little bit of tumult in

12  the case.  About three weeks before trial, the U.S. Attorney's

13  Office informed us that they were going to bring a superseding

14  indictment.  That gave the Court some concern because there

15  had been jury questionnaires sent and among the jury

16  questionnaires there was a list of witnesses.

17     In the middle of December when all this was going on and

18  we were trying to figure out if a supplemental jury

19  questionnaire was needed or what it would say, as the U.S.

20  Attorney's Office has given you, there is an email from them

21  to me listing 18 or 19 witnesses in addition to the however

22  many dozens there were before.  And as I said in my

23  submission, Judge, I can't honestly tell you that I ever--and

24  this is on me--informed Mr. Hamilton of that event.

25     For the Government to conclude that his contacting Ms.

1    Martin or anybody else was a knowing and willful violation of

2    a condition really is not the case given the context of what

3    was going on.  And more importantly, the contact is for my

4    office.  I had -- as you heard on the tape, the conversation

5    she was having -- she's having with Mr. Hamilton, you heard

6    the reference to 10 years.  You heard the reference to taxes.

7         The point of the contact by Mr. Hamilton, if you read the

8    entire transcript, was that the U.S. Attorney's Office had

9    told us at the exact same time that they were superseding the

10   indictment that they were also considering opening an

11   investigation on payroll tax issues from 10 years before.

12   Mr. Hamilton informed me that the person who had as much

13   knowledge as anybody as to that subject was the person

14   involved, Leslie Martin, who was the person involved in the

15   payroll tax issues.

16        I tried to reach out to Ms. Martin to find out what I

17   could because I had no idea what this was about, and then

18   asked Mr. Hamilton, because she did not know my phone number,

19   to make contact, to make the introduction.  And if you look at

20   the begins of the transcripts, you can see that's what's going

21   on.

22        At the same time the idea that Mr. Hamilton was trying to

23   persuade her to do something other than give her the choice to

24   talk or not to talk also in the transcript belies what was

25   also going on at the time.  If you look at the unredacted

1    transcript, you will see that right before the call that

2    occurred with Mr. Hamilton and Ms. Martin, the FBI had, in

3    fact, visited another one of the AmeriSouth company's

4    employees, and in so doing, as the transcript shows,

5    Mr. Hamilton was told by this employee afterwards that people

6    banged on her door; stayed on the doorstep; wouldn't go away

7    when she asked them to; identified themselves as the FBI, she

8    did not believe that they were there them; she was there by

9    herself; she ended up calling the police based on the conduct

10   at the door.  And when the police came, they showed the IDs,

11   and her husband came home, and then the event occurred.  She

12   was in tears that night.  She was in tears when she recounted

13   the story.  It was with that background as well that he could

14   understand, or at least the words that Mr. Hamilton speaks are

15   the words that she speaks.

16        I want to come back to the words in a second, but I want

17   to make sure that the Court is aware that what you're not

18   seeing in the transcript--and as to the issue that

19   Mr. Wirmani said exists, which was any superseding indictment

20   charged about campaign checks--was him saying anything about

21   campaign checks, and the only subject that he mentions is the

22   10-year-old 2010 tax investigation which was then a new issue

23   and she was the person in charge.

24        By the way, there was nothing in the indictment or the

25   superseding indictment on that subject.  In this case, she

1    would not have been a witness, even if I explained to

2    Mr. Hamilton what she was on that email, for tax issues; and

3    that she was uniquely situated to help me understand the

4    issues that we're now being told that needed to be understood,

5    that was the nature of the content.

6         In addition to which, I saw that the Government said

7    things like what they just said to you--that he says back all

8    the way to November, Mr. Hamilton was telling his employees

9    that they could have counsel, quote, on his dime was his

10   phrase.  Well, in America everyday employers indemnify their

11   employees who are in need of or have the ability to consult

12   with an attorney.  And in the nature of what was now being

13   investigated, which might be payroll tax issues as well as

14   others that the employees were involved in, it was prudent of

15   us to at least offer every employee the opportunity to consult

16   with a lawyer.  We did not know the nature of what the

17   investigation was, and it is my practice to do that.

