IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:19-cr-083-M-1 |
| | ) | Chief Judge Barbara M. G. Lynn |
| RUEL M. HAMILTON | ) | |

# MR. HAMILTON'S OBJECTIONS TO
# THE MAGISTRATE JUDGE'S PRETRIAL DETENTION ORDER

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1901 L Street, N.W.
Washington, DC 20036
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Mark S. Werbner, Bar. No. 21179700TX
Dion J. Robbins, Bar No. 24114011TX
WINSTON & STRAWN LLP
2121 N. Pearl Street Suite 900
Dallas, Texas 75201
MWerbner@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

## INTRODUCTION

Pursuant to 18 U.S.C. § 3145(b), Mr. Hamilton objects to Magistrate Judge Toliver's Order dated July 17, 2020 revoking his pretrial release, and he appeals to this Honorable Court to maintain or revise the terms of his pretrial release as appropriate. (Dkt. 234.)

The basis for the prosecution's motion to revoke is a miscommunication. Defense counsel asked Mr. Hamilton to contact a former employee to make an introduction and let her know that defense counsel would like to interview her regarding an issue separate from the superseding indictment. He did so without appreciating that the prosecution had made a late identification of that former employee as a witness subject to a no-contact rule. Mr. Hamilton should not be detained pending trial for this mistake, particularly when his trial is over three months away, and detainees are at a significant and dangerous risk due to the rampant spread of COVID-19 in correctional facilities.[1] Given Mr. Hamilton's previous battle with metastasized cancer, which has left him debilitated and with lungs scarred by chemotherapy and a damaged coronary system, sending him to jail in the midst of a global pandemic would pose a serious risk to his life. (Dkt. 223-2.) Pretrial detention of Mr. Hamilton is not warranted under these circumstances.

---

[1] Bill Chappell, *California will release up to 8,000 prisoners due to Coronavirus*, NPR (July 10, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/07/10/889861014/california-will-release-up-to-8-000-prisoners-due-to-coronavirus; Emily Hoerner, *Hundreds of Illinois prisoners released as COVID-19 spreads, but few elderly see reprieve*, Injustice Watch (May 6, 2020), https://www.injusticewatch.org/news/prisons-and-jails/2020/hundreds-of-illinois-prisoners-released-as-covid-19-spreads-but-few-elderly-see-reprieve/; Nick Givas, *Over 16K U.S. inmates have been released as coronavirus crisis has progressed*, Fox News (Apr. 16, 2020), https://www.foxnews.com/us/here-is-how-many-prisoners-have-been-released-covid-19.

I.     BACKGROUND

Mr. Hamilton acknowledges that he erred in contacting his former employee, Leslie Martin. The background is important. In late December the prosecution informed Mr. Hamilton and counsel that they were going to bring a substantive superseding indictment and also informed them that they were now looking at a completely different issue—payroll tax—which had never been raised before. Mr. Hamilton identified the people within and outside of his company with knowledge of the subject. Counsel reached out to these people to acquire information and Martin did not respond.

At the time Mr. Hamilton called Martin, he was unaware that the prosecution had added her to the witness list just three weeks prior.[2] One can see from the transcripts of the conversations that Mr. Hamilton never mentioned issues in the case—dealings with Carolyn Davis, Dwaine Caraway, or campaign checks in which Martin's name was written in a memo line.

Mr. Hamilton made his purpose for contacting Martin known in his initial voicemail message to her on January 8, and when they finally spoke on January 13: (1) to inform Martin—who during her employment was in charge of making AmeriSouth's 941 tax payments—that the government was looking into AmeriSouth's 2010 payroll tax delinquency (Dkt. 227-2), (2) to offer Martin indemnified counsel as he was doing for other AmeriSouth employees (Dkt. 227-2), and (3) to ask if she would be willing to meet with his counsel (Dkt. 227-3.)

