IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:19-cr-083-M-1 |
| | ) | Chief Judge Barbara M. G. Lynn |
| RUEL M. HAMILTON | ) | |

## MR. HAMILTON'S TRIAL BRIEF

Abbe David Lowell, Bar No. 358651DC
Christopher D. Man, Bar No. 453553DC
Kaitlin A. Pierce, Bar No. 242020DC
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, DC 20036
ADLowell@winston.com
202-282-5000 (ph)
202-282-5100 (fax)

Dion J. Robbins, Bar No. 24114011TX
WINSTON & STRAWN LLP
2121 N. Pearl Street, Suite 900
Dallas, TX 75201
DRobbins@winston.com
214-453-6100 (ph)
214-453-6400 (fax)

*Counsel for Defendant Ruel M. Hamilton*

## INTRODUCTION

Mr. Hamilton submits this trial brief to highlight issues for the Court that he believes are likely to arise at trial.

## I.    *JAMES* HEARING – CO-CONSPIRATOR HEARSAY ISSUES

The Court had scheduled a *James* hearing for June 8, 2020.  Before the hearing, the Court ordered the prosecution to "*proffer the statements it plans to offer* under Rule 801(d)(2)(E) and *the evidence it will offer* to convince the Court of the existence of a conspiracy."  (Dkt. 118 at 2 (emphasis added).)  The Court clarified that the prosecution should provide in advance of the hearing the out-of-court statements it intends to offer and a list of witnesses that it intends to call. (Dkt. 189.)  In doing so, the Court made clear:

> While the content of such statements must be considered, the Government cannot establish admissibility based on the statements alone.  *United States v. Fairley*, 880 F.3d 198, 213 (5th Cir. 2018).  "There must be 'independent evidence' establishing the conspiracy."  *United States v. Nelson*, 732 F.3d 504, 516 (5th Cir. 2013) (internal citation omitted).

(Dkt. 118 at 4.)

Nevertheless, the prosecution never offered any independent evidence of a conspiracy (e.g., a witness or material other than a list of out-of-court statements themselves) or called any witnesses whatsoever.[1]  Instead, the government filed a proffer claiming that it could prove what is alleged in the Factual Resumes to Davis' and Scroggins' guilty pleas (even though the Factual Resumes

---

[1] Making it even more onerous to resolve evidence issues before trial through a *James* hearing, in addition to not offering any independent evidence of a conspiracy or seeking to justify the invocation of the co-conspirator hearsay exception, the government claimed it has unspecified other evidence of a conspiracy that it will seek to introduce at trial (Dkt. 190 at 4), that its proffer "is not intended to contain all the statements the government may offer at trial" (*id.* at 14), claims the statements' "admissibility on other grounds must be considered on a case-by-case basis at trial" (*id.* at 3), and that it believes Davis' guilty plea will be corroborated by "the anticipated testimony of Scroggins" without even identifying what that testimony will be or calling him as a witness at the hearing (*id.* at 9).  This too did not conform with the Court's order to produce *all* statements.

to guilty pleas are plainly and admittedly inadmissible under the Confrontation Clause). The defense submitted a response addressing why the list of statements did not satisfy the standard for admissibility under the co-conspirator hearsay exception. (Dkt. 192.) To date, the prosecution never responded and has not met its pre-trial burden of establishing that any conspiracy existed from which any relevant statements "in furtherance of" could be made.

The whole purpose of the pre-trial *James* hearing is to decide the admissibility of such statements and evidence *before* trial so all parties would know how to prepare for trial and the trial itself could proceed smoothly. Having not met its burden nor followed the Court's direction, the prosecution has failed to meet its burden and the Court should exclude any statement that depends on the co-conspirator hearsay exception. To do otherwise, and let the prosecution wait until trial to identify the statements it seeks to introduce, how, and why those statements qualify under the exception would render the *James* hearing a pointless exercise, deny the defense notice of what evidence to prepare for, and prolong an already lengthy trial in the midst of efforts to shorten it.

Toward the end of the *James* hearing, the Court explained that it would take the issues of whether the prosecution had established a conspiracy and whether to admit any of the statements (and, if so, which ones) the prosecution sought to introduce as co-conspirator statements in furtherance of the alleged (and unproved) conspiracy "under advisement." (6/8/20 Tr. at 26.). This remains an important, open issue but one for which the prosecution has not followed the Court's directions or requirements of the caselaw.

## II.    JURY INSTRUCTION ISSUES

### A.    The Requirement For A *McDonnell* Instruction On "Official Acts"

Mr. Hamilton has argued that the Supreme Court's interpretation of the phrase "official act" in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), is relevant to this Indictment charging

substantive and a conspiracy to commit Section 666 bribery, and a violation of the Travel Act predicated upon a violation of Texas bribery law. The prosecution agrees. (Dkts. 113 at 7; 177 at 8.) Nevertheless, this Court – we respectfully suggest incorrectly – rejected this proposition on grounds that were not even advanced by the prosecution. (Dkt. 216 at 7.)

In short, the Court's error is two-fold. First, the Court concludes that the phrase "official act" as used in the federal bribery statute, 18 U.S.C. § 201, is inapplicable to Section 666 or the Travel Act because the phrase does not appear in either statute. Nevertheless, the concept of an "official act" is inherent in every bribery cases, as it reflects the alleged *quo* to be performed by the public official in exchange for the bribe. Second, and addressed in more detail below, the Court's current ruling did not address that "official acts" *is* the phrase used and charged throughout the indictment itself in framing the alleged crimes and, as such, must be proven, as even the prosecution acknowledges.