18        And Mr. Hamilton did tell her, as was clear in the

19   transcript, that she had the ability to do that or not, and

20   the ability to talk or not, and that is all over the various

21   transcripts.  But that's part of the context that was going on

22   as well.

23        In addition to which, as the conversation was happening

24   in the period of what was just being done, you should know the

25   other issues, because Mr. Wirmani takes Mr. Hamilton's words

1   and say that they were an attempt by using the phrases the FBI

2   lies, the FBI intimidates, and the FBI charges people when

3   they haven't done the crime.  Right at the exact time that all

4   this was happening, this is what I and Mr. Hamilton learned

5   for the first time right in this period.

6       First, I already told you about the event at the front

7   door of another employee leading to that event -- result in

8   which she conveyed.  It was exactly at this time and after we

9   made motions, the Government relented and gave us access to

10  transcripts which showed that not only had they engaged then

11  former counsel for Dwaine Caraway as a person to help set up

12  their conversation in August of 2018 with Mr. Hamilton, we

13  learned for the first time in that period of time that while

14  Dwaine Caraway was running for the city council in 2016 and

15  '17, that FBI agents gave him tens of thousands of dollars of

16  cash while he was a candidate; something we did not know and

17  really was quite shocking and extraordinary in terms of

18  Mr. Hamilton's mindset what the FBI does.

19          MR. WIRMANI:  Your Honor, some of this is well

20  beyond the scope of this hearing, Your Honor.

21          THE COURT:  I agree, but I'm going to let him have

22  his say.

23      Go ahead.

24          MR. LOWELL:  I'm sorry, Judge.  If you and the

25  Government think it's beyond, Mr. Wirmani was talking about

1    the things Mr. Hamilton said about intimidation and lying and

2    I'm telling you he learned right at the time this call was

3    made.  But it's in our papers and I don't want to take I more

4    of the Court's time, but I think it's very ermine, because

5    Mr. Wirmani said we have to understand the context.

6         Mr. Wirmani told you about 15 minutes ago about the

7    checks that -- and he showed you the one for Leslie Martin

8    about going to Dwaine Caraway's campaign, which was exactly

9    one of the things that we were learning about what was going

10   on with Mr. Caraway.

11        But the more important point, the federal government

12   isn't bringing a case for Mr. Hamilton making excessive local

13   campaign contributions.  The theory of their case is that he

14   made contributions, some of which were in excess, as part of

15   his agreement with Carolyn Davis as part of a bribe scheme

16   because that is the federal charge.  Interestingly, the checks

17   that are going to Dwaine Caraway are not part of that possible

18   scheme as to who could be a witness.

19        Carolyn Davis in no way, shape, manner, or form, as all

20   the discovery shows, was not seeking Mr. Hamilton to provide

21   checks to the Caraway campaign.  Indeed, Mr. Caraway had

22   chosen, because he turned out another person to be the person

23   to take over his seat thereafter.  I'm only raising that

24   because the Government tempers their motion and their points

25   to you with these disconnected theories -- I'm sorry --

1    disconnected sentences.

2        I'll give you another.  In their motion to you, they then

3    happen to throw out that at the same period of time

4    AmeriSouth, the company that both Mr. Hamilton worked with and

5    Ms. Martin did, it was a check, a distribution check for an

6    investment that Ms. Martin had made.  And in their papers to

7    the Court, they say, What a coincidence; this must be in the

8    same motion of a scheme that Mr. Hamilton was trying to

9    influence.  And they even said to you that this was the first

10    time in 17 years that this had happened.

11        In our response we showed that, again, either Ms. Martin

12    misled or misreported to the Government or something, because

13    there were dozens of such to her and others that were required

14    to be distributions for investments they made in the period.

15    And I won't take your time, but if you look at our response,

16    we basically set out the chronology, which has nothing to do

17    when Ms. Martin was identified even in the period where

18    Mr. Hamilton made contact at my request.

19        In the meantime, with all of this, this is what is clear.

20    Mr. Hamilton did contact Ms. Martin.  Mr. Hamilton knew that

21    she was somebody I needed to speak to to learn facts about a

22    new element of an investigation that was not part of the case.