When Mr. Hamilton reached Martin on January 13, he merely elaborated on the three points above. In response to questioning from Martin asking why she might need indemnified

---

[2] The prosecution sent an email to the Court and defense counsel on December 18, 2019 updating its witness list based on the superseding indictment. (Dkt. 227-1.) In the rush to deal with the superseding indictment, status conference, motion to continue, and end of the year events, defense counsel failed to communicate to Mr. Hamilton that Martin had been added to the witness list prior to Mr. Hamilton's contact with her.

counsel, Mr. Hamilton noted that the FBI can be "very intimidating" (Dkt. 227-3 at 7) and explained that "the FBI has been – has contacted and reached out to a number of our employees . . . and you know, like, showing up at their door, calling them, and so forth." (*id.* at 5).  In making this statement, Mr. Hamilton was referencing the experience of one of his current employees, who had FBI agents show up at her house after dark, refusing to leave until she finally called the local police.

And when Martin called Mr. Hamilton on January 22,[3] Mr. Hamilton again explained the reason for his call, stating, "the only reason that I even reached out to you is because [the prosecution] raised [the payroll tax] issue with my attorney." (Dkt. 227-4 at 3.)  It was only after Martin questioned why she would need any attorney if she had done nothing wrong that Mr. Hamilton warned—speaking from his own experience—that "the mere fact that you did nothing wrong does not keep you out of trouble with [the government]." (Dkt. 227-4 at 14.)  In his contact with Martin, Mr. Hamilton showed respect for the rules.  As the prosecution points out, "[Mr.] Hamilton carefully framed the conversation with disclaimers that Martin was free to speak with the FBI and that he was not telling her to refuse to be interviewed." (Dkt. 227 at 3.)

## II. STANDARD OF REVIEW

"When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions for release." *United States v. Rueben*, 974 F.2d 580, 585-86 (5th Cir. 1992) (citing *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985)); *United States*

---

[3] This third contact was done by Martin under FBI supervision after Mr. Hamilton had stated his reasons for calling in the earlier contacts.

3

*v. Baltazar Novoa*, No. 3:16-CR-536-L, 2019 WL 1040722, at *2 (N.D. Tex. Mar. 5, 2019) (citations omitted).

## ARGUMENT

I.     **18 U.S.C. § 3148(B) IS NOT SATISFIED**

Under 18 U.S.C. § 3148(b):

[A] judicial officer shall enter an order of revocation and detention if, after a hearing, the judicial officer

> (1) finds that there is . . .
>
>> (B) clear and convincing evidence that the person has violated any other condition of release; and
>
> (2) finds that—
>
>> (A) . . . there is no condition or combination of conditions of release that will assure that the person will not flee or pose a danger to the safety of any other person or the community; or
>>
>> (B) the person is unlikely to abide by any condition or combination of conditions of release.

*See United States v. Moreno*, 857 F.3d 723 (5th Cir. 2017).

### A.     Mr. Hamilton is Not a Flight Risk or a Danger to the Community

The government does not claim that Mr. Hamilton is a flight risk, and the claim that he poses a danger to the community is overblown. Although Magistrate Judge Toliver's Order found that "there is no condition or combination of conditions the Court could impose that would reasonably assure the safety of the community or another person," the record proves otherwise.[4]

---

[4] Defense counsel was recently made aware of the Government's *ex parte* filing regarding Mr. Hamilton's communication with the former employee. If counsel had been made aware of the *ex parte* filing, counsel could have and would have addressed these issues. Mr. Hamilton was prejudiced by not being made aware that the Court was considering information outside the record and addressing issues about which the government had made its presentation without the context of those events.

(Dkt. 234.) In preparation for a trial in which the prosecution has identified 64 witnesses, the prosecution claims Mr. Hamilton made an improper contact with a single witness—a late addition to the witness list that Mr. Hamilton did not realize had been made. The record is also clear that, in the six months between that contact and the government's motion (which Mr. Hamilton did not know was coming or that an inquiry was being made or *ex parte* submissions had been filed), he neither made any additional contacts with any witness nor violated any other condition of release.