The *McDonnell* decision itself demonstrates the need to define "official act" in bribery cases where that phrase is not used in the statute, as the phrase did not appear in the statute charged in *McDonnell* either (honest services fraud). This Court has followed *McDonnell* in this respect as well. In *United States v. Price*, this Court appropriately gave a *McDonnell* instruction with respect to the conspiracy to violate Section 666 charge (there was no substantive Section 666 charge) and a separate instruction for "official acts" in accordance with *McDonnell* when defining bribery under Texas state law, even though Texas state law also does not use the phrase "official acts." *United States v. Price*, No. 3:14-cr-293-M, Dkt. 518 at 13, 16-17 (N.D. Tex. Apr. 18, 2017) (jury instructions).[2] The crux of any bribery offense is a public official selling their "official acts,"

---

[2] With respect to the Section 666 conspiracy charged in *Price*, the Court instructed: "The following actions performed or agreed to be performed by the public official, without more, are not sufficient to establish guilt on this count: setting up a meeting, hosting an event, talking to another official,

so an "official act" in some form will be at issue in every federal prosecution under whatever statute.  Without such an act properly alleged and charged, there is no offense.

The Court's treatment of Section 666 is incomplete.  The Court notes that Section 666 does not use the phrase "official act," but instead requires that the improper payment be "in connection with any business, transaction of series of transactions."  (Dkt. 216 at 6.)  But the Court omits the three critical statutory words that follow – "of such organization," in other words the business, transaction and series of transactions must be of the federally-funded organization.  18 U.S.C. § 666(a)(1)(B).  Where, as here, that organization is a state or local government entity (here the Dallas City Council), the business or transactions of such organizations will be "official acts" of the government.  Bribing a public official for some personal act (e.g., the sort of things *McDonnell* explained were not "official acts," such as making a call expressing support, scheduling or attending a meeting, etc.) was not a crime.  Section 666 is triggered by bribery concerning the government's business or transactions – a subset of "official acts" (e.g., a Dallas City Council vote to honor some favorite Dallas son or daughter by issuing a Proclamation declaring a day to be "John Doe Day" or "Jane Doe Day" would be an official act, but in no sense business or a transaction).

*McDonnell* further illustrates the flaw in the Court's reasoning.  The prosecution there arose under the honest services fraud statute, 18 U.S.C. § 1346, which as noted above does not contain the words "official act."  But in *Skilling v. United States*, 561 U.S. 358 (2010), the Supreme Court narrowed the honest services fraud statute to reach only bribery and kickbacks.  In doing so, the Supreme Court explained that bribery would not be an ambiguous crime because the

_____

sending a subordinate to a meeting, or simply expressing support for a constituent.  You may, however, consider all of the evidence in determining if a public official entered into a corrupt agreement."  *Price*, Dkt. 518 at 13.

prohibition "draws content . . . from federal statutes proscribing—and defining—similar crimes," while citing to both Sections 201 *and 666*. *Skilling*, 561 U.S. at 412. Accordingly, when the trial court in *McDonnell* looked to define the "official act" that is inherent in any bribery prosecution, it looked to the definition in Section 201. *McDonnell*, 136. S. Ct. at 2365.

Here too, the definition of "official act" provides a broader context for what the alleged *quo* must be, even if the statute at issue such as Section 666 specifies a narrower sub-set of the types of "official acts" that may be actionable (e.g., "business" or "transactions"). To do otherwise, would leave the statute vague and unmoored, raising the very constitutional issues that led the Supreme Court to narrowly construe "official act" in *McDonnell*. *McDonnell*, 136 S. Ct. at 2368. As the Court cautioned, "the Government's expansive interpretation of 'official act' would raise significant constitutional concerns" by creating vague criminal laws, chilling public officials from being responsive to constituents, and improperly involving federal officials in setting standards of good government for state and local governments. *Id.* at 2372. Absent a meaningful and narrow definition, *McDonnell*'s constitutional concern would rise again here.

At a minimum, because constitutional concerns drove the narrow construction in *McDonnell* to exclude such mundane requests as asking a public official to make a phone call or set up a meeting or lobbying a fellow official, any court that expands the reach of an actionable *quo* risks both vagueness, overbreadth and fair notice problems because *McDonnell* itself seemingly drew the outside line. The honest services fraud statute only narrowly survived a vagueness challenge because the majority of the Court moored the definition of "official act" to Section 201. Leaving Section 666 and the Travel Act unmoored from that definition would render Section 666 and the Travel Act unconstitutionally vague. *See, e.g.*, *Skilling*, 561 U.S. at 415

(Scalia, dissenting) (finding Section 1346 unconstitutionally vague even with the majority's limiting instruction).

The second flaw in the Court's conclusion that the definition of "official act" is irrelevant because it is not used in the charging statute is that the phrase "official act" (or its variation) repeatedly is used throughout the Indictment. The grand jury framed the offenses charge in terms of "official acts," and the phrase is used more than a dozen times, so the phrase should be defined in keeping with *McDonnell*. (Indict. Paras. 8, 9, 15, 66, 68 ("official acts"), 11 ("official action"); 13, 58 (actions in "official capacity"); 14, 64 ("official assistance"), 15 ("pattern of official acts . . . which included" four acts); page 12 (subheading "Official Acts by Davis to Benefit Hamilton"); 61 ("votes and other official acts"). Where a Section 666 is charged in terms of "official acts," as the indictment here plainly does, the *McDonnell* definition of that phrase is fully applicable. *United States v. Skelos*, 707 F. App'x 733, 738 (2d Cir. 2017). And while the Court's opinion suggests that *McDonnell* is irrelevant to Section 666, the government – which drafted the Indictment – has *twice conceded* its relevance to this Indictment in response to the very motion at issue: "*Said another way, while the indictment clearly focuses on official government action (that is a reality in the post-*McDonnell *world), the allegations in the indictment and the resulting proof before the jury are not limited to one (or more) official acts.*" (Dkt. 113 at 7; Dkt. 177 at 8 (emphasis added).) Thus, because the Indictment charges "official acts," the prosecution must prove official acts and the jury has to be charged as to what that means.