23    He did so without understanding, as I think our papers show.

24    When Mr. Wirmani says it was knowing and willful and it was

25    clear that she was a witness, it was by no means clear that

1    she was a witness.  Now, I understand that in an email she was

2    a potential witness, but she was a potential witness for

3    something having nothing to do with what is in issue that you

4    can hear on the transcript.  Nevertheless, he contacted her

5    and, nevertheless, he did it under my direction to do so

6    because she would not respond to me.

7        We all could have been more cautious with respect to

8    this.  And given what he says -- what Mr. Wirmani says is so

9    offensive, I've given you the context to understand why he

10   felt the way he did at the time.

11       With that in mind, I think the Government's request that

12   his -- one more thing.  Two more things.  I'm sorry.

13       This event occurred in January.  Prior to that, from the

14   time he was indicted in February of '19 and from January to

15   the present, there's been no incident of any remote violation

16   of any condition, other than this incident, not one, and he

17   has done everything the Court has imposed on him to do.

18       In addition to which this event happened in January.  And

19   I realize the Government has a view of what it is and what it

20   was.  But it is July before they brought it to anybody's

21   attention, let alone mine, especially because they invoked my

22   name in what was being said.

23       And I'm only pointing that out in the case that with this

24   track record and with this record, for the Government to say

25   that the only remedy is to revoke his bail and send him to

1    jail where he is in three vulnerable categories, including

2    age, cancer survivor, immune deficiency, and impaired lungs,

3    is overkill even if he was the healthiest person in the United

4    States right now for the event that they are bringing to the

5    Court's attention, as we said in the response.

6         Now that I put all the dots together, I understand the

7    Government's concern.  I put it partially on me and, of

8    course, partially on my client.  But the remedy here is not

9    what they ask.  The remedy is for us to be better--me and my

10   client.  I now understand that the Government views her in the

11   capacity not just as a tax witness.  I see how she fits into

12   their other aspects, even though the Dwaine Caraway check

13   makes no sense to me given what their allegations are about

14   Ms. Davis, and that is the proper result of this.  We are on

15   our notice, and I just think, for whatever reason, the

16   pounding that they're doing is a little bit over the top.

17              THE COURT:  Mr. Lowell, let me ask you a question.

18   You said that you told Mr. Hamilton to contact Ms. Martin

19   because you couldn't reach her.  Did you advise him to have a

20   discussion with her about getting counsel and getting specific

21   counsel and to also discuss whether or not she should talk to

22   the FBI if they contacted her?

23              MR. LOWELL:  I can't get into the attorney/client

24   privilege aspect, other than telling it to you this way.  It

25   was on my request that Mr. Hamilton contacted her to ask if

1    she would talk to me.  It was at my request to Mr. Hamilton

2    that she, like four or five other employees, were notified

3    that the company was indemnifying them if they wanted lawyers,

4    whether they picked those same lawyer or not, and that had

5    been conveyed to others as well as her.  And I think that

6    answers your inquiry, Judge.

7             THE COURT:  I don't think it answers my inquiry, but

8    I understand, sir.

9             MR. LOWELL:  But, I mean, do you -- I'm trying to

10   answer without --

11            THE COURT:  And I'm not asking you to violate any

12   privilege that you have a discussion with your client and are

13   not in a position to have him waive, but I don't think it

14   answers the question really.

15       Is there anything else, Mr. Lowell?

16            MR. LOWELL:  If there are any other questions you

17   have than that.

18       I don't think I have neglected to explain the context of

19   what was going on and the words that were spoken that had been

20   brought to your attention and the nature of why it happened

21   and, more importantly, to put into the scheme of a case that's

22   now a year-and-a-half old the only event that took place that

23   had been brought to your attention, but especially the notion

24   that when the U.S. Attorney's Office says this is the only

25   remedy that can occur, I think I've said enough on that,

1    Judge.

2              THE COURT:  Okay.  Thank you, sir.

3              MR. WIRMANI:  Your Honor, may I have the last word,

4    briefly?