In offering to indemnify Martin's retention of counsel, Mr. Hamilton was careful to tell the witness that she was free to speak with the government.[5] Thus, the record does not demonstrate either a willful violation or an on-going problem. Since the first indictment was filed 17 months ago, Mr. Hamilton has complied with all conditions of release that were known to him, with his only instance of non-compliance due to a miscommunication from his counsel.

Now that Mr. Hamilton is aware of the full witness list, there is no reason to fear that he will make any improper contact. The fact that this was an isolated event should assure the Court that Mr. Hamilton will comply with all the conditions of his release.

### B. Mr. Hamilton Will Abide by Conditions or Combinations of Conditions on Release

To revoke Mr. Hamilton's pretrial release under subsection (2)(B), the Court must find that Mr. Hamilton is unlikely to abide by *any* condition or combination of conditions of release. This

---

[5] Dkt. 227-3 at 5 ("If the FBI contacts you and you want to speak to them, you can. You don't have to. You can get Counsel."); Dkt. 227-4 at 5-6 ("[T]hey can't make you talk to them. You can if you want to . . . . I can't tell you not to talk to them. . . ."); *id.* at 11 ("If you want to speak to them, you can."); *id.* at 12 ("So – but again, if you want to talk to them, you can. If you don't want to, you don't have to."); *id.* at 14 ("It's up to you [whether you talk to the government]. Now, you can decide whether you want to or – or not."); *id.* at 15-16 ("You know, if – if they reach out to you, you can, like I said, you can talk to them if you want or you can say let me get with my attorney and get back with you and you can decide what you want to do.").

is a high bar—if there is *one* set of conditions that Mr. Hamilton would abide by, the Court should not revoke his pretrial release.

Should the Court have any concern about future compliance with the conditions of release, even after the seriousness of his mistake has been so impressed on him from the proceedings and Magistrate Judge Toliver's order, the Court could impose a new and additional condition restricting Mr. Hamilton from discussing the case *with anyone,* other than his attorneys and immediate family. Indeed, this type of restriction would have prevented the violation at issue here. Adding a condition to the terms of his release preventing him from discussing his case with anyone other than his attorneys or immediate family would eliminate any confusion as to whom he may discuss his case.

If the Court does not find that adding the above-mentioned condition would be sufficient, it could impose a number of other conditions, including but not limited to:

- Requiring that any outreach to potential defense witnesses occur through defense counsel;

- Requiring Mr. Hamilton to periodically sign an affidavit, under penalty of perjury, that he has not contacted any witnesses in the case;

- Requiring Mr. Hamilton to keep a log of his daily phone calls and in-person communications with non-family members (excluding casual/non-substantive conversations);

- Requiring that Mr. Hamilton periodically turn over his cell phone records to his pretrial supervising officer;

- Requiring that Mr. Hamilton periodically turn over his business phone records to his pretrial supervising officer.

Given that this is Mr. Hamilton's first and only violation of the terms of his release, and this violation was not done willfully, the Court should find that some combination of conditions will assure Mr. Hamilton's compliance. *See United States v. Wolcott*, 2009 WL 1974753, at *2

(M.D. Tenn. July 8, 2009) (finding that 18 U.S.C. § 3148(b)(2)(B) was not satisfied when the defendant had an encounter with his co-defendant outside the courtroom in violation of the terms of his pretrial release); *United States v. De Castro-Font*, 587 F.Supp.2d 364, 369 (D.P.R. 2008) (finding that 18 U.S.C. § 3148(b)(2)(B) was satisfied and revoking the defendant's bail only after the defendant continued to contact a witness after a warning by the court).