The Court also cites a series of pre-*McDonnell* cases that are both no longer good law, and that have no applicability to this Indictment as charged. Citing *United States v. Whitfield*, 590 F.3d 325, 348 (5th Cir. 2009), the Court stated that the government is not required to "identify a particular decision that would be influenced at the time the bribe was paid." (Dkt. 216 at 6.) But

*Whitfield*, decided before *Skilling*, is no longer good law in this respect. *Whitfield* interpreted Section 1346 to require "something close to bribery," and it evidently believed the language quoted above would be close enough. *Whitfield*, 590 F.3d at 353 (quoting *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1987) (en banc)). Then, the following year, the Supreme Court in *Skilling* held that Section 1346 required *actual* bribery, not something "close to bribery," and directed that bribery be interpreted consistent with Section 201 and other federal bribery statutes. *Skilling*, 561 U.S. at 412. Since then, the Fifth Circuit has taken this language from *Skilling* to heart in finding that *quid pro quo* bribery is required:

> To define the scope of the honest-services statute's proscription of bribes and kickbacks, the *Skilling* Court directed courts to look to, *inter alia,* federal statutes defining similar crimes, such as 18 U.S.C. § 201(b), the principal federal bribery statute. We follow the Supreme Court's direction in *Skilling* and look to § 201(b) to give substance to the prohibition on honest-services fraud. In *United States v. Valle*, we held that an official may be convicted of bribery under § 201(b)(2) "if he has corruptly entered into a quid pro quo, knowing that the purpose behind the payment that he has ... agreed to receive [ ] is to induce or influence him in an official act, even if he has no intention of actually fulfilling his end of the bargain." 538 F.3d 341, 347 (5th Cir.2008).

*United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016); *see United States v. Grace*, 568 F. App'x 348, 350 (5th Cir. 2014) (explaining that post-*Skilling*, "[h]onest services fraud in the form of bribery requires a *quid pro quo*").

In addition to *Skilling*'s post-*Whitfield* clarification that courts should look to Section 201 in defining actual bribery, the Supreme Court further clarified what bribery means for purposes of Section 201 in *McDonnell*. In sharp disagreement with this Court's claim that the government is not required to "identify a particular decision that would be influenced at the time the bribe was paid" (Dkt. 216 at 6), the Supreme Court explained in *McDonnell*, the government must prove "the public official agreed to perform an 'official act' *at the time of* the alleged *quid pro quo*," and that "official act" "must be something *specific and focused* that is 'pending' or 'may by law be brought'

before any public official." *McDonnell*, 136 S. Ct. at 2371, 2374 (emphasis added); *see id.* at 2365 ("[T]he offense is completed at the time when the public official receives a payment in return for his agreement to perform *specific* official acts. . . .") (emphasis added) (quoting *Evans v. United States*, 504 U.S. 255, 268 (1992)).  The government must prove the public official took an action, or agreed to do so, "on" that specific question.  *McDonnell*, 136 S. Ct. at 2368; *see Sun-Diamond*, 526 U.S. at 406 ("The insistence upon an 'official act,' carefully defined, seems pregnant with the requirement that some particular official act be identified and proved.").

The vast majority of so-called "official acts" identified in the Superseding Indictment are not sufficient in the post-*McDonnell* jurisprudence and should be dismissed before or after the government rests as a matter of law, but the defense ought to at least be able to make the case to the jury that the standard set by the Supreme Court in *McDonnell* have not been met.  Caraway following up to simply request for the mayor to put an issue on an agenda is precisely the type of act outside the definition in *McDonnell*, and the unnamed act Caraway was to take in whatever capacity sometime in the future on Eleventh Street is far too speculative to count either.  (Dkt. 159 at 20-24.)

"Calling another public official" and "expressing support" do not constitute official acts. *McDonnell*, 136 S. Ct. at 2368, 2371.  Thus, Caraway's agreement to call the mayor about placing an item on the DCC agenda would not count as an official act for this reason either.  The same is true of the so-called "official acts" of Davis seeking support from other public officials and agreeing to lobby the TDHCA.  To put this issue in sharp focus, the Sixth Circuit just found a jury instruction error *in a Section 666 case* based on *McDonnell* because the jury was to convict on a similar theory to the one the prosecution advances here.  *Dimora v. United States*, 973 F.3d 496 (6th Cir. 2020).  Even in this pre-*McDonnell* tried case, there was an "official act" instruction, but