5              THE COURT:  You get to have the last word.

6              MR. WIRMANI:  Thank you, Your Honor.

7        I have no doubt that Mr. Lowell contacted Mr. Hamilton

8    and asked him to reach out to Ms. Martin.  I'll take his word

9    for that as an officer of the Court.

10       What I think everybody in this courtroom knows is that

11   Mr. Lowell did not advise his client to tell Ms. Martin that

12   he wouldn't speak to the FBI, that the FBI stormtroopers, that

13   they are going to intimidate her, get her indicted for conduct

14   she didn't commit.  I think we all know that's clear, Your

15   Honor.

16       The thrust of his argument is that his client did not

17   technically understand that Ms. Martin was a witness in the

18   bribery case.  We dispute that for the reasons we set forth in

19   our motion.  But Your Honor, even if you credit that argument,

20   I think it's clear under the relevant statute that there is

21   probable cause to believe that the Defendant obstructed the

22   ongoing tax investigation.  It's a grand jury investigation,

23   it fits the statute.  Wholly apart from the issue of whether

24   those charges will be brought, whether they could be proven

25   beyond a reasonable doubt to a jury, probable cause is a very,

1    very low standard, and on the face of those tapes, that

2    standard is satisfied here.

3         And finally with respect to the remedy, Your Honor, I'm

4    happy to discuss alternative remedies, if one exists.  The

5    issue is that I can't think of a modification to that

6    condition that will prevent this conduct in the future because

7    the condition at the very beginning was absolute.  There was

8    no exception for the things that the Defendant engaged in, and

9    especially those that were beyond the advice of his lawyer.

10        So with that, Your Honor, we'd ask that the Court fashion

11   a remedy that's appropriate for the violation, Your Honor.

12             THE COURT:  Mr. Hamilton, you appeared before me on

13   March 1st, 2019.  I entered an order setting conditions of

14   release in your case, and I'm going to read from that order

15   which specifically says that "The Defendant must avoid all

16   contact, directly or indirectly, with any person who is or may

17   be a victim or witness in the investigation or prosecution,

18   including any co-defendants or co-conspirators."

19        In addition, above the place that you signed, and you

20   indicated to me that you did indeed sign, and before you

21   signed you understood the conditions under which I was

22   releasing you and agreed to abide by them, it states under the

23   section "Advice of Penalties and Sanctions" that "It is a

24   crime punishable by up to 10 years in prison and a $250,000

25   fine, or both, to obstruct a criminal investigation, tamper

1   with a witness, victim, or informant, retaliate or attempt to

2   retaliate against any witness, victim, or informant, or

3   intimidate or attempt to intimidate a witness, victim, juror,

4   informant, or officer of the court."

5       And as is relevant here, it also explained to you that

6   among the possible penalties in this case, it could mean that

7   you be jailed pending your trial.

8       After you informed me that you knew and understood all of

9   the conditions under which I was releasing you, I told you

10  that by law, under the law I was required to inform you and

11  did inform you of certain issues, including the fact that if

12  you violate any condition of release, a warrant for your

13  arrest may be issued and you may be jailed pending trial and

14  also prosecuted for contempt of court.

15      I also--it was the very last thing I advised you of--I

16  advised you that it is a crime to try to influence, threaten,

17  attempt to bribe, or retaliate against any juror, witness, or

18  other person who may have information about this case, or to

19  otherwise obstruct the administration of justice.

20      So on several fronts I made clear that, first of all, you

21  were not to have any contact with any person who even may be a

22  witness in this case and any person who may be a witness in

23  the investigation of this case, not simply the prosecution.

24  Also I made clear that the consequence of violating that order

25  could include the fact that you be jailed pending your trial

1    in this case.

2        I find, based on the evidence that I've heard here, that

3    presented in the written briefs, as well as the Government's

4    exhibits here -- and I will say that, although I've not

5    listened to the entire calls, everything I did listen to was

6    already transcribed and included in the Government's brief as

7    attachments, and I heard no objection from anyone about me

8    considering the briefs of either party.  In fact, both parties

9    suggested that I consider their briefs and the attachments

10   thereto.