II. **MR. HAMILTON'S PRETRIAL RELEASE REVOCATION IN THE MIDST OF THE COVID-19 PANDEMIC IS DISPROPORTIONATE TO THE NATURE OF THE VIOLATION**

Magistrate Judge Toliver made no mention of the consequences of a revocation during the coronavirus pandemic, for an individual who is in many risk categories, when authorities are finding ways to release prisoners from jail, even those who have been convicted. Just yesterday, Dallas County reported 30 new COVID-19 deaths, the highest single-day death toll since the pandemic began.[6] Jails and prisons have been identified by healthcare experts as hotbeds for the coronavirus, and the federal correctional institution Seagoville has more than 1,100 prisoners that have tested positive for COVID-19 and one death.[7] Additionally, Seagoville prison has the largest

---

[6] Aria Jones and Dana Branham, *Dallas County Reports Record 30 New Coronavirus Deaths, 413 Cases*, The Dallas Morning News (July 22, 2020), https://www.dallasnews.com/news/public-health/2020/07/22/dallas-county-reports-record-30-new-coronavirus-deaths-413-cases/?utm_source=Newsletter&utm_medium=email&utm_content=BREAKING%3A+Dallas+County+reports+record+30+new+coronavirus+deaths+Wednesday&utm_campaign=CoronavirusBreakingNews_07222020.

[7] *See* Timothy Williams, Benjamin Weiser, and William Rashbaum, *'Jails are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars*, New York Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html; *see also* Centers for Disease Control and Prevention, *COVID-19 in Correctional and Detention Facilities - United States, February - April 2020* (May 15, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/mm6919e1.htm?s_cid=mm6919e1_w (acknowledging that correctional "facilities face significant challenges in controlling the spread of [COVID-19]" due to high turnover rates, daily entry and exit of staff members, crowded living conditions, shared lavatories, and limited medical and isolation resources); Sophia Beausoleil, *Families Worried About Loved Ones in COVID-19 Outbreak at Federal Prison in Seagoville*,

7

COVID-19 outbreak of any federal prison in the country.[8] As the Court will recall, Mr. Hamilton's primary care provider has concluded that Mr. Hamilton's age and complex medical history "place him in a high-risk category for complications and death related to COVID-19." (Dkt. 223-2.)

## CONCLUSION

Mr. Hamilton respectfully requests that he be allowed to appear before the Court so that he can address the issue in person. He accepts responsibility for the miscommunication and respectfully requests that this Court revoke or amend Magistrate Judge Toliver's order revoking his pretrial release and revise his terms of release as the Court deems appropriate.

Dated:  July 23, 2020

Respectfully submitted,

/s/ Abbe David Lowell

| | |
|---|---|
| Abbe David Lowell, Bar No. 358651DC | Mark S. Werbner, Bar. No. 21179700TX |
| Christopher D. Man, Bar No. 453553DC | Dion J. Robbins, Bar No. 24114011TX |
| Kaitlin A. Pierce, Bar No. 242020DC | WINSTON & STRAWN LLP |
| WINSTON & STRAWN LLP | 2121 N. Pearl Street Suite 900 |
| 1901 L Street, N.W. | Dallas, Texas 75201 |
| Washington, DC 20036 | MWerbner@winston.com |
| ADLowell@winston.com | 214-453-6100 (ph) |
| 202-282-5000 (ph) | 214-453-6400 (fax) |
| 202-282-5100 (fax) | |

*Counsel for Defendant Ruel M. Hamilton*

---

NBCDFW (July 20, 2020), https://www.nbcdfw.com/news/coronavirus/families-worried-about-loved-ones-in-covid-19-at-federal-prison-in-seagoville/2410048/.

[8] Sophia Beausoleil, *Families Worried About Loved Ones in COVID-19 Outbreak at Federal Prison in Seagoville,* NBCDFW (July 20, 2020), https://www.nbcdfw.com/news/coronavirus/families-worried-about-loved-ones-in-covid-19-at-federal-prison-in-seagoville/2410048/.

8

**CERTIFICATE OF SERVICE**

I certify that on July 23, 2020, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

/S/Abbe David Lowell<br>
Abbe David Lowell