the jury was instructed that an "*'official action' includes the exercise of both formal official influence (such as a public official's votes) and informal official influence (such as a public official's influence on other public officials).*"   *Id.*   at 501 (italics by Sixth Circuit to highlight problematic language).  The Sixth Circuit noted that *McDonnell* clarified "that 'official acts' are limited to 'formal exercise[s] of governmental power.'"   *Id.* (quoting *McDonnell*, 136 S. Ct. at 2368).  Pointing specifically to the instruction language "that official action 'includes' the exertion of 'informal official influence such as a public official's influence on other public officials,'" the court rejected the government's claim this instruction was consistent with *McDonnell* as "wishful thinking." *Id.* at 504.  The Sixth Circuit vacated the judgment and remanded for the district court to conduct harmless error analysis.  The dissenting judge from the remand decision agreed that "[t]here is no question that the district court erroneously instructed the jury in light of *McDonnell*," and would have gone farther to conclude the error was not harmless."   *Id.* at 507 (Merritt, J., dissenting).  The U.S. Department of Justice conceded a similar error before the Second Circuit.  *See United States v. Boyland*, 862 F.3d 279, 290 (2d Cir. 2017) (government conceding that jury instructions on honest services fraud and Hobbs Act counts that treat a public official "lobbying other governmental agencies, and advocating for his constituents" as an official act is erroneous under *McDonnell*); *see also United States v. Silver*, 864 F.3d 102m 118 n.84 (2d Cir. 2017) (noting *Boyland* rejected jury instructions permitting a conviction based on one public official lobbying another); *United States v. Skelos*, 707. F. App'x 733, 738 (2d Cir. 2017) (reversing Section 666 conviction where jury was told making calls or meeting with lobbyists could count as official acts).  It is unclear why the prosecution here continues to advance a theory of guilt that it surely knows is indefensible on appeal (and that DOJ likely would not defend as in *Boyland*), but Mr. Hamilton should be able to get instructions to the jury that will help the jurors appreciate the error as well.

### B.     A *Quid Pro Quo* Instruction Is Required

Although it is clear that the Supreme Court has held that bribery under Section 201 and Section 1346 requires *quid pro quo* bribery, the Court nevertheless stated that "the Fifth Circuit has never held that § 666 is limited to *quid pro quo* bribery, as Hamilton argues."  (Dkt. 216 at 5.) But, the Fifth Circuit has done just that, and, in addition, such a definition is required with respect to the Travel Act count because there is no dispute that the Texas predicate offense of state bribery requires a *quid pro quo*.  (Dkt. 158 at 22-23.)

The Fifth Circuit in *Grace* held that Section 666 requires a showing of *quid pro quo* bribery, quoting *United States v. Valle*, 538 F.3d 341, 347 (5th Cir. 2008).  We ask the Court to consider that it too quickly concluded that the Fifth Circuit got it wrong because *Grace* was "misquoting *Valle* as describing § 666, in a section of the opinion addressing a conviction under 18 U.S.C. § 1346." (Dkt. 26 at 5 n.4.)  The Fifth Circuit literally wrote the following in *Grace*:

> As the Government correctly points out, *Skilling v. United States* holds that honest services fraud under 18 U.S.C. § 1346 encompasses only bribery and kickback schemes.  To define "bribery" and "kickbacks," the Court in *Skilling* directed courts to look to federal statutes defining similar crimes, such as 18 U.S.C. §§ 201 (defining bribery of federal officials) and 666 (defining bribery concerning federally funded entities).  We have interpreted § 666 to mean that a public official can be guilty of bribery "even if he has no intention of actually fulfilling his end of the bargain." [Footnote 12:  *United States v. Valle*, 538 F.3d 341, 347 (5th Cir. 2008).]  The decisive factor is that the public official has "corruptly entered into a quid pro quo, knowing that the purpose behind the payment that he has received, or agreed to receive, is to induce or influence him in an official act."  [Footnote 13: *Id.*]

*Grace*, 568 F. Appx 344, 350 (5th Cir. 2014).

*Grace* accurately described *Skilling* as reading the *quid pro quo* bribery element into Section 1346 based on the bribery requirements in Sections 201 and 666.  Likewise, *Valle* pointed to the same similarities in statutes.  *Valle* noted that the intent "to influence" language of Section 201 was held by the Supreme Court to require *quid pro quo* bribery in *Sun-Diamond*, and it looked

to *United States v. Ford*, 435 F.3d 204 (2d Cir. 2006), which explained that Section 666 used the same "influence" language to connote *quid pro quo* bribery.  *Valle*, 538 F.3d at 346-47.  Analyzing Section 666, *Ford* made clear: "'Intending to be influenced' clearly modifies 'whoever,' i.e. the recipient of something of value.  In short, the recipient must have accepted the thing of value while 'intending to be influenced.'  Or, as the Supreme Court put it plainly in *Sun–Diamond Growers,* there must be a *quid-pro-quo*."  *Ford*, 435 F.3d at 213; *see also United States v. Skelos*, 707 F. App'x 733, 738 (2d Cir. 2017) (explaining that Section 666 bribery, honest services fraud, and Hobbs Act extortion each "requires proof of a *quid pro quo* agreement") (citing *Ford*); *United States v. Sidoo*, 2020 WL 3440990, at *9 (D. Mass. June 23, 2020) (explaining in the context of Section 666 that "[f]or a payment to constitute a bribe, there must be 'a quid pro quo — a specific intent to give or receive something of value in exchange for an official act.'") (quoting *Sun-Diamond*, 526 U.S. at 404–05).  It is immediately after discussing *Ford* and Section 666, that *Valle* quotes *Sun-Diamond* for itself.  Thus, respectfully, the Fifth Circuit in *Grace* did not make a mistake by misquoting *Valle* and it is doubtful that the Fifth Circuit would agree that it made a mistake.[3]

More broadly, the more recent Supreme Court and Fifth Circuit decisions reflect that the concept of a *quid pro quo* is implicit in the definition of bribery itself (which is the offense charged here).  While it is true that some other circuits had suggested that Section 666 may criminalize gratuities or some form of bribery that falls short of *quid pro quo* bribery, *Skilling* and *McDonnell* and *Sun-Diamond* more clearly establish that a *quid pro quo* is necessary for there to be bribery.  Even the Supreme Court's most recent decision to mention Section 666, while noting that