11       I find based on those attachments that you knowingly --

12   that the Government's established that you knowingly violated

13   the order setting conditions of release in this case by

14   contacting a person who you knew was a potential witness in

15   the investigation, even if you were not aware that that person

16   was a potential witness in the prosecution of this case.  But

17   I do think there is ample evidence that you actually knew this

18   person was a potential witness in the prosecution of this

19   case.  You knew or you should have known, definitely.

20       Also, I have talked with the Pretrial Services officer,

21   and I have tried to figure out, especially since I'm going to

22   tell the Government I was disappointed that it took several

23   months for it to be brought to my attention that the order

24   setting conditions of release was violated, but I talked with

25   the Pretrial Services officer about what conditions I could

1   add in this case, because now having made those findings, the

2   question before me is whether or not there is a combination of

3   conditions I could impose which would basically take care of

4   this issue, make sure this doesn't happen, and that whether or

5   not you would likely follow those conditions.

6       I will tell you, first of all, that I cannot find that

7   you would likely follow any conditions I could impose, because

8   you blatantly violated the conditions that I did impose.  And

9   as to the second question or the other question, talking with

10   the Pretrial Services officer, I am at a loss as to what I

11   could possibly do in this case or what condition I could

12   impose, other than what I've already said to you, that would

13   prevent you from reaching out--regardless of why you did,

14   because the order said not to do it, period--but reaching out

15   to any person who may be or is a victim or witness to the

16   investigation or prosecution of this case that I haven't

17   already imposed.  I cannot think of a single thing.

18       Mr. Lowell, I invite you to address specifically what I

19   could do that would prevent that from happening in the future.

20   And I'm going to tell you that I'm not convinced that just the

21   simple promise that, Now we understand, is going to be good

22   enough, because I don't think that the order in any way was

23   ambiguous.  I followed the order up with written admonitions

24   in court.  I think it's clear from the conversation and the

25   content of the conversations that Mr. Hamilton's intent in

1    talking to Ms. Martin was more than just getting her to call

2    you.  And so if you have some conditions that you think I

3    could impose that would take care of that, you let me know

4    now.

5         MR. LOWELL:  I do, Judge.  Thank you for giving me

6    the chance.

7         There are a few things, given your findings, that I

8    believe are warranted, other than the Draconian one that the

9    Government has asked.

10        First and foremost, I think Mr. Hamilton has been

11   released without having to put up any additional security.

12        But more importantly than that, if you don't think,

13   Judge--and I know you do, because I know the Court well, this

14   Court well--that this whole process hasn't scared the bejesus

15   out of the client, who may not have understood the

16   potentiality of a witness, this may be the case with others,

17   but you could well understand that this is quite an event for

18   somebody like Mr. Hamilton.

19        So I think your concern really that there aren't -- that

20   he -- that there's no chance that he would obey is really

21   broad, honestly.  But there is that.

22        The third thing is, the condition that we can also

23   impose, that other than his family and those who are his

24   friends, other than an expansive list I'll work out with the

25   Government of not only who is or might be a witness, or

1    anybody else,  Mr. Hamilton cannot call anybody other than the

2    people that we define, so that there is no ambiguity that you

3    should be worried about that there's a gray area, once we

4    establish with the Government who that might be.

5         And I think that, you know, my being more vigilant -- and

6    I have to take some of the blame, Judge, even though you

7    thought I couldn't answer all of your questions, I answered a

8    fundamental one.  So I would say that if you were not to count

9    the impact that this whole proceeding has had on my client,

10   you're not giving that enough; and if you're not also taking

11   into consideration that if the issue is -- the only thing in a

12   year-and-a-half that this one incident -- I mean, this

13   incident with one person occurred, to put in perspective, we

14   surely can create conditions that will assure you and the

15   Government that Mr. Hamilton, and in this case I, have learned

16   our lesson and can be trusted not to do anything that would

17   give you any concern in the future.

18        And as I said, there could be security, there could be an

19   expansive list, there could be the prohibition about him

20   contacting anybody other than the people that we put on the

21   list--I mean, I don't mean far-flung people calling from

22   California, but people in the Dallas area--he can report on a

23   weekly basis as to who it is that he's speaking with so that

24   that list can be viewed by Pretrial Services.  All that can

25   happen as opposed to the ultimate penalty, especially in the

1   midst of COVID-19, which I really think goes too far, Judge,

2   notwithstanding your ruling.  I think we can do all of that

3   and you should see that all of that is sufficient.