---

[3] Even if the Court believes the Fifth Circuit misquoted its prior opinion or believes the statement to be *dicta*, *Grace* provides considered analysis by the Fifth Circuit and the Court rejected without addressing the arguments laid out in *Grace* and *Valle*.

some courts have construed the statute to reach gratuities, characterized the bribery prong of the statute, as it has been charged here, as requiring *quid pro quo* bribery.  *Bravo-Fernandez v. United States*, 137 S. Ct. 352, 361 (explaining that the First Circuit "held, § 666 proscribes only *quid pro quo* bribes, and not gratuities"), *id.* n. 4 ("Three other Federal Courts of Appeals have considered the question; each has held that § 666 prohibits gratuities as well as *quid pro quo* bribes") (2016).  *Bravo* makes clear what the Supreme Court has now said repeatedly, a charge of bribery requires a *quid pro quo* and that includes bribery under Section 666.  Unlike the Supreme Court in *Skilling*, which directly construes bribery definitions across statutes *in pari materia*, it is unclear why this Court would break from the settled meaning of bribery in the context of Section 666.

The Supreme Court repeatedly has explained "that § 666 'was designed to extend *federal bribery prohibitions to bribes* offered to state and local officials employed by agencies receiving federal funds."  *Sabri v. United States*, 541 U.S. 600, 607 (2004) (emphasis added) (quoting *Salinas v. United States*, 522 U.S. 52, 58 (1997)); *see Salinas*, 522 U.S. at 57 (Section 666 "forbids acceptance of a bribe by a covered official who intends 'to be influenced or rewarded in connection with any business, transaction, or series of transactions of [the defined] organization, government or agency.'"); *see United States v. Shoemaker*, 746 F.3d 614, 623 (2014) ("the unlawful act is that proscribed by § 666, which requires only that the bribe-giver 'corruptly' offer or give a bribe '*with intent* to influence or reward' the agent.").

In stripping a *quid pro quo* from the definition of bribery in Section 666 – and causing a definitional break in the meaning of "bribery" as used in Section 201 (despite identical "to influence" language) and Section 1346, and even the also charged Texas state bribery law – the Court has not left any definitional guidance as to what is necessary to prove bribery.  Not only does *Sun-Diamond* show the need for "to influence" language to be defined as bribery, merely

submitting "to influence" language to the jury would violate the First Amendment as, absent bribery, efforts to influence public officials is protected First Amendment activity.  (Dkt. 160.) And in retroactively defining "bribery" as something other than its settled definition, there is a risk that the scope of the offense will be broadened retroactively in violation of due process and the *ex post facto* clause.

In any event, the government has repeatedly described the alleged indictment as about bribery, again citing the requirement of a *quid pro quo*.  Dkt. 86 at 6 ("Davis signed a six-page factual resume [10] detailing her *quid pro quo* arrangement with Hamilton, in which Hamilton funneled bribes…."); Dkt 113 at 8 (responding to the *quid pro quo* argument as adequately pled and an issue for the jury, not that there is no such agreement); Dkt 142 at 2 (describing Hamilton payments to Caraway as "bribe payments"), at 3 (describing campaign contributions to Davis as made to "increase the bribe benefit" to her); Dkt 184 at 2 (describing Hamilton–Davis relationship as a "bribery scheme"); Dkt 185 at 4 ("bribery in the form of illegal campaign contributions"); Dkt 182 at 3 (campaign contributions were part of the bribery); Dkt 179 at 14 (describing Davis and Hamilton benefits as bribery); Dkt 180 at 7, 10 (Davis payment was a bribe); Dkt 88 at 9 and 10 (acknowledging the defense argues a need to prove *quid pro quo* bribery, and not denying it).[4]

In response to Mr. Hamilton's First Amendment motion, the government conceded that laws restricting campaign finance activities must target *quid pro quo* corruption:  "And further, the *McCutcheon* Court recognized the continuing legitimacy of campaign-finance laws, provided that "[a]ny [such] regulation must [] target what we have called "*quid pro quo*" corruption *or its*

---

[4] Here too, the Court included a pre-*McDonnell* rationale based on *Whitfield* that the level of specificity of the *quid pro quo* does not require identifying the specific *quid pro quo* at the time of the agreement.  (Dkt. 216 at 8-9.)  As shown above, *McDonnell* has superseded that analysis.

*appearance*." *Id.* at 192."  (Dkt 186 at 2.)  *See* Dkt 126 (MTD 6).  The jury should be instructed on the *quid pro quo* requirement that the grand jury charged and both sides recognize as applicable.

### C.    The Need To Define Business And Transactions

Section 666 does not criminalize bribery made in exchange for any official act, but only those official acts that are "in connection with any business, transaction, or series of transactions of such" federally-funded agency to which the allegedly bribed party serves as an agent and that are worth more than $5,000.  18 U.S.C. §666(a)(1)(B) & (2).  Because the terms "business" and "transaction" are key terms in the statute, they should be defined for the jury.  And, as undefined statutory terms, they should be afforded their ordinary meaning as reflected in dictionaries.  *See, e.g.*, *Bostock v. Clayton Cty.*, 140S. Ct 1731, 1738-39 (2020); *Intel Corp. Inv. Pol'y Comm. v. Sulmya*, 140 S. Ct 768, 776 (2020).  Indeed, the Fifth Circuit affirms this Court when it does so. *See, e.g.*, *Encompass Off. Solutions, Inc. v. La. Hlth. Serv. & Indem. Co,*, 919 F.3d 266, 272, n.2 (5th Cir. 2019) (affirming this Court, noting this Court's use of a dictionary to define a statutory term); *Thompson v. Goetzman*, 337 F.3d 489, 490 n.20 (5th Cir. 2003) (affirming this Court, noting "[d]ictionaries are a principal source for ascertaining the ordinary meaning of statutory terms"); *see also Lewis v. Sw. Airlines Co.*, 2018 WL 400775, at *4 (N.D. Tex. Jan. 11, 2018) (Lynn, C.J.) (defining statutory terms consistent with dictionary definitions).