4         THE COURT:  Okay.  I disagree with you, sir.  I

5   don't think either of those remedies would prevent

6   Mr. Hamilton from picking up a phone and calling somebody who

7   isn't cooperating with the Government, and there is no way to

8   know whether or not he is actually doing it.

9         MR. LOWELL:  I hate to interrupt you.

10        THE COURT:  At this point Mr. Hamilton has forfeited

11   the right for me to just believe in his word.  He has

12   blatantly violated an order that was specific in this case.

13   I've already ordered that he not contact certain classes of

14   people, and I believe that he knowingly did that, and I

15   believe he knowingly did that in an attempt to influence

16   someone he knew was a possible witness in the investigation of

17   this case.

18      I'm going to revoke the order setting conditions of

19   release --

20        MR. LOWELL:  Judge, could I just say one more thing,

21   please?  I'm sorry.

22      Because you are finding this on a call that I was the

23   sponsor of, I have to take this blame as well, and --

24        THE COURT:  And you know what?  I agree with that,

25   and I think that I should talk to Chief Judge Lynn about your

1    conduct as well, but that's not what's before me right now.

2    What's before me is Mr. Hamilton's conduct, and --

3              MR. LOWELL:  I understand.  I'm pleading with Your

4    Honor, given the situation of his medical condition, not to

5    take the ultimate step when we could do everything short of

6    that.

7         And you say that there's no way of knowing that he

8    wouldn't pick up the phone.  Yes, there is.  We could require

9    him to make calls only on his cell phone and give you -- or

10   the Pretrial Services Department those records on an everyday

11   basis.  There surely are conditions that you can impose -- if

12   you're concerned --

13             THE COURT:  I disagree with you, and so I'm revoking

14   the order setting conditions of release in this case and I'm

15   ordering that Mr. Hamilton be detained.  Of course you have

16   the right to appeal me and you know how to do that.

17             MR. LOWELL:  Can I ask you, given that there's no

18   risk for the moment, to stay that so we can bring it to Judge

19   Lynn and not require him on a Friday in the midst of the COVID

20   crisis to detain him at this point, so that we have an

21   opportunity to quickly bring it forward and we promise we

22   will?

23             THE COURT:  In light of the fact that it took the

24   Government six months to bring this to my attention, I will

25   grant the stay of my order.

1          MR. WIRMANI:  Your Honor, can I approach alone?

2          THE COURT:  Okay.

3          MR. LOWELL:  Judge, we will file no later than

4     Monday.

5          I'm sorry.  Why is there an ex parte?

6          (Discussion at the bench, out of the hearing of the

7          reporter.)

8          MR. LOWELL:  I promise I will do this promptly.

9          THE COURT:  Okay.  I'm granting your motion for a

10    stay and I'm staying my order pending you filing an appeal and

11    that appeal being heard.  So I'm staying my order for 14 days,

12    unless you file an appeal, and if you file an appeal, I'm

13    staying my order until Judge Lynn has had an opportunity to

14    review it.

15         MR. LOWELL:  Thank you, Judge.

16         THE COURT:  Anything else we need to do today?

17         MR. WIRMANI:  Not from the Government, Your Honor.

18         MR. MELSHEIMER:  Thank you, Your Honor.

19                    (End of hearing.)

20

21

22

23

24

25

1          I HEREBY CERTIFY THAT THE FOREGOING IS A

2     CORRECT TRANSCRIPT FROM THE RECORD OF

3     PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4     I FURTHER CERTIFY THAT THE TRANSCRIPT FEES

5     FORMAT COMPLY WITH THOSE PRESCRIBED BY THE

6     COURT AND THE JUDICIAL CONFERENCE OF THE

7     UNITED STATES.

8

9     S/Shawn McRoberts                07/17/2020

10    _____DATE_____
      SHAWN McROBERTS, RMR, CRR
11    FEDERAL OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25