The defense argued in MTD 6 (Dkt.126) that "[t]he common definition of a business" is "[a] commercial enterprise carried on for profit."  *Flava Works, Inc. v. City of Miami*, 609 F.3d 1233, 1239 (11th Cir. 2010) (quoting *Black's Law Dictionary* 211 (8th ed. 2004)); *see Nicolaci v. Anapol*, 387 F.3d 21, 25 (1st Cir. 2004) ("The term 'business,' in its ordinary and common usage, refers to regularly repeated activity for profit.").  "[T]ransaction" is defined as "[a]n act, agreement, or several acts or agreements between or among parties whereby a cause of action or alteration of

14

legal rights occur.  It may involve selling, leasing, borrowing, mortgaging or lending." *Black's Law Dictionary* at 1496 (6th ed. 1990).  "It must therefore consist of an act of agreement. . . in which more than one person is concerned, and by which the legal relationship of such persons between themselves has been altered." *Id.*  Federal criminal statutes similarly define "transaction" by illustration.  "[T]he term 'transaction' includes a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition." 18 U.S.C. §1956(c)(3) (money laundering).  The prosecution never offered a different definition for these terms.

It is true that this Court rejected these definitions of "business" or "transaction" in its June 15 Order (Dkt. 220), but this Court's Order leaves the statute unworkable in terms of jury instructions and the Supreme Court's decision issued the same day in *Bostock v. Clayton County* demonstrates that this Court's analysis is erroneous.  This Court's Order leaves the jury instructions unworkable because, while no one disputes that Mr. Hamilton has offered the common definitions of "business" or "transaction," this Court rejected those definitions as too narrow. Nevertheless, the Court did not provide any substitute definitions as to what those terms mean and – just as importantly – never defined either term in a way in which they hold separate meaning and one term will not subsume the other, rendering it surplusage.

Here, for example, there appears to be no way (and no way has been suggested by the Court or anyone else) to define "business" or "transaction" more expansively without having one term subsume the other, rendering it superfluous.  *Cf. Adams v. Safe Home Sec. Inc.*, 2019 WL 3428776, at *3 (N.D. Tex. July 30, 2019) (Lynn, C.J.) (finding statutory language ambiguous and subject to three potential interpretations and then rejecting one interpretation because it would render other statutory language superfluous); *Greco v. Nat'l Football League*, 116 F. Supp. 3d 744, 750 (N.D. Tex. 2015) (Lynn, C.J.) (defining statutory definitions in accordance with their standard dictionary

meaning and refusing to give them a broader definition as that would render them superfluous).[5] And, left undefined, the jury should ascribe the ordinary meaning to these terms – the very definitions proposed by Mr. Hamilton, so we come full circle in returning to them.

Additionally, we believe the Court's reasoning for rejecting these definitions reflects a misreading of the statute. The Court expresses concern that defining "business" in its ordinary commercial sense would exclude bribes to government officials, as government's do not act commercially. (Dkt. 220 at 3.) This is a mistaken factual assumption. First, the term business, in its ordinary commercial sense, remains applicable to government entities in many contexts. *See, e.g.*, *United States v. Paixao*, 885 F.3d 1203, 1206 (9th Cir. 2018) (noting that the government engages in commercial business, operating courthouse cafeterias and so forth). Second, Section 666 is not confined to the bribery of government officials, but reaches private, federally-funded organizations that operate commercially, including those businesses that are receiving federal stimulus money, universities (in the "Varsity Blues" scandal), and commercial health care providers who take Medicare/Medicaid (*Sabri v. United States*, 541 U.S. 600, 606 (2004)).

---

[5] In *Greco*, this Court rejected the very sort of argument the prosecution makes here. The plaintiffs there sought attorneys' fees under a statute that permitted such claims to be made against an "individual or corporation." These terms were not defined in the statute, and the NFL argued based on standard dictionary definitions that it was not an "individual" because it was not a human being and it was not a "corporation" because it is an unincorporated association. 116 F. Supp. 3d at 749-50. The Court agreed, rejecting arguments that the terms were somehow ambiguous and to construe "individual" or "corporation" so broadly that either term would be made superfluous. *Id.* at 750. And *Greco* was a civil case. Here, that same refusal to broaden standard dictionary definitions is all the stronger due to the rule of lenity and need to provide fair notice. Nobody has so much as proposed an alternative definition of either "business" or "transaction," much less shown how either term could be more broadly defined without subsuming the other term. Just as the Court could not define "individual" as any entity in *Greco* without rendering "corporation" superfluous, the Court could not here define "business" so broadly as to mean anything an entity does without rendering "transaction" superfluous. Of course, if Congress had meant to cover "anything an entity does," Congress would have just said that instead of using the "business" or "transaction" language.

Finally, "business" does not have to do all of the lifting because there is the word "transaction" too, and it includes much of what government officials are bribed to do.  The bulk of Section 666 cases involve a government official being bribed to award a government contract, which would be a transaction.  If Congress meant to reach something more than "business" or "transactions," it would have said so or defined those terms differently.

Finally, the Supreme Court's decision in *Bostock*, issued the same day as this Court's Order, is being heralded as a victory for textualism.  The Supreme Court looked to the definition of "sex" in Title VII to find that it applied to discrimination against people who are gay, lesbian or transgender.  The Court explained:

> This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment.  After all, only the words on the page constitute the law adopted by Congress and approved by the President.  If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives.  And we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations.

(Slip op. at 4.)  The Court turned to dictionaries in defining "the key statutory terms."  (*Id.* at 4-5.) In reaching its conclusion, the Court explained:

> Those who adopted the Civil Rights Act might not have anticipated their work would lead to this particular result.  Likely, they weren't thinking about many of the Act's consequences that have become apparent over the years, including its prohibition against discrimination on the basis of motherhood or its ban on the sexual harassment of male employees.  But the limits of the drafters' imagination supply no reason to ignore the law's demands.  When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest.  Only the written word is the law, and all persons are entitled to its benefit.

(Slip op. at 2.)  In other words, this Court should not deviate from the statute's plain language as if Congress intended something different, particularly when that would result in such a broad reading as to allow on statutory term to swallow the other.  The statute is plenty broad using common definitions.

17

C.     **The Need For First Amendment Instructions**

Section 666, like other bribery statutes, risk being given an unconstitutional sweep absent First Amendment instructions clarifying their limited scope, and this Indictment, which on its face seeks to criminalize First Amendment activity, makes the need for such instructions all the more important.  Section 666 uses the phrase "to be influenced" and Supreme Court has long explained that the "to be influenced" language means bribery.  *See, e.g.*, *United States v. Sun-Diamond Growers of Ca.*, 526 U.S. 398, 404-05 (1997) ("Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act, while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act.  In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act."); *United States v. Birdsall*, 233 U.S. 223, 230 (1914) (explaining the "to be influenced" language refers "to bribe giving"); *see also United States v. Nagin*, 810 F.3d 348, 351 (5th Cir. 2016) (explaining that a conviction under Section 201 requires the defendant to have "corruptly entered into a quid pro quo , knowing that the purpose behind the payment that he has ... agreed to receive [ ] is to induce or influence him in an official act.") (quoting *United States v. Valle*, 538 F.3d 341, 347 (5th Cir. 2008); *United States v. Sidoo*, 2020 WL 3440990, at *9 (D. Mass. June 23, 2020) (explaining in the context of Section 666 that "[f]or a payment to constitute a bribe, there must be 'a quid pro quo — a specific intent to give or receive something of value in exchange for an official act.'") (quoting *Sun-Diamond*, 526 U.S. at 404–05).  The Supreme Court repeatedly has explained "that § 666 'was designed to extend federal bribery prohibitions to bribes offered to state and local officials employed by agencies receiving federal funds."  *Sabri v. United States*, 541 U.S. 600, 607 (2004) (quoting *Salinas v. United States*, 522 U.S. 52, 58 (1997)); *see Salinas*, 522 U.S. at 57 (Section 666 "forbids acceptance of a bribe by a covered official who intends 'to be

18

influenced or rewarded in connection with any business, transaction, or series of transactions of [the defined] organization, government or agency.'"); *see United States v. Shoemaker*, 746 F.3d 614, 623 (2014) ("the unlawful act is that proscribed by § 666, which requires only that the bribe-giver 'corruptly' offer or give a bribe '*with intent* to influence or reward' the agent.").

Without the clarification that an intent to influence means bribery, the jury could mistake than *any* intent to influence would violate the statute, which is not what Congress intended and would violate the First Amendment.  The Supreme Court has clarified that Congress has no power to prohibit a citizen's attempt to influence public officials, except in the case of *quid pro quo* bribery. In *McCutcheon v. FEC*, 134 S. Ct. 1434 (2014), the Supreme Court explained "the possibility that an individual who spends large sums of money may garner 'influence or access to' elected officials or political parties. . . does not give rise to such *quid pro quo* corruption."  *Id.* at 1450-51. Accordingly, "the Government may not seek to limit the appearance of mere influence or access." *Id*. at 1451.  The Supreme Court has explained that efforts to influence and obtain access to elected officials cannot be prohibited due to the First Amendment:

> The fact that speakers *have influence over and access to* elected officials does not mean that these officials are corrupt: "*Favoritism and influence* are not . . . avoidable in representative politics.  It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies.  It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate *will respond* by producing those political out comes the supporter favors.  Democracy is premised on *responsiveness*."  Reliance on a "generic *favoritism or influence theory* . . . is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle."

*Citizens United v. FEC*, 558 U.S. 310, 359 (2010) (quoting *McConnell v. FEC*, 540 U.S. 93, 296-97(2003) (emphasis added)).  The Court emphasized: "Ingratiation and access, in any event, are not corruption." *Id.* at 360.  The prosecution agrees:  "And further, the *McCutcheon* Court recognized the continuing legitimacy of campaign-finance laws, provided that "[a]ny [such]

19

regulation must [] target what we have called "*quid pro quo*" corruption *or its appearance*." *Id.* at 192." (Dkt 186 at 2.) *See* Dkt 126 (MTD 6).

Even more recently, the Supreme Court distinguished legislative campaigns, where "politicians are expected to be appropriately *responsive* to the preferences of their supporter" and it is expected that an elected legislator (unlike a judge) will provide "*special consideration*" to his supporters. *Williams-Yulee v. The Florida Bar*, 135 S. Ct. 1656, 1667 (2015) (emphasis added). Justice Ginsburg added: "'Favoritism,' *i.e.*, partiality," may be "inevitable in the political arena." *Id.* at 1674 (Ginsburg, J., concurring); *see also* ("'Favoritism and influence' are inevitable 'in *representative* politics.'") (emphasis in original) (citations omitted). The lower courts have recognized that these decisions have created a sea change in First Amendment law, requiring that inconsistent prior precedents be swept aside. The Ninth Circuit noted these more recent decisions "narrowed the scope of the anticorruption rationale to cover *quid pro quo* corruption only, as opposed to money spent to obtain *influence over or access to elected officials*." *Lair v. Bullock*, 798 F.3d 736, 746 (9th Cir. 2015) (emphasis added). This required the Ninth Circuit to overturn its prior precedent that "relied on a state's interest in combatting 'influence,' whereas *Citizens United* narrowed the analysis to include quid pro quo corruption but to exclude the state's interest in combatting 'influence.'" *Id.* Likewise, the Third Circuit has reiterated that the recent Supreme Court decisions mean "that Congress may take action only to address *quid pro quo* corruption and not 'the appearance of mere influence or access.'" *Lodge No. 5 of the FOP v. City of Philadelphia*, 763 F.3d 358, 379(3d Cir. 2014). To allow prosecutions based on anything less would chill constitutionally protected conduct, such as a supporter's attempt to "garner influence over or access to elected officials," *McCutcheon*, 134 S. Ct. at 1451, or a politician's efforts "to be appropriately responsive to the preferences of [his] supporter," *Williams-Yulee*, 135 S. Ct. at 1667.

There is no denying the fact that many people mistakenly equate the exercise of perfectly legitimate First Amendment activities as corruption, including the sort of making of campaign contributions and cultivating friendships with elected officials that are at issue in this case. These instructions are particularly warranted in this case to avoid prejudice, as the Indictment specifically charges First Amendment activities as bribery. The Court need only look to the jury pool's questionnaires with so many comments about people objecting to the way campaigns are financed (including because of the special consideration donors get).

Respectfully, the Court did not address a major argument the defense raised in MTD 7 (Dkt. 160; First Amendment). To be sure, while the defense believes that bribery cases require careful instructions to avoid infringing upon the First Amendment, the defense readily concedes that actual bribery is not a protected First Amendment activity. The defense has never argued otherwise.

A major concern to the defense with this Superseding Indictment is that it paves a path for conviction that does not depend on bribery at all, but would allow conviction based on purely protected First Amendment activity – the *influence* that comes from campaign or lobbying activity. The Superseding Indictment steps away from just addressing bribery to claiming that Mr. Hamilton provided Davis "bribes *and other things of value.*" (Dkt. ¶7 (emphasis added); *see id.* ¶10 ("bribe payments and other things of value").) And instead of claiming that these "bribes and other things of value" were just in exchange for Davis' official acts while on the Dallas City Council, they also allege that they were "to promote her [Davis'] consulting and lobbying venture on behalf of herself and Hamilton's projects once she was off the Council in June 2015 due to term limits." (Dkt. 139 ¶¶7, 18.) The prosecution claims that Mr. Hamilton helped Davis bundle campaign contributions to others, so that Davis could "establish herself as a consultant and lobbyist once she left the

Council" and "to further Hamilton's political objectives." (Dkt. 139 ¶¶10, 11.)  The prosecution claims that "[f]rom on or about October 2015 to on or about October 2018, Hamilton, as agreed, paid Davis at least $20,000 as a 'consultant' to benefit Hamilton's financial interests." (*Id.* ¶59.)

Consequently, the prosecution has advanced two very different theories of guilt, and one of those theories plainly criminalizes First Amendment activity.  While the First Amendment is no bar to the government trying to prove Mr. Hamilton paid David "bribes" in return for Davis' official acts on the DCC, the jury could reject that theory and still convict Mr. Hamilton of a so-called "conspiracy" to engage in First Amendment activity.

Following the language of Count 1, the jury could mistakenly conclude that there was a criminal conspiracy because Mr. Hamilton agreed to give Davis, not "bribes," but "other things of value."  He did this because he wanted to help Davis "establish herself as a consultant and lobbyist once she left the Council" and "to further Hamilton's political objectives."  (Dkt. 139 ¶¶10, 11.) So, he helped her raise money for other DCC candidates to help her preserve goodwill with those candidates once she left office, and could then have the sort of access that would make her a valuable lobbyist to Mr. Hamilton.  After she left the DCC (and could no longer be bribed to do anything), Mr. Hamilton in fact did hire her to help him as a community consultant, political advisor and lobbyist.  This is simply an agreement to help someone become a lobbyist, which is entirely a First Amendment-protected activity.

If Mr. Hamilton could convince a jury that all of the things he did for Davis was to help her become an effective lobbyist who could help him once she left the DCC, that would be an absolute defense to bribery.  But the Superseding Indictment conveys the false impression that it is a conspiracy.  Adequate jury instructions are necessary for the jury to appreciate that difference.

Dated:  October 26, 2020

Respectfully submitted,

/s/ Abbe David Lowell

| | |
|---|---|
| Abbe David Lowell, Bar No. 358651DC | Dion J. Robbins, Bar No. 24114011TX |
| Christopher D. Man, Bar No. 453553DC | WINSTON & STRAWN LLP |
| Kaitlin A. Pierce, Bar No. 242020DC | 2121 N. Pearl Street, Suite 900 |
| WINSTON & STRAWN LLP | Dallas, TX 75201 |
| 1901 L Street, NW | DRobbins@winston.com |
| Washington, DC 20036 | 214-453-6100 (ph) |
| ADLowell@winston.com | 214-453-6400 (fax) |
| 202-282-5000 (ph) | |
| 202-282-5100 (fax) | |

*Counsel for Defendant Ruel M. Hamilton*

### CERTIFICATE OF SERVICE

I certify that on October 26, 2020, a copy of the foregoing was filed with the Court's electronic case filing system, thereby effecting service on counsel for all parties.

/S/Abbe David Lowell
Abbe David Lowell
